**IN THE UNITED STATES DISTRICT COURT**

**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | **:** | |
| **v.** | **:** | **CRIMINAL NO. 98-00587-01** |
| **LAZARA ORDAZ** | **:** | |

**GOVERNMENT'S RESPONSE IN OPPOSITION TO
DEFENDANT'S MOTION TO REDUCE SENTENCE
PURSUANT TO 18 U.S.C. § 3582(c)(1)(A)(i)**

Defendant Lazara Ordaz seeks compassionate release under 18 U.S.C. § 3582(c)(1)(A)(i). This motion should be denied, because she does not present a health condition identified by the CDC as a risk factor for a more severe outcome from COVID-19.

The government recognizes that Ordaz has been in custody for a long time – she has served 253 months of a 420-month term for leading a drug trafficking organization. It appears that she has exhibited good conduct in recent years, and we commend her for her steps toward rehabilitation. We are particularly impressed by the dedication of and the quality of the submissions by her friend, Jan Schneiderman, who has ably addressed the current circumstances and advocated for Ordaz's release. But we must oppose relief, given that compassionate release, involving the termination of a valid sentence, is an extraordinary measure limited to those cases in which exceptional circumstances, usually medical in nature, exist. Such circumstances are not present here.

# I.     Background.

## A.     Criminal Conduct.

Lazara Ordaz was given an incredible opportunity. In 1980, she was 21 years old, and living in her native Cuba, when she and her three brothers saw a chance for a better life. Amidst political tumult, President Fidel Castro announced that anyone who wanted to leave Cuba could do so, setting off the six-month "Mariel boatlift," when tens of thousands fled the island in search of political freedom and economic opportunity in the United States. Ordaz and her brothers joined them. When she arrived in Florida, she was sponsored by a Catholic organization and relocated to San Jose, California, but she soon moved to Miami, where her family members settled. PSR ¶ 142.

She then rewarded the United States for its welcome by setting off on a nearly two-decade spree of criminal activity that only escalated in severity as the years passed. Beginning in 1981, she repeatedly committed crimes in Florida – carrying a concealed firearm (1981), possession of marijuana (1983), petit theft (1984), possession with intent to sell controlled substance (1988), sale of cocaine (1988), possession of cocaine (1990). PSR ¶¶ 125-130. She incurred only modest penalties, which did not deter her at all.

By 1993, she was living in Philadelphia, and took her criminal activity to a new level. She put together and led an organization that sold millions of dollars' worth of cocaine, between September 1993 and October 1998, in North Philadelphia. The government labeled it the Ordaz Cocaine Organization.

The group distributed in excess of 150 kilograms of cocaine and profited over $3,000,000 from the prolific distribution. To achieve the level of organization required to

conduct such an operation, the defendant hired several subordinates, to include lookouts, street sellers, "caseworkers" or mid-level managers, and an upper-level manager. In addition, her organization utilized an "enforcer," a term used to describe someone tasked with using violence and firearms as a first resort to protect the organization from rival drug dealers or others hostile to the defendant and/or her operation.

The defendant and her subordinates obtained cocaine both from a local source and from Miami, Florida, where the defendant and/or her co-conspirators would travel by car on a weekly basis to obtain at least one kilogram at a time. The defendant utilized stash houses throughout Philadelphia. She marked her drug distribution territory first at the corner of 7th and Tioga streets in Philadelphia, and later down the street at 8th and Tioga Streets. When the defendant became incarcerated as a result of a firearms offense in Philadelphia County (CP9610-0287), she continued to direct her drug trafficking operation from jail, as well as during the time that she was participating in a work release program after her incarceration. Once released from jail, the defendant did not hesitate— again—to keep and carry firearms despite her status as a convicted felon.[1]

