IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA

    v.

LAZARA ORDAZ,

               Defendant.

CRIMINAL ACTION
NO. 98-587

## OPINION

**Slomsky, J.**                                                                                    **October 9, 2020**

## I.  INTRODUCTION

Defendant Lazara Ordaz, who is serving a 420-month sentence, moves for compassionate release pursuant to 18 U.S.C. § 3582(c)(1)(A).  Defendant requests a modification to time served asserting that the COVID-19 pandemic, her age, and her medical condition place her at an increased risk of harm from the virus, and, given the length of her time served and her personal characteristics, when all taken together, amount to extraordinary and compelling circumstances justifying her release.  The Government opposes Defendant's Motion, citing the lack of a COVID-19 risk factor in her medical records, numerous measures the Board of Prisons ("BOP") has implemented to prevent the spread of COVID-19 in its facilities, and the severity of Defendant's underlying offenses.  For reasons that follow, Defendant's Motion will be denied.

## II.  BACKGROUND

Lazara Ordaz is a native of Cuba, who came to the United States on the "Mariel boatlift." (See Doc. No. 959 at 2.)  She settled in Florida and, beginning in 1981, started a crime spree that included convictions for carrying a concealed firearm in 1981, possession of marijuana in 1983,

petit theft in 1984, possession with intent to sell a controlled substance in 1988, sale of cocaine in 1988, and possession of cocaine in 1990.  (Id.)

By 1993, she moved to Philadelphia and put together and led an organization that sold millions of dollars' worth of cocaine.  (Id.)  The Ordaz Cocaine Organization ("OCO") operated from September 1993 to October 1998 in North Philadelphia.  (Id.)  The organization distributed over 150 kilograms of cocaine and profited in excess of $3 million.  (Id.)  Defendant hired subordinates for day-to-day operations, including an "enforcer" to protect products and sales, lookouts, street sellers, and mid-level and upper-level managers.  (Id. at 3.)  The enforcers protected the organization from rival drug dealers and other hostile actors by being tasked to use violence and firearms.  (Id.)

Her organization obtained cocaine from local sources and sources in Miami, Florida.  (Id.)  OCO members would travel by car on a weekly basis to obtain at least one kilogram of cocaine.  (Id.)  Stash houses for the cocaine were used throughout Philadelphia.  (Id.)

When Defendant was incarcerated in Philadelphia for a firearms offense, she continued to direct her drug trafficking operation from jail.[1]  (Id.)  When she was released and participated in a work-release program, she continued to direct the operation and carry firearms, despite her felony conviction.  (Id.)

On December 16, 1998, a Superseding Indictment was filed, charging her and 17 others with the following offenses:

- Conspiracy to distribute more than 150 kilograms of cocaine, in violation of 21 U.S.C. § 846 (Count 1);

---

[1]   Ordaz states that the shootout that occurred in August 1996 has improperly labeled her a violent person.  (See Doc. No. 955 at 13.)  She was fired at by two individuals in an automobile and returned fire.  Innocent persons were hit by bullets. (See Doc. No. 959 at 3 n. 1.)  Although Ordaz contends that she was only seeking to protect children in the area, such a gunfight was foreseeable among drug traffickers.  (See Doc. No. 955 at 13.)

2

- Use of a communication facility or telephone to facilitate a drug felony, in violation of 21 U.S.C. § 843(b) (Counts 33, 27, 40, 41, 44, 47, 49, 50, 54-62, and 64-66); and

- Possession of a firearm by a convicted felon, in violation of 21 U.S.C. § 922(g)(1) (Count 74)

(Id. at 4.)

On December 2, 1999, Defendant pled guilty to all 22 counts.  (Doc. No. 265).  On November 1, 2000, she was sentenced to 420 months' imprisonment, followed by five years' supervised release.  (See Doc. No. 478.)  For the last fourteen years, she had no infractions in prison, although she had ones in 2000, 2005, and 2006.  (See Doc. No. 959 at 4.)