_____

[1] Ordaz expresses concern that she is deemed violent as a result of an incident that occurred on August 1, 1996. The PSR recounts: "[W]hile the defendant was standing in the corner of North 7th and W. Tioga Streets, Philadelphia, two individuals went by in a beige automobile and fired shots at her. The defendant returned fire numerous times with her own gun. During the shoot-out, 6-year-old Christina Reyes, who was sitting on the porch of 704 W. Tioga with her mother, received wounds to her head and back and was taken to St. Christopher's Hospital. Another victim in the shootout was 38-year-old Jesus Magobet who was standing at the corner of W. Tioga and Marshall Streets. He suffered a gunshot wound to his left hand and was taken to Temple University Hospital." PSR ¶ 131. Ordaz objects that she did not initiate this gun battle, and was only seeking to protect children in the area. That might be so, but it is also irrelevant. The fact is that she persisted for years in a residential area in plying a deadly trade, arming herself and others

On December 16, 1998, a grand jury sitting in the Eastern District of Pennsylvania returned a 76-count indictment, charging the defendant and 17 others with various offenses relating to drug trafficking and firearms. Specifically, the defendant was charged in 22 counts with the following offenses: conspiracy to distribute more than 150 kilograms of cocaine, in violation 21 U.S.C. § 846 (Count One); use of a communication facility or telephone to facilitate a drug felony, in violation of 21 U.S.C. §843(b) (Counts 33, 37, 40, 41, 44, 47, 49, 50, 54-62, and 64-66); and possession of a firearm by a convicted felon, in violation of 21 U.S.C. § 922(g)(1) (Count 74). The charges were based on the defendant's conduct during a six-year period in which she organized and led the drug trafficking organization.

She pled guilty to all 22 counts. The guideline range was 360 months to life. Judge Brody elected to impose a sentence within but not at the bottom of the range, and imposed a term of imprisonment of 420 months.

The defendant is serving her sentence at FCI Coleman Low, with an anticipated release date of June 20, 2029. Her disciplinary history in custody includes infractions from 2000, 2005, and 2006, which involved being in an unauthorized area, engaging in sexual acts, and using a telephone or mail without authorization. She has engaged in clear conduct during the past 14 years.

---

while they trafficked large quantities of illegal drugs. What happened on August 1, 1996, was a natural result of that.

### B.     Request for Compassionate Release.

The defendant asserts that she is deserving of compassionate release because: (1) her case presents extraordinary and compelling reasons supporting her release; (2) she will not pose a danger if released; and (3) the 3553(a) factors support her release. Def.'s Mot. at 5. The defendant has also alleged the following: the conditions at Coleman have reached a "crisis" stage; BOP's conclusion denying relief is "wrong"; she meets the Attorney General's criteria set forth in his memoranda to BOP regarding transfers to home confinement; her sentence was calculated "incorrectly" and "may be lower" under the 2018 sentencing guidelines; the defendant has self-rehabilitated while incarcerated; and BOP's response to COVID-19 is ineffective and contrary to the Attorney General's directives.

On May 15, 2020, the defendant submitted a request for compassionate release to the warden. In the defendant's words, the request was a "COVID Release Request" based on the defendant's status as an elderly/vulnerable person, and it listed the following medical conditions: high blood pressure, hypothyroidism, and osteoporosis. On June 15, 2020, the defendant submitted a motion to this Court for compassionate release.

The undersigned obtained the defendant's recent medical records from BOP (attached as Exhibit A), and reviewed those attached to the defendant's motion. The records reveal that the defendant, who is 61 years old, presents back and shoulder pain, hypertension, hypothyroidism, and anemia. All of these conditions appear well-controlled at this time with medication provided by the institution, as indicated by her medical records. The defendant's conditions have not impacted her ability to engage in many

normal activities of daily living. As she states in her motion, she has taken over 80 courses in varied subjects, to include fitness, sewing, sign language, computer, and business, just to name a few. Def.'s Mot. at 22. In fact, as of May of this year, letters from her supporters at the UNICOR distribution warehouse indicate that the defendant has worked as a Material Handler, a New Hire Row Trainer, and even a forklift operator, all with great success. Def.'s Mot. Ex. G. The letters make clear that her medical conditions have not kept her from participating in numerous programs and engaging in regular activity.