On October 4, 2019, Defendant sent an informal request to the Warden of the Federal Correctional Institution ("FCI") at Coleman, Florida,[2] requesting reconsideration of her sentence and compassionate release under the First Step Act.  (See Doc. No. 955 at Ex. A.)  On December 19, 2019, the Administration at FCI Coleman Low denied her request, explaining that Defendant had not served enough of her sentence to warrant reconsideration and compassionate release.[3]  (Id.)  On May 15, 2020, she filed a formal request with the Warden at FCI Coleman Low, asking the BOP to file a Motion for Compassionate Release on her behalf.  (Id.)  On May 18, 2020, the BOP denied her request, explaining that Defendant had not served two-thirds of her sentence, which began on November 1, 2000, and that she should reapply when she reaches the two-thirds mark. (Id.)

On June 15, 2020, Defendant filed the instant Motion for Compassionate Release under 18 U.S.C. § 3582(c)(1)(A), requesting that her sentenced be reduced to time served or, alternatively,

---

[2]   Defendant is incarcerated at the lowest security unit in FCI Coleman. Her prison will be referred to as FCI Coleman Low.

[3]   At this point, Defendant has only served 58.4% of her sentence.  (Doc. No. 955, Ex. A.)

that she be released to home confinement for the remainder of her sentence.  (Id. at 25.)  Defendant

contends that she is a good candidate for compassionate release given her medical history, the

BOP's response to COVID-19, the length of her time served,[4] and her personal characteristics.

(Id. at 5, 10, 21.)

First, Defendant argues that her hypertension (high blood pressure), hypothyroidism, and

osteoporosis[5] put her at an extreme risk of death should she contract COVID-19.   (Id. at 6.)

Defendant points to her medical records, attached to her Motion as Exhibit B, as evidence that her

hypertension places her at an extreme risk of serious repercussions if she were to contract the virus.

(Id. at 7.)  Defendant also avers that her past respiratory infections put her at an extreme risk of

decreased survival should she contract COVID-19.  (Id.)  Defendant also points to her age, 61

years old, and her African descent as notable factors that place her at an even greater risk.  (Id.)

Second, Defendant alleges FCI Coleman Low has not implemented the BOP's action plan

for combatting COVID-19, and that the situation at FCI Coleman Low has reached a "crisis level."

(Id. at 10.)  Defendant explains that her "unit" was closed to serve as a quarantine unit for inmates

showing symptoms of the virus, and she was placed in a new unit, where another inmate sleeps

---

[4]    Defendant also alleges that in light of new sentencing guidelines, her sentence was too long
      for the crimes she had committed, although she does not specify what the correct sentence
      should be.  (See Doc. No. 955 at 20-21).  Defendant has used this argument twice before, in
      motions to reduce or correct her sentence filed in 2014 and 2016, respectively, arguing that
      sentencing guideline amendments warrant a sentence reduction. (See Doc. Nos. 918, 923, and
      945).  The motions were denied.  In making a similar argument here, it too fails because it
      relates to the validity of her sentence, and "[m]otions for a sentence reduction under §
      3582(c)(1)(A) are not substitutes for direct appeal or habeas corpus motions."  See United
      States v. Williams, 2019 U.S. Dist. LEXIS 208774 (E.D.N.C. 2019).

[5]    In her Motion, she also lists several conditions which she has had over the years, none of which
      in any way put her at an extreme risk should she contract COVID-19.  (See Doc. No. 955 at 6)
      (listing in addition shoulder pain, orthopedic pain, anemia, glaucoma, allergic rhinitis, acute
      respiratory infections, sinusitis, esophageal reflux, lumbago, sciatica, bone and cartilage
      disorders, degenerative disc disease, anterolisthesis, dysphagia, vertigo, and dental issues.)

within four feet of her.  (Id.)  Defendant argues that converting one unit to a quarantine unit has effectively placed the prison population of four units into three units, resulting in overcrowding. (Id. at 11.)  Defendant further argues that her unit has received two new inmates who have tested positive for COVID-19 and remain in the quarantine unit.  (Id.)  Defendant also cites the number of federal inmates and staff who have tested positive for COVID-19, but claims these numbers are underreported and false.  (Id. at 24.)  Defendant agues FCI Coleman Low has not given inmates proper personal protective equipment ("PPE") and has become unsafe.  (Id. at 12.)  Because of these alleged circumstances, she claims that she can no longer provide self-care in the prison system.[6]  (Id. at 12, 15.)