C.    BOP's Response to the COVID-19 Pandemic.

As this Court is well aware, COVID-19 is an extremely dangerous illness that has caused many deaths in the United States in a short period of time and that has resulted in massive disruption to our society and economy. In response to the pandemic, and despite the defendant's criticism of BOP's ability to address the challenges presented by COVID-19, BOP has in fact taken significant measures to protect the health of the inmates in its charge. BOP has explained that "maintaining safety and security of [BOP] institutions is [BOP's] highest priority." BOP, Updates to BOP COVID-19 Action Plan: Inmate Movement (Mar. 19, 2020), available at

https://www.bop.gov/resources/news/20200319_covid19_update.jsp.

Indeed, BOP has had a Pandemic Influenza Plan in place since 2012. BOP Health Services Division, Pandemic Influenza Plan-Module 1: Surveillance and Infection Control (Oct. 2012), available at

https://www.bop.gov/resources/pdfs/pan_flu_module_1.pdf. That protocol is lengthy and

detailed, establishing a multi-phase framework requiring BOP facilities to begin preparations when there is first a "[s]uspected human outbreak overseas." *Id*. at i. The plan addresses social distancing, hygienic and cleaning protocols, and the quarantining and treatment of symptomatic inmates.

Consistent with that plan, BOP began planning for potential coronavirus transmissions in January. At that time, the agency established a working group to develop policies in consultation with subject matter experts in the Centers for Disease Control, including by reviewing guidance from the World Health Organization.

On March 13, 2020, BOP began to modify its operations, in accordance with its Coronavirus (COVID-19) Action Plan ("Action Plan"), to minimize the risk of COVID-19 transmission into and inside its facilities. Since that time, as events require, BOP has repeatedly revised the Action Plan to address the crisis.

Presently, BOP operations are governed by Phase Seven of the Action Plan. The current modified operations plan requires that all inmates in every BOP institution be secured in their assigned cells/quarters, in order to stop any spread of the disease. Only limited group gathering is afforded, with attention to social distancing to the extent possible, to facilitate commissary, laundry, showers, telephone, and computer access. Further, BOP has severely limited the movement of inmates and detainees among its facilities. Though there will be exceptions for medical treatment and similar exigencies, this step as well will limit transmissions of the disease. Likewise, all official staff travel has been cancelled, as has most staff training.

BOP is endeavoring to regularly issue face masks to all staff and inmates, and strongly encouraged them to wear an appropriate face covering when in public areas when social distancing cannot be achieved.

Every newly admitted inmate is screened for COVID-19 exposure risk factors and symptoms. Asymptomatic inmates with risk of exposure are placed in quarantine for a minimum of 14 days or until cleared by medical staff. Symptomatic inmates are placed in isolation until they test negative for COVID-19 or are cleared by medical staff as meeting CDC criteria for release from isolation. In addition, in areas with sustained community transmission, all facility staff are screened for symptoms. Staff registering a temperature of 100.4 degrees Fahrenheit or higher are barred from the facility on that basis alone. A staff member with a stuffy or runny nose can be placed on leave by a medical officer.

Contractor access to BOP facilities is restricted to only those performing essential services (e.g. medical or mental health care, religious, etc.) or those who perform necessary maintenance on essential systems. All volunteer visits are suspended absent authorization by the Deputy Director of BOP. Any contractor or volunteer who requires access will be screened for symptoms and risk factors.

Social and legal visits were stopped as of March 13, and remain suspended at this time, to limit the number of people entering the facility and interacting with inmates. In order to ensure that familial relationships are maintained throughout this disruption, BOP has increased detainees' telephone allowance to 500 minutes per month. Tours of facilities are also suspended. Legal visits will be permitted on a case-by-case basis after

the attorney has been screened for infection in accordance with the screening protocols for prison staff.