Third, Defendant argues that because, by her calculation, she has completed more than two-thirds of her sentence and was not given credit for what she contends is countable time served, the BOP's denial of her request to submit a motion for compassionate release was incorrect.  (Id. at 12.)  Defendant argues that the start date the BOP used when calculating her time served was incorrect, positing that her time incarcerated prior to sentencing should count as credit towards her sentence.  (Id.) She points out she has been imprisoned since October 1998, despite her sentence

---

[6]   Defendant's friend and former bunkmate, Jan Schneiderman, has provided an affidavit in support of Defendant's contention that FCI Coleman Low has become unsafe.  (See Doc. No. 956.)  Schneiderman goes into detail about the layout of the women's "camp," explaining that those who are asymptomatic are not tested, and those who are tested are placed together to await results in the visiting room, sleeping on mattresses on the floor.  (Id. at 5.)  Schneiderman also points to the BOP's website as containing inaccurate information because it does not separately identify COVID-19 cases sourced from the men's prison and the women's prison at FCI Coleman Low.  (Id. at 7.)  Thus, the number of cases at the women's prison is impossible to calculate.  (Id.)  It should be noted that the government was impressed by the dedication and quality of the submission by Schneiderman, who ably addressed the current circumstances and advocated for her release.  (See Doc. No. 959 at 1.)  But other circumstances overcome her claims, and thus release is not warranted.

officially beginning November 1, 2000.[7]  (Id. at 14).  Defendant further avers that from August 1996, when the gun incident occurred, to date, she has not been a violent person and that incident should not be considered against her.  (Id. at 13.)

Lastly, Defendant argues that compassionate release is appropriate in view of the relevant Section 3553(a) factors.[8]  (Id. at 16, 18-19).  Defendant cites her prison record, which shows that she had no infractions for fourteen years.  (Id. at 18.)  She claims this proves that she has rehabilitated in prison and that she will not pose a danger to the community or another person if released.  (Id.)  Defendant further points to her steady employment with Federal Prison Industries ("UNICOR") and classwork as evidence of her good character.  (Id. at Ex. E.)  While incarcerated,

---

[7]  This Court does not have jurisdiction to consider the BOP's calculation of her good time credit. Under 18 U.S.C. § 3585, the Attorney General, through the BOP, has sole authority to determine sentence calculations.  See United States v. Whaley, 148 F.3d 205 (2d Cir. 1998). The proper way to challenge the BOP's calculation is through a habeas corpus petition in the district in which a defendant is serving a sentence.  See United States v. Jenkins, 541 F. Supp. 2d 822 (W.D. Va. 2008).

[8]  When modifying a sentence under 18 U.S.C. § 3582(c)(1)(A), a court must consider the relevant sentencing factors set forth in 18 U.S.C. § 3553(a), which include:

> (1) the nature and circumstances of the offense and the history and characteristics of the defendant;
>
> (2) the need for the sentence imposed—
>> a. to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>> b. to afford adequate deterrence to criminal conduct;
>> c. to protect the public from further crimes of the defendant; and
>> d. to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner[.]
>
> . . . [and]
>
> (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct.

Defendant has received certifications for taking over eighty courses, ranging from sewing to accounting to drug rehabilitation to first responder courses.  (Id. at 22.)  Defendant has attached recommendation letters from four UNICOR employees who have served as her supervisors over the years, all of whom support her Motion and vouch for her good character.  (Id. at Ex. G.) Defendant ultimately argues she will not pose a threat if released because she has a job and a home waiting for her.  (Id. at 19.)  Defendant intends to move in with her niece in Hialeah, Florida, and commence work at Camarioca Garden, LLC, in Homestead, Florida.  (Id.)