Further details and updates of BOP's modified operations are available to the public on the BOP website at a regularly updated resource page: www.bop.gov/coronavirus/index.jsp. While the defendant asserts that the measures taken by BOP have merely been "published," and have not in fact been implemented, the actual current status of operations at BOP facilities (i.e. suspension of inmate movement and visits) makes it clear that BOP has in fact implemented these procedures and has not merely published its plan to do so. Def.'s Mot. at 10.

In addition, in an effort to relieve the strain on BOP facilities and assist inmates who are most vulnerable to the disease and pose the least threat to the community, BOP is exercising greater authority to designate inmates for home confinement. On March 26, 2020, the Attorney General directed the Director of the Bureau of Prisons, upon considering the totality of the circumstances concerning each inmate, to prioritize the use of statutory authority to place prisoners in home confinement. That authority includes the ability to place an inmate in home confinement during the last six months or 10% of a sentence, whichever is shorter, *see* 18 U.S.C. § 3624(c)(2), and to move to home confinement those elderly and terminally ill inmates specified in 34 U.S.C. § 60541(g). Congress has also acted to enhance BOP's flexibility to respond to the pandemic. Under the Coronavirus Aid, Relief, and Economic Security Act, enacted on March 27, 2020, BOP may "lengthen the maximum amount of time for which the Director is authorized to place a prisoner in home confinement" if the Attorney General finds that emergency

conditions will materially affect the functioning of BOP. Pub. L. No. 116-136,

§ 12003(b)(2), 134 Stat. 281, 516 (to be codified at 18 U.S.C. § 3621 note). On April 3,

2020, the Attorney General gave the Director of BOP the authority to exercise this

discretion, beginning at the facilities that thus far have seen the greatest incidence of

coronavirus transmission. As of this filing, BOP has transferred 7,285 inmates to home

confinement since March 26.[2] Indeed, the defendant acknowledges that Coleman Low

has reduced the number of inmates at its facility, then speculates "upon information and

belief" that it will become "overcrowded" at some unknown time in the future. Def.'s

Mot. at 11.

Taken together, all of the above-described measures are designed to mitigate

sharply the risks of COVID-19 transmission in a BOP institution. BOP has pledged to

continue monitoring the pandemic and to adjust its practices as necessary to maintain the

safety of prison staff and inmates while also fulfilling its mandate of incarcerating all

persons sentenced or detained based on judicial orders.

---

[2] This Court does not have authority to grant a transfer to home confinement, or review BOP's administrative decision regarding that issue. *See* 18 U.S.C. § 3621(b) (BOP's designation decision is not subject to judicial review). *See also, e.g., United States v. Rodriguez-Collazo*, 2020 WL 2126756, at *2-3 (E.D. Pa. May 4, 2020) (Younge, J.); *United States v. Pettiway*, No. CR 08-129, 2020 WL 3469043, at *2 (E.D. Pa. June 25, 2020) (Bartle, J.); *United States v. Torres*, 2020 WL 3498156, at *5-6 (E.D. Pa. June 29, 2020) (Kearney, J.); *United States v. Cruz*, 2020 WL 1904476, at *4 (M.D. Pa. Apr. 17, 2020); *United States v. Mabe*, 2020 U.S. Dist. LEXIS 66269, at *1 (E.D. Tenn. Apr. 15, 2020) ("the CARES Act places decision making authority solely within the discretion of the Attorney General and the Director of the Bureau of Prisons. . . . This Court therefore does not have power to grant relief under Section 12003 of the CARES Act.").

Ordaz expresses understandable concern about the ability of BOP to continue to mitigate the spread of COVID-19. At Coleman Low, which houses 1,980 inmates (including 212 in a camp), there are currently 174 inmates who have tested positive. In addition to all the steps described above, BOP has quarantined those who are infected while they recover. There has been no death at the facility.