On August 3, 2020, the Government filed a Response.  (See Doc. No. 959.)  In it, the Government argues that Defendant's Motion should be denied because she has not shown an extraordinary and compelling reason to justify release.  (Id. at 1.)  The Government first submits that none of Defendant's underlying health issues rise to the level of putting her at severe risk from COVID-19 and of being unable to provide self-care in prison.  (Id.)  The Government notes the following regarding hypertension:

> The [Centers for Disease Control ("CDC")] advise: "Although many patients with severe illness from COVID-19 have underlying hypertension, it is unclear at this time if hypertension is an independent risk factor for severe illness from COVID-19. Hypertension is common in the United States.  Hypertension is more frequent with advancing age and among men, non-Hispanic blacks, and people with other underlying medical conditions such as obesity, diabetes and serious heart disease.  At this time, people whose only underlying medical condition is hypertension are not considered to be at higher risk for severe illness from COVID19."

(Id. at 16.)  Further, according to the Government, Defendant's medical records reveal Defendant's hypertension is under control, as she takes medication prescribed by the prison doctors.  (Id. at 17.)  The Government also points to recent cases that have denied compassionate release on this

basis.[9]  (Id.)  In addition, Defendant does not have pulmonary hypertension, which is an extremely serious risk factor if COVID-19 were contracted.  (Id.)  The Government further argues that her sinus infections, esophageal reflux, and myriad other conditions do not place her at risk.  (Id. at 18.)  Further, the Government maintains African descent is not a risk factor in and of itself.  (Id. at 19.)  Moreover, the Government argues FCI Coleman Low can continue to treat Defendant's medical issues successfully.  (Id.)

Next, the Government argues that the BOP has implemented several precautions to prevent the spread of COVID-19 in FCI Coleman Low, including: implementing social distancing where possible, limiting the movements of inmates and confining them to cells when necessary, regularly issuing facemasks to inmates and staff, screening newly admitted detainees for symptoms, placing

---

[9]    Specifically, the Government cites:

See, e.g., United States v. Nesbitt, 2020 WL 3412577, at *4 (E.D. Pa. June 22, 2020) (Bartle, J.) (ordinary hypertension does not justify release); United States v. Colbert, 2020 WL 3529533, at *2 (E.D. Mich. June 30, 2020) ('Hypertension, a condition that affects about 46% of the U.S. adult population, high cholesterol, and having had prostate cancer in the past are not 'extraordinary and compelling' conditions.'); United States v. Hull, 2020 WL 2475639, at *2 (D. Conn. May 13, 2020) (regular as opposed to pulmonary hypertension is not a CDC risk factor; also, BOP is endeavoring to protect Fort Dix inmates, and 'the mere existence of COVID-19 cases [at a prison] does not reflect that the BOP is incapable of managing the pandemic within its facilities.'); United States v. Adams, 2020 WL 3026458 (D. Conn. June 4, 2020) (59-year-old at Devens with high blood pressure does not present risk factor); United States v. Melgarejo, 2020 WL 2395982, at *4 (C.D. Ill. May 12, 2020) ('The Court could find no cases where a defendant with hypertension and no comorbidities was granted relief under the compassionate release statute.'); United States v. Alexander, 2020 WL 2468773, at *5 (M.D. La. May 13, 2020) (denied for a variety of reasons, including the view that high blood pressure by itself is not a sufficient extraordinary and compelling reason); United States v. Wood, 2020 WL 3162944, at *2 (E.D. Tenn. June 12, 2020) (hypertension is not a risk factor; 'While the Court sympathizes with Mr. Wood's concerns, it is unwilling to order the release of prisoners whose underlying conditions, based on the CDC's guidelines, do not place them at a greater risk of severe illness from COVID-19; otherwise, the Court, to be evenhanded, would face the untenable situation of having to release all prisoners with any underlying condition.')."  (Doc. No. 959 at 17.)

asymptomatic inmates with risk of exposure in fourteen-day quarantine, placing symptomatic inmates in isolation, screening staff temperatures prior to admittance, prohibiting social visits, limiting legal and maintenance visits, and screening all necessary visitors for symptoms.  (Id. at 7-9.)  At the time of its Response, the Government conceded that 174 inmates had COVID-19 but none had died at FCI Coleman Low.  (Id. at 11.)  Currently, 101 inmates and eight staff members at FCI Coleman Low have the virus, and there has been one inmate death.  See COVID-19 Cases, FEDERAL BUREAU OF PRISONS, (Sept. 14, 2020), https://www.bop.gov/coronavirus/. However, 133 inmates and three staff members have recovered from the virus.  See id.