## II. Discussion.

The compassionate release statute, 18 U.S.C. § 3582(c)(1)(A), as amended by the First Step Act on December 21, 2018, provides in pertinent part:

> (c) Modification of an Imposed Term of Imprisonment.—The court may not modify a term of imprisonment once it has been imposed except that—
>
> (1) in any case—
>
> (A) the court, upon motion of the Director of the Bureau of Prisons, or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier, may reduce the term of imprisonment (and may impose a term of probation or supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment), after considering the factors set forth in section 3553(a) to the extent that they are applicable, if it finds that—
>
> (i) extraordinary and compelling reasons warrant such a reduction . . .
>
> and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission . . . .

Further, 28 U.S.C. § 994(t) provides: "The Commission, in promulgating general policy statements regarding the sentencing modification provisions in section 3582(c)(1)(A) of title 18, shall describe what should be considered extraordinary and compelling reasons for sentence reduction, including the criteria to be applied and a list of specific examples.

Rehabilitation of the defendant alone shall not be considered an extraordinary and compelling reason." Accordingly, the relevant policy statement of the Commission is binding on the Court. *See Dillon v. United States,* 560 U.S. 817, 827 (2010) (where 18 U.S.C. § 3582(c)(2) permits a sentencing reduction based on a retroactive guideline amendment, "if such a reduction is consistent with applicable policy statements issued by the Sentencing Commission," the Commission's pertinent policy statements are binding on the court).[3]

The Sentencing Guidelines policy statement appears at § 1B1.13, and provides that the Court may grant release if "extraordinary and compelling circumstances" exist, "after considering the factors set forth in 18 U.S.C. § 3553(a), to the extent that they are applicable," and the Court determines that "the defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g)."

---

[3] Prior to the passage of the First Step Act, while the Commission policy statement was binding on the Court's consideration of a motion under § 3582(c)(1)(A), such a motion could only be presented by BOP. The First Step Act added authority for an inmate himself to file a motion seeking relief, after exhausting administrative remedies, or after the passage of 30 days after presenting a request to the warden, whichever is earlier.

Under the law, the inmate does not have a right to a hearing. Rule 43(b)(4) of the Federal Rules of Criminal Procedure states that a defendant need not be present where "[t]he proceeding involves the correction or reduction of sentence under Rule 35 or 18 U.S.C. § 3582(c)." *See Dillon,* 560 U.S. at 827-28 (observing that, under Rule 43(b)(4), a defendant need not be present at a proceeding under Section 3582(c)(2) regarding the imposition of a sentencing modification).

Critically, in application note 1 to the policy statement, the Commission identifies the "extraordinary and compelling reasons" that may justify compassionate release. The note provides as follows:

> 1. Extraordinary and Compelling Reasons.—Provided the defendant meets the requirements of subdivision (2) [regarding absence of danger to the community], extraordinary and compelling reasons exist under any of the circumstances set forth below:
>
> (A) Medical Condition of the Defendant.—
>
>     (i) The defendant is suffering from a terminal illness (i.e., a serious and advanced illness with an end of life trajectory). A specific prognosis of life expectancy (i.e., a probability of death within a specific time period) is not required. Examples include metastatic solid-tumor cancer, amyotrophic lateral sclerosis (ALS), end-stage organ disease, and advanced dementia.
>
>     (ii) The defendant is—
>
>         (I) suffering from a serious physical or medical condition,
>
>         (II) suffering from a serious functional or cognitive impairment, or
>
>         (III) experiencing deteriorating physical or mental health because of the aging process,
>
>     that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover.
>
> (B) Age of the Defendant.—The defendant (i) is at least 65 years old; (ii) is experiencing a serious deterioration in physical or mental health because of the aging process; and (iii) has served at least 10 years or 75 percent of his or her term of imprisonment, whichever is less.
>
> (C) Family Circumstances.—
>
>     (i) The death or incapacitation of the caregiver of the defendant's minor child or minor children.

> (ii) The incapacitation of the defendant's spouse or registered partner when the defendant would be the only available caregiver for the spouse or registered partner.

> (D) Other Reasons.—As determined by the Director of the Bureau of Prisons, there exists in the defendant's case an extraordinary and compelling reason other than, or in combination with, the reasons described in subdivisions (A) through (C).