Finally, the Government asserts the 18 U.S.C. § 3553(a) factors weigh in favor of continuing confinement.  (Id. at 19.)  The Government claims that Defendant has not demonstrated how release, less than two-thirds of 35-year sentence, promotes respect for the law, reflects the seriousness of the offense, or provides just punishment for the crimes, given their number and magnitude.  (Id.)  The Government also submits she would pose a danger if released because she continued to run her drug operation while in prison and on parole in 1996.  (Id. at 19-20.)

## III.  DISCUSSION

### A.  The Analytical Framework Regarding Motions for Compassionate Release Pursuant to 18 U.S.C. § 3582(c)

Generally, a district court "may not modify a term of imprisonment once it has been imposed."  18 U.S.C. § 3582(c).  There are, however, "a few narrow exceptions" to this general "rule of finality," Freeman v. United States, 564 U.S. 522, 526 (2011), including the compassionate release statute, 18 U.S.C. § 3582(c)(1)(A).  As amended by the recently enacted First Step Act, it empowers a district court to modify a term of imprisonment on a defendant's motion after the

defendant has exhausted her administrative remedies.[10]  18 U.S.C. § 3582(c)(1)(A)(i).  The statute

provides, in part, that a court

> may reduce the term of imprisonment (and may impose a term of
> probation or supervised release with or without conditions that does
> not exceed the unserved portion of the original term of
> imprisonment), after considering the factors set forth in [18 U.S.C.
> § 3553(a)] to the extent that they are applicable, if it finds that—
>
> > (i) extraordinary and compelling reasons warrant such a
> > reduction; . . .
>
> and that such a reduction is consistent with applicable policy
> statements issued by the Sentencing Commission[.]

18 U.S.C. § 3582(c)(1)(A).  Congress, however, has not defined the term "extraordinary and

compelling reasons," except to the extent that "[r]ehabilitation of the defendant alone" is

insufficient to constitute an extraordinary and compelling reason.  28 U.S.C. § 994(t).  Instead,

Congress delegated the authority to define "extraordinary and compelling reasons" to the United

States Sentencing Commission.  Section 1B1.13 of the Sentencing Guidelines explains that a

sentence reduction under Section 3582(c)(1)(A) may be ordered where a court determines:

> [A]fter considering the factors set forth in 18 U.S.C. § 3553(a),
> that—
>
> > (1) (A) Extraordinary and compelling reasons warrant the
> > reduction; . . .

---

[10]  A defendant may file a motion for compassionate release directly with a district court after she "has fully exhausted all administrative rights to appeal a failure of the [BOP] to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier."  18 U.S.C. § 3582(c)(1)(A).  In other words, before a defendant can make such a request to the Court, she "must at least ask the Bureau of Prisons (BOP) to do so on [her] behalf and give [the] BOP thirty days to respond" Raia, 954 F.3d at 955, and if the BOP does respond adversely within the thirty days, to then exhaust any available administrative appeals during that period.   See 18 U.S.C. § 3582(c)(1)(A)).  Here, Defendant has met the exhaustion requirement because she sent her request to the Warden at FCI Coleman on May 15, 2020, which was denied on May 18, 2020. She filed her Motion for Compassionate Release on June 15, 2020.

(2) the defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g); and

(3) the reduction is consistent with this policy statement.

Application Note 1 to Section 1B1.13 discusses the meaning of "extraordinary and compelling reasons," and lists three specific qualifying circumstances: (1) a defendant's medical condition, (2) age, or (3) family circumstances. U.S.S.G. § 1B1.13 app. note 1(A)–(C). This Note states:

Provided the defendant [is not a danger to the safety of any other person or to the community], extraordinary and compelling reasons exist under any of the circumstances set forth below:

(A) Medical Condition of the Defendant.

(i)     The defendant is suffering from a terminal illness (i.e., a serious and advanced illness with an end of life trajectory). A specific prognosis of life expectancy (i.e., a probability of death within a specific time period) is not required. Examples include metastatic solid-tumor cancer, amyotrophic lateral sclerosis (ALS), end-stage organ disease, and advanced dementia.

(ii)    The defendant is—

(I)     suffering from a serious physical or medical condition,

(II)    suffering from a serious functional or cognitive impairment, or

(III)   experiencing deteriorating physical or mental health because of the aging process,

that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover.