In general, the defendant has the burden to show circumstances meeting the test for compassionate release. *United States v. Heromin,* 2019 WL 2411311, at *2 (M.D. Fla. June 7, 2019); *United States v. Stowe*, 2019 WL 4673725, at *2 (S.D. Tex. Sept. 25, 2019). As the terminology in the statute makes clear, compassionate release is "rare" and "extraordinary." *United States v. Willis*, 2019 WL 2403192, at *3 (D.N.M. June 7, 2019) (citations omitted).

The defendant is not eligible for compassionate release, because she does not present an "extraordinary and compelling reason" as stated in the governing guideline policy statement.

The government acknowledges that an inmate who presents a risk factor identified by the CDC as increasing the risk of an adverse outcome from COVID-19 presents "a serious physical or medical condition . . . that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility," as stated in note 1(A), as, due to her comorbidities, the defendant may be less able to protect herself against an unfavorable outcome from the disease. But the defendant presents no such condition.

Her initial request for compassionate release to BOP in light of COVID-19 identified hypertension, hypothyroidism, and osteoporosis as the medical conditions upon which she based her request. Her instant motion now lists all of her medical diagnoses over the past several years, regardless of whether they are controlled, in remission, or presently nonexistent: shoulder pain, orthopedic pain, anemia, respiratory issues, esophageal reflux (acid reflux), glaucoma, allergic rhinitis (hay fever), acute upper respiratory infections, sinusitis,[4] lumbago,[5] sciatica,[6] bone and cartilage disorders, degenerative disc disease and facet arthropathy at L5-S1, dysphagia,[7] anterolisthesis (a spine condition), vertigo, and dental issues. Def.'s Mot. at 6. The defendant has asserted that her medical issues "would prove fatal" should she contract COVID-19.

To the contrary, the CDC has created two separate lists of underlying conditions, one which identifies the ailments known to cause increased risk for severe illness should one contract COVID-19, and one which identifies ailments for which there are

---

[4] Sinusitis is defined by the CDC as a sinus infection. https://www.cdc.gov/antibiotic-use/community/for-patients/common-illnesses/sinus-infection.html (retrieved July 25, 2020).

[5] Lumbago is a general term used to describe pain in the lower back.

[6] According to the Mayo Clinic, "Sciatica refers to pain that radiates along the path of the sciatic nerve, which branches from your lower back through your hips and buttocks and down each leg." https://www.mayoclinic.org/diseases-conditions/sciatica/symptoms-causes/syc-20377435 (retrieved July 25, 2020).

[7] The Mayo Clinic defines dysphagia as difficulty swallowing, meaning "it takes more time and effort to move food or liquid from your mouth to your stomach." https://www.mayoclinic.org/diseases-conditions/dysphagia/symptoms-causes/syc-20372028 (retrieved July 25, 2020).

insufficient data to conclude anything other than that the condition "might" cause an increased risk for severe illness.[8] Despite the defendant's contention that the CDC has "designated hypertension as the highest risk factor," the CDC has *not* included this condition on its list of ailments known to cause greater risk of severe illness. Instead, the CDC has included hypertension on its list of underlying conditions that "might" put an individual at increased risk of severe illness. None of the defendant's other past or present conditions have been identified by the CDC as causing her to be at greater risk of severe illness should she contract COVID-19.[9]

The defendant's BOP medical records show that she takes medication as prescribed to control her hypertension. Despite her contention that she "should be seen by a specialist" for her hypertension and alleged "respiratory issues," her medical records offer no support for specialized treatment.