(B) Age of the Defendant. The defendant (i) is at least 65 years old; (ii) is experiencing a serious deterioration in physical or mental health because of the aging process; and (iii) has served at least 10 years or 75 percent of his or her term of imprisonment, whichever is less.

(C) Family Circumstances.

> (i)  The death or incapacitation of the caregiver of the defendant's minor child or minor children.

> (ii)  The incapacitation of the defendant's spouse or registered partner when the defendant would be the only available caregiver for the spouse or registered partner.

U.S.S.G. § 1B1.13 n.1(A)-(C).  Application Note 1 further provides a "catch-all" provision, which allows a court to modify a sentence for "extraordinary and compelling reason[s] other than, or in combination with, the reasons described in subdivisions (A) through (C)."  U.S.S.G. § 1B1.13 n.1(D).[11]

The Application Notes only provide "helpful guidance" and are "not ultimately conclusive[.]"  United States v. Rodriguez, No. 03-271, 2020 U.S. Dist. LEXIS 58718, at *17 (E.D. Pa. Apr. 1, 2020) (quoting United States v. Fox, No. 14-03, 2019 U.S. Dist. LEXIS 115388, at *5 (D. Me. July 11, 2019).  Since the Sentencing Commission has not yet amended Section 1B1.13 or its commentary to account for the First Step Act, a district court has the authority to independently assess whether there are extraordinary and compelling reasons warranting a sentence reduction under 18 U.S.C. § 3582(c)(1)(A).  See Rodriguez, 2020 U.S. Dist. LEXIS 58718 at *17.

In general, however, "[i]n the context of the current global pandemic, [c]ourts around the country have [only] granted compassionate release where the defendant suffers from a serious condition that increases the likelihood of severe consequences from COVID-19."  United States v.

---

[11]  Although by its express language Section 1B1.13 applies to motions brought by the Director of the BOP, the current consensus is that the First Step Act removed this requirement.  See generally, United States v. Rodriguez, No. 03-271, 2020 U.S. Dist. LEXIS 58718, at *17 (E.D. Pa. Apr. 1, 2020) (considering whether a defendant bringing a direct-to-court motion for compassionate release demonstrated "extraordinary and compelling reasons" and using Section 1B1.13 as "helpful guidance.").

Somerville, No. 12-225, 2020 U.S. Dist. LEXIS 93935, at *18 (W.D. Pa May 29, 2020) (internal

quotation omitted).  In the Third Circuit, this means that "the mere existence of COVID-19 in

society and the possibility that it may spread to a particular prison alone cannot independently

justify … release."  United States v. Raia, 954 F.3d 594, 597 (3d Cir. 2020).  In addition, "[m]ost,

though not all, of the cases where compassionate release has been granted also involved some

showing that COVID-19 is actually present, usually to a significant degree, in the facility where

the prisoner is incarcerated."  Somerville, 2020 U.S. Dist. LEXIS 93935, at *18.  Thus, "a prisoner

seeking release due to COVID-19 must at least show: (1) a sufficiently serious medical condition,

or advanced age, placing the prisoner at a uniquely high risk of grave illness or death if infected

by COVID-19; and (2) an actual, non-speculative risk of exposure to COVID-19 in the facility

where the prisoner is held."  Id. at *20.

If a district court determines that an extraordinary and compelling reason exists, it must

then weigh that reason against the Section 3553(a) factors to determine if a sentence reduction is

warranted and, if so, the extent of such reduction.  See id. at *2 (explaining that "the Court must

weigh [the] extraordinary circumstances against the ordinary sentencing factors under 18 U.S.C.

§ 3553(a).").  Section 3553(a), however, establishes factors for a court to consider in initially

imposing a sentence, so not every factor applies to motions for compassionate release.  As noted

in the instant case, the applicable factors are:

> (1) the nature and circumstances of the offense and the history and
> characteristics of the defendant;
>
> (2) the need for the sentence imposed—
>
> > a.  to reflect the seriousness of the offense, to promote respect for the
> > law, and to provide just punishment for the offense;
> >
> > b.  to afford adequate deterrence to criminal conduct;

    c.   to protect the public from further crimes of the defendant; and

    d.   to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner[.]