The CDC advises: "Although many patients with severe illness from COVID-19 have underlying hypertension, it is unclear at this time if hypertension is an independent risk factor for severe illness from COVID-19. Hypertension is common in the United States. Hypertension is more frequent with advancing age and among men, non-Hispanic blacks, and people with other underlying medical conditions such as obesity, diabetes,

---

[8] https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html?CDC_AA_refVal=https%3A%2F%2Fwww.cdc.gov%2Fcoronavirus%2F2019-ncov%2Fneed-extra-precautions%2Fgroups-at-higher-risk.html (retrieved on July 23, 2020)

[9] *See, e.g.*, *United States v. Cantatore*, 2020 WL 2611536, at *4 (D.N.J. May 21, 2020) (hyperthyroidism is not a risk factor).

and serious heart disease. At this time, people whose only underlying medical condition is hypertension are not considered to be at higher risk for severe illness from COVID-19." *See* https://www.cdc.gov/coronavirus/2019-ncov/hcp/faq.html#Patients-with-Hypertension , last accessed August 1, 2020.

A vast number of courts have accordingly denied relief in recent months when hypertension is the only putative risk factor presented. *See, e.g.*, *United States v. Nesbitt*, 2020 WL 3412577, at *4 (E.D. Pa. June 22, 2020) (Bartle, J.) (ordinary hypertension does not justify release); *United States v. Colbert*, 2020 WL 3529533, at *2 (E.D. Mich. June 30, 2020) ("Hypertension, a condition that affects about 46% of the U.S. adult population, high cholesterol, and having had prostate cancer in the past are not 'extraordinary and compelling' conditions."); *United States v. Hull*, 2020 WL 2475639, at *2 (D. Conn. May 13, 2020) (regular as opposed to pulmonary hypertension is not a CDC risk factor; also, BOP is endeavoring to protect Fort Dix inmates, and "the mere existence of COVID-19 cases [at a prison] does not reflect that the BOP is incapable of managing the pandemic within its facilities."); *United States v. Adams*, 2020 WL 3026458 (D. Conn. June 4, 2020) (59-year-old at Devens with high blood pressure does not present risk factor); *United States v. Melgarejo*, 2020 WL 2395982, at *4 (C.D. Ill. May 12, 2020) ("The Court could find no cases where a defendant with hypertension and no comorbidities was granted relief under the compassionate release statute."); *United States v. Alexander*, 2020 WL 2468773, at *5 (M.D. La. May 13, 2020) (denied for a variety of reasons, including the view that high blood pressure by itself is not a sufficient extraordinary and compelling reason); *United States v. Wood*, 2020 WL 3162944, at *2

(E.D. Tenn. June 12, 2020) (hypertension is not a risk factor; "While the Court sympathizes with Mr. Wood's concerns, it is unwilling to order the release of prisoners whose underlying conditions, based on the CDC's guidelines, do not place them at a greater risk of severe illness from COVID-19; otherwise, the Court, to be evenhanded, would face the untenable situation of having to release all prisoners with any underlying condition.").

While the defendant alleges that "respiratory issues" contribute to the basis for her request for release, not only is this term absent from the CDC's lists, but it appears from the defendant's BOP records that as of January 29, 2020, she has not suffered from any recent respiratory ailment. Instead, her records suggest that on one occasion in 2011, she was diagnosed with an upper respiratory infection which is in remission status. Her records from 2018 and 2019 make no mention of "respiratory issues" during those years. The defendant appears to allege that acid reflux, or esophageal reflux, is a respiratory disease, but it is actually defined as a condition which affects the stomach.[10] The majority of her BOP records instead document her back pain, another condition that is absent from both CDC lists which identify conditions that cause, or might cause, risk of severe illness.

_____

[10] According to the Mayo Clinic, esophageal reflux "occurs when stomach acid frequently flows back into the tube connecting your mouth and stomach (esophagus). This backwash (acid reflux) can irritate the lining of your esophagus….Most people can manage the discomfort of GERD with lifestyle changes and over-the-counter medications." https://www.mayoclinic.org/diseases-conditions/gerd/symptoms-causes/syc-20361940 (Retrieved July 25, 2020). *See United States v. DeYoung*, 2020 WL 3605650, at *2 (D. Utah July 2, 2020) (gastroesophageal reflux disease with esophagitis and a diaphragmatic hernia are not sufficient conditions for release).