    . . .

    (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct [.]

18 U.S.C. § 3553(a)(1)-(2), (6).  If a balance of a defendant's extraordinary and compelling reason and the Section 3553(a) factors support a reduced sentence, the court may reduce the prison term, modify the terms of supervised release, or both.

**B.  Defendant's Motion for Compassionate Release Will Be Denied.**

Defendant's Motion will be denied because she has not shown an extraordinary and compelling reason for her release.  Further, the relevant Section 3553(a) factors weigh against a reduction or modification of her sentence.  Each of these conclusions is discussed in turn below.

    1.    **Defendant's Medical Condition Do Not Present Extraordinary and Compelling Reasons.**

Defendant has not shown the kind of particularized vulnerability to COVID-19 and its effects required to constitute compelling reasons for release.  Defendant has not established that she suffers from sufficiently serious medical condition that place her at a uniquely high risk of illness or death if she were to be infected by COVID-19, even though she has shown that the existence of COVID-19 at FCI Coleman Low is more than just speculative.[12]

---

[12] Defendant has shown an actual, non-speculative risk of contracting COVID-19 at FCI Coleman Low.  Although the COVID-19 case numbers for FCI Coleman Low do not distinguish between the virus contracted at the men's institution and the women's camp, there is sufficient reason to believe COVID-19 is present within the women's facility.  (See Doc. No. 956.)  As the Government concedes, at the time of writing, 174 inmates had tested positive for the virus, some of which were probably within the women's encampment.  (See Doc. No. 959 at 11.)  As a result, Defendant has shown that COVID-19 is actually present, to a significant degree, at

14

Defendant's medical condition is not severe enough to warrant release because her condition does not place her at an especially high risk of serious illness or death if she were to contract COVID-19. Defendant's medical records reveal she suffers from, among other things, hypertension and hypothyroidism. District courts, however, routinely deny motions for compassionate release based on these medical conditions.[13] See United States v. Falci, No. 17-228, 2020 U.S. Dist. LEXIS 108498, at *12-14 (D.N.J. June 22, 2020) (denying a motion for compassionate release where the defendant suffered from hypertension because "[t]here is no indication that Defendant suffers from pulmonary hypertension or any other 'serious heart condition' that the CDC has identified as a high-risk factor."); United States v. Yanney, No. 4:15-CR-298, 2020 U.S. Dist. LEXIS 116480 at *10 (M.D. Pa. July, 2, 2020) (finding defendant's obesity and hypertension insufficient to qualify as an extraordinary and compelling reason for compassionate release); United States v. Numann, No. 3:16-cr-00065, 2020 U.S. Dist. LEXIS 72285 at *8 (D. Alaska April 24, 2020) (denying defendant's motion for compassionate release because "[t]here is no evidence that epilepsy or hypothyroidism make a person more susceptible

---

FCI Coleman Low. However, the Court also notes that the BOP has put into place several precautions to quarantine individuals who have contracted the virus or are showing symptoms so as to contain the spread. (Id.) Further, the BOP has reduced the number of inmates at FCI Coleman Low. (See Doc. No. 955 at 11.)

[13] The Court has considered the CDC's guidance on conditions that increase an individual's risk of severe illness from COVID-19. In its most recent guidance, dated July 17, 2020, the CDC outlines two categories of risk factors. The first category includes conditions that will increase an individual's risk of experiencing severe illness from COVID-19. The second category is more tenuous. It includes conditions that may increase an individual's risk of severe illness. Of Defendant's alleged medical conditions, only one is listed under these categories. Non-pulmonary hypertension is listed as a condition that may increase an individual's risk of severe illness from COVID-19. Defendant has non-pulmonary hypertension. She also has hypothyroidism and anemia, which are not in either category. See People of Any Age With Underlying Medical Conditions, CENTERS FOR DISEASE CONTROL AND PREVENTION, (July 17, 2020), http://www.cdc.gov/coronavirus. The CDC's guidance, however, is not binding on this Court and, in any event, there is no showing that her conditions substantially diminish her ability to provide self-care at FCI Coleman Low.

to COVID-19.").   Section 1B1.13 of the Sentencing Guidelines also supports Defendant's continued incarceration because there is no showing that her condition substantially diminishes her ability to provide self-care within FCI Coleman Low.