The defendant also suggests that her African descent presents as a risk factor; however, the CDC similarly has not identified this as a medical condition known to increase risk of severe illness. See, e.g., *United States v. Alexander*, 2020 WL 2507778 (D.N.J. May 15, 2020) (being African-American is not a risk factor; hypertension is under control). Despite the defendant's assertion that she is a "high-risk" individual, CDC guidance and the weight of authority strongly indicate that she is not.

We must therefore conclude that Ordaz does not present an "extraordinary and compelling reason" permitting compassionate release. Further, even if she did, relief should be denied. This Court must consider all pertinent circumstances, including the 3553(a) factors, and possible danger to the community. At present, the defendant's medical conditions are appropriately managed at the facility, which is also engaged in strenuous efforts to protect inmates against the spread of COVID-19, and would also act to treat any inmate who does contract COVID-19. Moreover, the full sentence remains appropriate in light of the defendant's conduct in building and leading a large and sophisticated drug trafficking enterprise that she directed even while incarcerated for a firearms offense.

While the defendant asserts that she has never been given a "second chance," her criminal history suggests otherwise. On three separate occasions, the defendant was spared jail and sentenced to a term of probation as a result of felony convictions she incurred in Miami and Fort Lauderdale, Florida. On each occasion, she violated the terms of her probation, causing the court to revoke probation and sentence her to a period of incarceration. Then, while incarcerated for a gun offense in Philadelphia County, the

defendant continued to run her drug business from jail by telephone. Once released from

jail and during her participation in a work release program, she continued operating her

drug trafficking business. As made clear by the defendant's own conduct, she had four

"second chances," and each time was incapable of living a law-abiding life and/or

following court orders. As such, the defendant's guideline sentence of 35 years for her

conduct in this case was entirely appropriate.

In sum, the defendant fails to demonstrate how release, less than two-thirds into a

35-year sentence, reflects the seriousness of the offense, promotes respect for the law,

and provides just punishment for the offense. *See* 18 U.S.C. § 3553(a)(2)(A). A

consideration of the factors above shows that release at this juncture is inappropriate

based on the offense of conviction, the defendant's managed medical condition, and the

amount of time remaining on the defendant's sentence.

Finally, aside from relying on her medical issues as an extraordinary and

compelling reason for compassionate release, the defendant further takes issue with the

calculation of her guideline sentence, apparently regretting her decision to plead guilty

and stipulate to the drug quantity for which she was charged. However, a motion for

compassionate release does not function as a direct appeal nor a motion for habeas corpus

(both of which have been filed and decided), nor does buyer's remorse constitute an

extraordinary or compelling reason to grant a motion for compassionate release. <u>See</u>

*United States v. Williams*, 2019 WL 6529305 (E.D.N.C. Dec. 4, 2019) ("The arguments

defendant makes relate to validity of her conviction and sentence. Motions for a sentence

reduction under § 3582(c)(1)(A) are not substitutes for direct appeal or habeas corpus

motions."). In addition, though the defendant has suggested that the 2018 sentencing guidelines "may" result in a lower sentence had she committed her crimes over two decades later, that is just speculation. The guideline range today, albeit advisory, would be the same, and it is notable that even at a time the Guidelines were mandatory the sentencing judge here elected to impose a sentence above the bottom of the range.

In sum, upon consideration of all pertinent factors, the motion for compassionate release should be denied.

Respectfully yours,

WILLIAM M. McSWAIN
United States Attorney


*/s Robert A. Zauzmer*
ROBERT A. ZAUZMER
Assistant United States Attorney
Chief of Appeals


*/s Erica Kivitz*
ERICA KIVITZ
Assistant United States Attorney

**CERTIFICATE OF SERVICE**

I hereby certify that a copy of this pleading has been served by first-class mail,

postage prepaid, upon:

>Ms. Lazara Ordaz
>No. 52247-066
>FCI Coleman Low
>846 NE 54th Terrace
>Sumterville, FL  33521


>*/s Erica Kivitz*
>ERICA KIVITZ
>Assistant United States Attorney


Dated:  August 3, 2020.