Further, Defendant's argument that her age presents an extraordinary and compelling reason for release is also unpersuasive.  Although the Application Notes state that reaching sixty-five years of age has bearing on the compassionate release decision, age alone in the absence of related medical condition would not warrant compassionate release.  Defendant, at age sixty-one, is essentially in the age group covered by the Application Notes, but her reported medical condition does not rise to the level of warranting compassionate release.  Moreover, her family circumstances do not support release at this time.

### 2.    The Section 3553(a) Sentencing Factors Do Not Weigh in Favor of Defendant's Release

Finally, the relevant Section 3553(a) factors do not support Defendant's release to home confinement or sentence reduction.  First, the Court has examined the nature and circumstances of the offense and Defendant's history and characteristics.  See 18 U.S.C. § 3553(a)(1).  From her arrival in Florida in 1988 until her arrest in 1998, Defendant committed a series of crimes growing in severity.  Defendant's convictions include conspiracy to distribute more than 150 kilograms of a cocaine, using communications facilities or telephones to facilitate drug felonies, and possession of a firearm despite being a convicted felon, which resulted in an imposition of a 35-year sentence.  (See Doc. No. 10.)  As the head of the OCO, she employed enforcers, lookouts, street sellers, mid-level managers, and upper-level managers to help her distribute over 150 kilograms of cocaine worth over $3,000,000.  (See id.)  The enforcers were tasked with using violence to protect their illicit product.  (Id.)

In 1996, Defendant was involved in a shootout that injured two innocent bystanders.  While imprisoned and on parole for the related firearms offense, she continued to lead the OCO.  As such, she has shown a tendency to continue criminal activity.

The Court also has considered whether her release would reflect the seriousness of the offenses, promote respect for the law, provide just punishment, afford adequate deterrence, and protect the public from further crimes by her.  See 18 U.S.C. § 3553(a)(2)(a)-(c).  Defendant has served less than two-thirds of a 35-year sentence.[14]  The magnitude of her crimes warrant the sentence she received.  And although Defendant asserts she will not pose a danger to others because she will have gainful employment if released, had no infractions in prison for fourteen years, and has taken numerous classes, her release at this point would not reflect the seriousness of the offenses, not promote respect for the law, not provide just punishment, not afford adequate deterrence, and not protect the public from further crimes being committed by her.

To the extent that Defendant's sentence must provide her with necessary "educational or vocational training, medical care, or other correctional treatment," 18 U.S.C. § 3553(a)(2)(d), she has not been deprived of these opportunities while incarcerated.  Defendant has taken over 80 courses and worked with UNICOR.  Further, Defendant's medical records reveal the BOP has

---

[14]   In United States v. Pawlowski, 967 F.3d 327, 331 (3d Cir. 2020), the Court held the following regarding Section 3582(c)(1)(a) and its requirement that a court reviewing a motion for compassionate release consider the Section 3553(a) factors to the extent they are applicable:

> . . . Because a defendant's sentence reflects the sentencing judge's view of the § 3553(a) factors at the time of sentencing, the time remaining in that sentence may—along with the circumstances underlying the motion for compassionate release and the need to avoid unwarranted disparities among similarly situated inmates—inform whether immediate release would be consistent with those factors. . .

taken care of her needs, as she receives regular medication to control her hypothyroidism, hypertension, and other ailments.

Lastly, the Court has considered the factor of the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct. See 18 U.S.C. § 3553(a)(6).  Defendant's co-conspirators received significantly lesser sentences because they were less culpable than her.  Defendant pled guilty to being the leader of the entire Ordaz Cocaine Organization.  She received a sentence within the range set by the Sentencing Guidelines, which Congress created to specifically address sentencing disparities.  To reduce Defendant's sentence would not reflect the Guideline's goal of avoiding unwarranted sentence disparities among similarly situated defendants and ensuring consistent punishment for similar offenses.

## IV.    Conclusion

For the foregoing reasons, Defendant's Motion for Compassionate Release will be denied. An appropriate Order follows.