**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA**

**UNITED STATES OF AMERICA**         **CASE NO.: 2:98-cr-00587-JHS-1**

**v.**

**LAZARA ORDAZ**

**MOTION FOR REDUCTION IN SENTENCE
("COMPASSIONATE RELEASE")**

**INTRODUCTION**

Lazara Ordaz respectfully requests that this Court grant her motion for compassionate release under 18 U.S.C §3582(c)(1)(A). Ms. Ordaz has served 24 years, or approximately 70% of her original sentence. Now 65 years old, she is incarcerated at Federal Correctional Institution Tallahassee ("FCI Tallahassee"), where her health is deteriorating. Ms. Ordaz filed a motion for compassionate release in June 2020 because of her multiple medical conditions and the risk of contracting COVID-19 during the height of the pandemic. Since then, she has developed additional medical conditions, including shortness of breath, degenerative disc disease, and limited use of her left arm. These conditions have made performing routine activities, such as making her bed, difficult and painful for Ms. Ordaz.

Ms. Ordaz has devoted herself to rehabilitation. Numerous friends, family, and community members have come forward to describe Ms. Ordaz's generous nature, work ethic, and extensive mentoring activities. Given her detailed and realistic reentry plan and demonstrated commitment to using her remaining years in pursuit of redemption, Ms. Ordaz will successfully reintegrate into society. The Acting Warden at FCI Tallahassee, where Ms. Ordaz is incarcerated, has recommended a reduction in sentence as Ms. Ordaz meets the criteria under BOP Policy Statement 5050.50. Acknowledging her serious transgression, Ms.

Ordaz humbly asks that this Court allow her to continue to atone beyond the walls of FCI Tallahassee.

## STATEMENT OF THE FACTS

1. **Personal History**

Lazara Ordaz was born in Havana, Cuba, to two factory workers, Raquel Machado and Cosme Ordaz. PSR ¶ 140. Ms. Ordaz was raised by her aunt and uncle in Havana alongside three step-siblings and was one of six children born to her parents. *Id.* Ms. Ordaz's family was not well-off but could make ends meet. PSR ¶ 141. As part of a pre-college program, Ms. Ordaz worked as a teacher and studied pedagogy. PSR ¶ 149. Yet, life under Fidel Castro was difficult; as Ms. Ordaz reports, it was a life "with no freedom," where the threat of imprisonment was constant, and she had to work seven days a week just to "fight to eat." Following her brother's words, "Come, we'll be free," Ms. Ordaz emigrated to the United States from Cuba as a refugee on the Mariel Boat Lift in 1980 at only twenty-one years old, leaving her community and her job as a schoolteacher behind. PSR ¶ 31, 142. She and her brother were two out of over 125,000 refugees who fled Fidel Castro's regime and sought asylum in the United States at that time.[1] She could not speak English.

Once in this country, Ms. Ordaz reports that she found herself isolated due to the language barrier and inability to function in society. She worked under the table as a landscaper and as a cashier but could not earn enough to make ends meet. PSR ¶ 153. She had to rely on her brothers for survival and they earned money selling drugs. PSR ¶ 107. Selling drugs seemed like the only option to provide for herself. At the time, she didn't

---

[1] Alexander Stephens, *Making Migrants "Criminal": The Mariel Boatlift, Miami, and U.S. Immigration Policy in the 1980s*, 17 ANTHURIUM: A CARIBBEAN STUDIES J. 1 1, https://anthurium.miami.edu/articles/10.33596/anth.439.

understand the repercussions of this decision. Ms. Ordaz moved to Philadelphia, where two of her other brothers were dealing drugs. PSR ¶ 142. Philadelphia was unfamiliar and cold, and just when she was ready to leave, her brothers involved her in their drug business. PSR ¶ 11. Ms. Ordaz believed that someone in her situation could only make money working in the drug business because no one she knew was doing anything else.

As a woman, Ms. Ordaz had to be tough to survive in Philadelphia's drug world. She defended her street corner and got to know the local residents in the community. She paid for block parties, purchased Christmas gifts for neighborhood children, and supported her family in Cuba. PSR ¶ 156. Ms. Ordaz was particularly close to Maritza DeFabian, and she was the godmother of one of Maritza's sons. In August 1996, while Ms. Ordaz was standing on the corner, with children playing nearby, some rival drug dealers drove by and opened fire on her. PSR ¶ 131. Despite Ms. Ordaz's best attempts to protect the children, Ms. DeFabian's daughter, Christina, was wounded in the subsequent exchange of gunfire. *Id*. Ms. Ordaz was charged with reckless endangerment and carrying a firearm without a license. *Id*.

Ms. DeFabian, the mother of the injured child, swore under oath that Ms. Ordaz did nothing but "try to protect the children;" she affirmed that "there is no way she [Ms. Ordaz] is responsible for my daughter's injuries." Ex. A, Doc. 955 at 58. Ms. Ordaz maintains a close relationship with Ms. DeFabian and Cristina to this day and notes that Christina has grown from a little girl into a beautiful young woman.

In December of 1998, Ms. Ordaz was charged with conspiracy to distribute cocaine, use of a telephone to facilitate a drug felony, and possession of a firearm as a convicted felon. PSR ¶¶ 1-2. She pled guilty to all charges. In November of 2000, Ms. Ordaz received her current sentence of 420 months. Doc. 478. Over the last two decades, Ms. Ordaz has gone

from being an isolated young woman unfamiliar with American society to a wise mother, mentor, and friend. She takes full accountability for her past actions and notes that the woman she is today would not repeat the mistakes of the woman she was 24 years ago.

### 2. **Incarceration**

#### 1. *Medical Conditions*

When she was initially incarcerated, Ms. Ordaz was healthy and suffered from no notable physical ailments. PSR ¶ 145. Ms. Ordaz worked hard throughout her incarceration. She operated a forklift, handled materials, and participated in other physically demanding activities at a UNICOR warehouse. Doc. 955 at 72. Because of untreated shoulder pain, unexplained shortness of breath, and sciatica, Ms. Ordaz can now no longer walk across the compound or carry commissary items back to her room. Ex. B. at 25, 27. Over a year ago, Ms. Ordaz's health had deteriorated to such a degree that she could only work 30 minutes a day. Ex. C at 157. Although she still attempts to help, she can no longer even mop without taking a break. *Id*. at 164. Attempting to do chores is be "painstakingly difficult" for her. Ex. B at 12. Other incarcerated women report needing to help Ms. Ordaz dress, go up and down stairs, shower and read. *Id.* at 23-27.

Besides this, Ms. Ordaz has reported a family history of heart disease, which will require careful monitoring in the coming months and years. Ms. Ordaz already suffers from an increasing number of age-related conditions, including cataracts, dental damage so severe that she wears dentures, hypertension, and hypothyroidism. Ex. C at 143-4. Her medical records document a history of vertigo and falling. *Id*. at 37. Ms. Ordaz has long suffered from sleep apnea and must use a CPAP machine. *Id*. at 48, 118, 173. Her latest medical tests show an eGFR rate of 45, indicative of stage 3a kidney disease.[2] *Id*. at 179.

---

[2] https://www.kidney.org/atoz/content/gfr

*2. Conditions at FCI Tallahassee:*

In May 2023, the DOJ Office of the Inspector General made an unannounced inspection of FCI Tallahassee and later published several disturbing findings.[3] The facility presents a myriad of health and safety concerns. It is dangerously understaffed; in the Health Services Department, 38% of the positions are vacant. *Id.* at 38. The DOJ found that because of these shortages, medical providers have difficulty communicating with Spanish-speaking clients and have been forced to distribute crucial drugs at inopportune times, dispensing insulin and psychiatric medications too early in the day to be effective. *Id.* at 35. The Department also has an incomplete medical screening process and difficulty in promptly addressing medical emergencies. *Id.* at 38.

These lapses in healthcare are particularly dangerous given the unhygienic conditions of Tallahassee. DOJ investigators observed and photographed moldy bread being served to inmates and rodent droppings in the food storage. *Id.* at 4. The roofs in the female housing unit regularly leak, and toilets in the communal bathrooms are inoperable. *Id.* at 16. In some rooms, leakage from the windows is so severe that inmates must use feminine hygiene products to absorb water. *Id.* at 14. An unknown black substance permeates walls and ceilings; instead of replacing the affected segments, prison staff simply painted over them. *Id.* at 15.

---

[3] *Inspection of the Federal Bureau of Prisons' Federal Correctional Institution Tallahassee*, Dep't Just. Off. Inspector Gen. (Nov. 2023), https://oig.justice.gov/sites/default/files/reports/24-005.pdf.

# ARGUMENT

### 1. **MS. ORDAZ HAS EXHAUSTED HER ADMINISTRATIVE REMEDIES**

To be eligible under 18 U.S.C. §3582(c)(1)(A) for a reduction in sentence, a person must exhaust their remedies by requesting that the BOP file a compassionate-release motion on their behalf. After the Warden responds, or fails to do so within 30 days, the movant is free to file a motion in the sentencing court. Ms. Ordaz's unit team approved her request for release on June 5, 2024 and it was forwarded to the BOP Office of General Counsel that same day. Ex. D. Under the First Step Act, the BOP has thirty days to consider a request to move for compassionate release. *United States v. Raia*, 954 F.3d 594, 597 (3d Cir. 2020). Specifically, a movant can only file "after [he or she] has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf **or** the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, **whichever is earlier**." *United States v. Harris*, 812 F. App'x 106, 107 (3d Cir. 2020) (emphasis in original). These alternate options act independently and so either – full exhaustion of remedies or a 30-day time frame – satisfy the exhaustion requirement. *Id.*

Deciding this motion now will also serve judicial efficiency. *Pennsylvania v. Ritchie*, 480 U.S. 39, 50 (1987) ("The interests of judicial economy and the avoidance of delay . . . would be best served by resolving the issue."). Pro bono counsel has worked on this motion for many months. The people at FCI Tallahassee who know Ms. Ordaz personally have decided she deserves to go home. Waiting for the BOP Central Office to approve the recommendation and then pass it to the AUSA to draft a motion when one has already been written makes no sense.[4] These entities

---

[4] Counsel consulted with the U.S. Attorney's Office to seek concurrence for this motion. After an open and cordial exchange of information, no agreement was reached.

can weigh in as needed in a reply brief. Ms. Ordaz has thus properly exhausted her administrative remedies and her motion is properly before this Court.

## II. THE CONDITIONS OF MS. ORDAZ'S INCARCERATION CONSTITUTE EXTRAORDINARY AND COMPELLING CIRCUMSTANCES

Ms. Ordaz's medical conditions and age have reduced her ability to accomplish tasks necessary to her daily life, reaching the level of extraordinary and compelling circumstances that justify her release. 18 U.S.C. § 3582(c)(1)(A). When Ms. Ordaz was convicted over two decades ago, she had "always enjoyed good health." PSR ¶ 145. Prison accelerates aging: a recent study in San Francisco showed that the average 59-year-old incarcerated person has the health of a free 71.7-year-old.[5] Ms. Ordaz had a series of physically demanding jobs, such as operating a forklift and handling warehouse materials, which has taken its toll. Doc. 955 at 72. She lived through the COVID pandemic in prison and tested positive for the disease. Now she is 65 and is suffering from numerous ailments that make it impossible for her to function in a prison environment.

In May 2023, the United States Sentencing Commission submitted revised Guidelines to Congress to bring them in line with the First Step Act, which Congress passed in 2018 to increase the use and accessibility of compassionate release. *See* 18 U.S.C. § 3582(c)(1)(A); *United States v. Claude*, 16 F.4th 422, 426 (3d Cir. 2021); *United States v. Maumau*, 993 F.3d 821, 824 (10th Cir. 2021). On November 1, 2023, these new amendments took effect. The amendments provide grounds for relief for incarcerated individuals on three grounds relevant here. First, incarcerated people are eligible for compassionate release if they suffer from a "medical condition that requires long-term or specialized medical care that is not being provided and without which the defendant is at risk of serious deterioration in health or death." 1B1.13(b)(1)(C). Second, a reduction in

---

[5] Anna Chodos, M.D., *et al.*, *Older Jail Inmates and Community Acute Care Use*, Am. J. Pub. Health, Sept. 2014, at 1728.

sentence is appropriate for those who are "experiencing deteriorating physical or mental health because of the aging process that substantially diminishes the[ir] ability. . . to provide self-care" in a prison if the person "is not expected to recover." 1B1.13(b)(1)(C). Third, an incarcerated person who is "at least 65 years old," is "experiencing a serious deterioration in physical or mental health because of the aging process," and has served "10 years or 75 percent of his or her term of imprisonment, whichever is less," also demonstrates extraordinary and compelling circumstances. USSG §1B1.13(b)(2).

No doubt exists that Ms. Ordaz qualifies under the Guideline §1B1.13(b)(2). She is over 65 years old. Her physical health is deteriorating due to the aging process, as outlined below. She has served over 10 years. In addition, she is unable to provide self-care due to physical infirmities which the BOP has failed to care for and from which she will not recover as long as she remains in custody – if ever.

**1. The Deterioration of Ms. Ordaz's Physical Health Due to Aging Constitutes an Extraordinary and Compelling Circumstance**

Ms. Ordaz's health problems which she has accumulated over two decades of incarceration meet the "extraordinary and compelling" guidelines. Specifically, she "experiencing a serious deterioration in physical . . . health" due to aging.  USSG §1B1.13(b)(2). Ms. Ordaz struggles with the activities of daily living because chronic shoulder pain, hypertension, shortness of breath, cataracts, falling spells, and sciatica. Ex. C at 143-5. She has moderate sleep apnea and her CPAP machine is unreliable. *Id*. at 173. Although she still tries to mop and clean floors, she states that she must stop every few steps to catch her breath and rest. Even with the use of an inhaler, which she utilizes three to times per day, she experiences shortness of breath and she can no longer go up the stairs or make a bed. Ex. C at 162, 164. In March 2023, more than a year ago, Ms. Ordaz could only work

30 minutes a day. *Id*. at 157. She reports that the doctor offered to take her off work duty but she refused because she wanted to continue to work and contribute.

As commendable as that is, the other women on her unit explain that Ms. Ordaz cannot complete activities of daily living, although it is very difficult for her to admit this. For instance, one woman explains "Lazara tries her best to function but cannot do so without the help of others. . . . It is difficult for Lazara to travel up [the] stairs and this puts limits on where she can go over the compound." Ex. B at 27. Her roommate for the past two years states "I often have to assist Ms. Ordaz in all of her daily activities including helping her dress, making her bed, making sure the room is inspection ready, cleaning the floors and also have to assist her around the compound when she has to go to different departments[.]" *Id.* at 23; *see, e.g., United States v. Reaves*, 2023 U.S. Dist. LEXIS 59708 (E.D. Pa. Apr. 5, 2023) (granting compassionate release when a 56-year-old inmate had difficulty bathing and dressing. Another woman who assists her writes "She [Ms. Ordaz] needs help making her bed, reading, carrying her commissary, showering, many other things that I assist her with." *Id.* at 25. Another adds "Her asthma causes her such shortness of breath and wheezing I sometimes wonder if this is going to be her last breath. Her eyesight is failing that she has to ask others for assistance in reading the computer and filling out forms." *Id.* at 27.  Age-related health problems such as knee pain that interferes with daily activities, hypertension, or decreased hearing can also justify compassionate release. *United States v. Cunningham*, No. CR 12-60-GF-BMM, 2024 WL 50908 (D. Mont. Jan. 4, 2024). As Ms. Ordaz continues to age, her ability to care for herself will diminish even further.

Ms. Ordaz must navigate this difficult prison environment while suffering from chronic pain. Ms. Ordaz received an MRI in 2021 due to a dislocated joint and impingement

syndrome diagnosis. Ex. C at 10. Ms. Ordaz had shoulder surgery in 2009, and it is likely

that she will require additional surgery and medications in the future, given that she has

experienced significant post-surgery shoulder pain for over 10 years. *Id*. at 16. The surgery

typically requires months of physical therapy and follow-up treatments, both of which will

unlikely to be available to her because of limitations of BOP medical care due to staffing

shortages. Doc. 955 at 7. Without the surgery she cannot reach for things or carry simple

things like commissary purchases.

These chronic conditions co-exist with the risk of communicable disease, which is

ever-present for incarcerated people. Ms. Ordaz knows this far too well. Since 2020 alone,

Ms. Ordaz has tested positive for Hepatitis B and has been exposed to scabies. Ex. C at 60,

95. Recently she reported she had tested positive for *H. pylori*. *Id*. at 212. She also contracted

COVID-19. Ex. C at 30. COVID is particularly dangerous for people like Ms. Ordaz; in the

United States, 81% of COVID-19 deaths occur in adults aged 65 and older.[6] And the disease

is far from a distant specter. On January 23, 2024, alone, 24,771 people were diagnosed with

the disease in the U.S., and 178 people died.[7] In Florida, where Ms. Ordaz is incarcerated,

COVID-19 infection rates among incarcerated people are almost twice as high as the state

average.[8]

---

[6] National Center for Health Statistics, *COVID-19 Mortality in Adults Aged 65 and Over: United States, 2020*, NCHS Data Brief, Oct. 2022, at 1, https://www.cdc.gov/nchs/data/databriefs/db446.pdf.
[7] *Reported Cases & Deaths by Country: United States*, Worldometer, https://wsyww.worldometers.info/coronavirus/country/us/#graph-cases-daily (last accessed Mar. 19, 2024).
[8] Eddie Burkhalter et al., *Infected and Incarcerated: How the Virus Tore Through the U.S. Prison System*, N.Y. Times (Apr. 10, 2021) https://www.nytimes.com/interactive/2021/04/10/us/covid-prison-outbreak.html.

Though Ms. Ordaz is determined to remain positive and productive, these physical ailments have begun to take a toll on her mental health. She has struggled with Adjustment Disorder and has taken various medications to address recurring anxiety and depression. Ex. C at 28. At times, she has suffered from abnormal weight loss. *Id*. at 41. She is coping with gender dysphoria and the BOP is not providing hormone treatment or mental health counseling.

## 2. Ms. Ordaz's Medical Conditions Require Care That FCI Tallahassee Has Repeatedly Failed to Provide in a Timely or Adequate Manner

For the near quarter-century that Ms. Ordaz has been incarcerated, FCI Tallahassee and other BOP prisons have consistently delayed and denied treatment, jeopardizing her health and leaving her in chronic pain. "[N]eglect[ing] to provide urgent treatment" recommended by BOP doctors or "repeatedly delay[ing]" scheduled care can constitute "extraordinary and compelling" circumstances warranting early release. *United States v. Verasawmi*, No. CR 17-254 (FLW), 2022 WL 2763518 (D.N.J. July 15, 2022) (finding that delays in chronic care, rather than a single medical issue, can meet the "extraordinary and compelling" standard); *United States v. Spencer*, 519 F. Supp. 3d 237, 249 (E.D. Pa. 2021) (granting compassionate release because the BOP could not "provide adequate medical care to treat his conditions" because of staff shortages and other challenges "due to the pandemic"). If the BOP cannot provide sufficient medical care, judicial intervention may be necessary to prevent people with pressing health concerns from continuing to "fall through the cracks." *Spencer*, 519 F. Supp. 3d at 249.

The BOP cannot provide the level of care and attention that Ms. Ordaz's medical conditions require. Multiple "diagnoses of painful chronic conditions" can when "taken together, establish extraordinary and compelling circumstances." *United States v. Sitzmann*, No. CR 08-0242 (PLF), 2022 WL 884179, at *4 (D.D.C. Mar. 25, 2022). Ms. Ordaz received shoulder surgery in 2008

and, in the decade since, has experienced chronic postoperative pain, which is so severe that her shoulder feels as if it has "glass" piercing it. Ex. C at 143 (noting onset of shoulder pain in 2013). She is unable to sleep on her left side. *Id*. at 16. She cannot even dress herself without experiencing this pain. *Id*. at 50. She also has sciatica, first identified in 2011 on the left side and bilaterally in 2019, which causes pain; if she sits too long, she walks with a limp. *Id.* at 81, 143. This is not the normal aches and pain associated with aging but debilitating pain that has been going on for years. *Id.* at 81, 87-88 (8/10 sciatic pain in 2021); 124 (outside consult 2021 with increase of pain meds).

The BOP is unable to treat her to control the pain. She was taking Trileptal, an anti-epilepsy medication that is effective in controlling nerve pain,[9] but the BOP will no longer give her that medication because it was removed from the agency's formulary. Ex. C at 158. The medical notes state "Pharmacy refused to dispense lidoderm pain patches" and instead stated Ms. Ordaz should "try OTC meds and muscle rubs." *Id.* In addition to taking away a prescription medicine that worked, the BOP forced Ms. Ordaz to take on the financial burden of paying for a less-powerful medication at inflated commissary prices. *Id*. Ms. Ordaz requires additional surgery to address her condition which was scheduled for the fall of 2021, but has not happened. *Id*. at 127. Ms. Ordaz reports that the medication duloxetine was not effective and that she needed the pain patches and meloxicam for effective pain management. *Id.* at 164. Due to the unsuccessful substitution Ms. Ordaz has remained in pain. *Id*. at 159.

Ms. Ordaz suffers from unexplained breathing problems that make it impossible for her to climb stairs or walk to different parts of the compound without resting and becoming winded. In March 2023 she reported that her breathing problems had reduced her ability to work as an orderly

---

[9] https://www.mayoclinic.org/diseases-conditions/peripheral-neuropathy/in-depth/pain-medications/art-20045004

to 30 minutes a day and she was concerned about losing her job. Ex. C at 157. She could no longer get to the pill line to collect medications. *Id.* Her blood pressure was taken three times between March and September 2023, and each time reached levels the American Heart Association considers stage 2 hypertension (141/76, 169/80, 150/81).[10] Ex. C. at 154. The cause of her shortness of breath remains unknown.

Ms. Ordaz also suffers from cataracts in both eyes, which were diagnosed as early as 2021 and have not been removed. Ex. C. at 66, 183. As her vision continues to deteriorate, the health risks associated with cataract surgery increase; untreated cataracts can become hypermature, making them dense and difficult to remove.[11] Continuing to delay treatment can eventually lead to permanent vision issues or even blindness. *Id.* at n. 10; *United States v. Gaffney*, No. 1:95-CR-53 (LMB), 2022 WL 888350, at *4 (E.D. Va. Mar. 25, 2022) (finding poorly treated glaucoma and macular degeneration contributed to satisfying the extraordinary and compelling standard). In the meantime, Ms. Ordaz needs help reading and filling out forms due to vision problems. She has not received a new prescription since 2019, exacerbating the problem. Ex. C at 152.

Finally, Ms. Ordaz lived openly as a lesbian before her incarceration. PSR ¶ 143. In 2022 she was diagnosed with gender dysphoria, but nothing has been done to begin the transition from female to male, other than providing a chest binder. Ex. C. at 144, 166, 195, 225.

It is not enough for the BOP to provide intermittent treatment or care; Ms. Ordaz is entitled to "consistent care, monitoring, and treatment required for her conditions." *United States v. Robles*,

---

[10] https://www.heart.org/en/health-topics/high-blood-pressure/understanding-blood-pressure-readings

[11] Alfred Mamelok, M.D. & Lanny Foster, 8 *Attorney's Textbook of Medicine* § 56.04 (3d ed. 2024).

No. 19CR4122, 2022 WL 229362, at *2 (S.D. Cal. Jan. 26, 2022). FCI Tallahassee has a chronically understaffed Health Services Department, and the DOJ has noted its inability to provide both emergency and routine medical treatment in a timely manner.[12] Ms. Ordaz saw the doctor at FCI Tallahassee at the request of the U.S. Attorney's Office handling this case. He wrote her some new prescriptions, but he did not schedule any tests nor diagnose the reason for Ms. Ordaz's shortness of breath. Ms. Ordaz reported on July 22, 2024 that the doctor no longer worked at the prison and had not filled her new prescriptions. Ms. Ordaz has fallen through the cracks time and time again; she requires a level of sustained care that the BOP cannot provide. FCI Tallahassee has not adequately cared for Ms. Ordaz; this combined with her age, creates a compelling reason to grant her compassionate release under the 2023 Guidelines. Ex. D.

## II.   MS. ORDAZ HAS SERVED OVER TWO THIRDS OF HER SENTENCE AND HAS FULFILLED THE PURPOSE OF HER SENTENCE UNDER 3553(a).

Ms. Ordaz's medical conditions and age constitute extraordinary and compelling reasons for her release, meaning this Court can consider whether the purposes of sentencing Ms. Ordaz have been fulfilled. 18 U.S.C. §3553(a). Ms. Ordaz was convicted of a serious crime, but that does not determine the person she will be for the remainder of her life. A sentence must be sufficient, but not greater than necessary, to serve the purposes of "just punishment, deterrence, protection of the public, and rehabilitation." *Dean v. United States*, 137 S. Ct. 1170, 1175 (2017) (citing U.S.C. § 3553(a)(2)(A)–(D)). These purposes of sentencing are considered "in light of the extraordinary and compelling reasons for reducing the term of imprisonment." *United States v. Greene*, 516 F. Supp. 3d 1, 27 (D.D.C. 2021) (Jackson-Brown, J.). Here, the Warden of FCI Tallahassee has

---

[12] *Inspection of the Federal Bureau of Prisons' Federal Correctional Institution Tallahassee*, U.S. Dep't Just. Off. Inspector Gen. (Nov. 2023), https://oig.justice.gov/sites/default/files/reports/24-005.pdf.

approved Ms. Ordaz's request for compassionate release. Ex. D. This shows that the people who are trained to assess progress toward rehabilitation and potential dangerousness and who interact with Ms. Ordaz on a daily basis believe that she is ready to go home. *United States v. Rodriguez*, No. 00 CR. 761-2 (JSR), 2020 WL 5810161, at \*4 (S.D.N.Y. Sept. 30, 2020).

Courts must consider evidence of rehabilitation, considering who the person is today rather than limiting analysis to the gravity of the transgression. *Concepcion v. United States*, 142 S. Ct. 2389, 2400 (2022). The evaluation of a defendant's "history and characteristics is not frozen in time" *United States v. Tidwell*, 476 F. Supp. 3d 66, 77 (E.D. Pa. 2021). Evidence of rehabilitation is "clearly relevant to the selection of an appropriate sentence" under 18 US.C. § 3553(a), as it informs the defendant's characteristics and the purpose of the sentence imposed. *Pepper v. United States*, 562 U.S. 476, 491 (2011). This accords with the longstanding principle that a punishment should suit not only the crime but also each individual defendant before the court. *Id.* at 488. Ms. Ordaz's original sentence is no longer appropriate or necessary to serve the purposes of incarceration; her extraordinary conduct while incarcerated shows that she is a woman redeemed.

### A. Ms. Ordaz Poses No Danger to the Public

Releasing Ms. Ordaz, who is now 65 years old and suffering from numerous physical ailments, will not endanger the public. According to the U.S. Sentencing Commission, "[o]lder offenders were substantially less likely than younger offenders to recidivate following release."[13] Overall, only "13.4 percent of offenders age 65 or older at the time of release were rearrested compared to 67.6 percent of offenders younger than age 21 at the time of release." *Id.* at n.6; *United*

---

[13] *The Effects of Aging on Recidivism Among Federal Offenders* 3, U.S. Sentencing Comm'n (Dec. 2017), https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2017/20171207_Recidivism-Age.pdf.

*States v. Gaffney,* No. 1:95-CR-53 (LMB), 2022 WL 888350, at *6 (E.D. Va. Mar. 25, 2022) (quoting a Sentencing Commission study that "offenders who are released when they are older than 60 have a rearrest rate of only 16.0%").

Further, the Department of Justice reports that recipients of compassionate release have a significantly lower rate of recidivism than people who complete their sentences.[14] Congress did not intend for "court[s] to deny . . . motion[s] for compassionate release simply and solely because the defendant's offense of conviction is an egregious and dangerous crime." *Greene*, 516 F. Supp. 3d at 27 (granting compassionate release to a man who killed a federal marshal).

By recommending Ms. Ordaz for a reduction in sentence, the Warden at FCI Tallahassee has signaled that Ms. Ordaz is not a danger to the community. The relevant factors in determining dangerousness include "the nature and circumstances of the offense charged," "the history and characteristics of the person," including "the person's character, physical and mental condition, family ties, . . . community ties, past conduct, history relating to drug or alcohol abuse, [and] criminal history," and "the nature and seriousness of the danger to any person or the community that would be posed by the person's release." 18 U.S.C. § 3142(g). Under each of these factors, Ms. Ordaz does not pose a danger to the public.

Ms. Ordaz's prison record stretches back a quarter of a century and demonstrates that she no longer poses a danger to their community. A movant's behavior while incarcerated indicates whether they will be a danger to their community upon release. *Babb v. United States*, 2021 WL 2315459, 19 (D. Md. June 4, 2021) (granting sentence reduction to a defendant who was a "model prisoner who has made every effort to turn his life around" despite being charged with drug trafficking and two murders). Because people grow and change, no conviction is immutable.

---

[14] *The Federal Bureau of Prisons' Compassionate Release Program* 11, U.S. Dep't Just. Off. Inspector Gen. (Apr. 2013), https://oig.justice.gov/reports/2013/e1306.pdf.

Firearms and drug offenses do not automatically render someone dangerous to the public and ineligible for a sentence reduction. *United States v. Rodriguez*, 451 F.Supp.3d at 406 (finding compassionate release appropriate because the defendant's drug dealing was "seventeen years behind him"). Similarly, success in prison can result in a person who committed two "serious" armed robberies no longer posing a risk to the community. *United States v. Parker*, No. 08-534, 2021 WL 1264171, at *4 (E.D. Pa. Apr. 6, 2021). Even someone convicted of rape and running a drug ring from prison can stop being a threat decades after the fact. *United States v. Gaffney*, No. 1:95-CR-53 (LMB), 2022 WL 888350, at *5 (E.D. Va. Mar. 25, 2022) ("Gaffney is not the same person who was convicted in this district nearly thirty years ago.").

Ms. Ordaz has served over two decades in prison; her drug dealing is 25 years behind her. Her disciplinary record has been almost perfect since day one, with only one infraction in the past ten years. Ex. E at 9. Ms. Ordaz has demonstrated remorse for her crimes, recognized their severity, and worked hard while incarcerated, receiving stellar reports for her work. Doc. 955 at 72. Her UNICOR supervisors and co-workers attest on her immense work ethic, trustworthiness, honesty, and strong interpersonal skills, and "respectful and cooperative attitude towards staff." over the years. *Id*. at 72-5; Ex. B at 4-5, 15-16. Ms. Ordaz's dedication to the numerous jobs she has held displays her ability to contribute positively to society.

Ms. Ordaz has worked hard to educate herself so she will be employable once she is released. Ms. Ordaz got involved in drug distribution when she was unfamiliar with the United States, spoke no English, and was dependent on her Spanish-speaking brothers who were dealers. She is now able to speak English and obtained her GED in 2003. Ex. E at 1. She has built on that foundation over the decades, completing over eighty programs or classes to better herself,

including courses on drug addiction, life management skills, interpersonal and business communications, business management, and arts and humanities. Ex. E at 1-2; Ex. B at 7.

Ms. Ordaz will pose the same low risk to the community whether she is released now or in four years. Incarceration must serve a purpose; here the only result will be further deterioration in Ms. Ordaz's health. A movant's "medical decline moves the needle with regard to the need 'to protect the public from future crimes of the defendant.'" *United States v. Oishi*, No. 17-CR-00555-DKW-8, 2022 WL 4120785, at *4 (D. Haw. Sept. 9, 2022). Ms. Ordaz has several painful and degenerative conditions that make it impossible for her to return to the streets. Ms. Ordaz's risk to the community is nil, so keeping her locked up will not make the community safer. *United States v. Fields*, 569 F. Supp. 3d 231, 239 (E.D. Pa. 2021) (considering "the relevant question" to be whether continued incarceration would "pose[] less risk to the community . . . ").

Ms. Ordaz's family and community attest to her changed character, giving further assurance that she will pose no danger to the public if released. Individuals incarcerated with Ms. Ordaz state that she "isn't the same person she came in as" Ex. B at 4. In fact, "if the world had more people like Ms. Ordaz, it would be a much better place." *Id*. at 11. Many of her companions in the unit explain her importance: "the unit runs smooth [sic] because of her good work." *Id*. at 13. She helps addicts get clean and mentors younger prisoners, using her "wisdom and past experiences to help people from different walks of life." *Id*. at 15.

Given the numerous support letters that attest to Ms. Ordaz's change of character, coupled with her near-perfect disciplinary record, eager participation in programming while incarcerated, and severe health conditions that will make her unable to return to a life of crime, all reflect that Ms. Ordaz does not pose a danger to the public under the 18 U.S.C. § 3142(g) factors.

**B.  Ms. Ordaz Has Been Sufficiently Punished**

Ms. Ordaz's lengthy prison sentence, spanning two and a half decades, has been adequate to address the severity of her crime; the deterrent effect of her lengthy sentence will not be undermined by a grant of compassionate release. Ms. Ordaz previously requested relief under the First-Step Act and was denied. *United States v. Ordaz,* No. 98-00587-01, 2020 WL 5993289 (E.D. Pa. Oct. 9, 2020). Many of the grounds for that denial are no longer applicable for three reasons. First, nearly four more years have passed, meaning that Ms. Ordaz has completed ⅔ of her sentence, a benchmark both the government and this Court cited as reasons to deny her compassionate release. *Id.* at *1, *5, *9. Now that she has achieved that milestone, it must count in her favor. *United States v. Benjamin*, No. CR 10-131, 2021 WL 308228, at *4 (E.D. Pa. Jan. 29, 2021) (granting compassionate release after 50 percent of sentence served); *United States v. Kilgo*, 2023 WL 150608 at *2 (S.D. Ohio Jan. 10, 2023) (same). Second, the U.S. Sentencing Commission has passed new guidelines for granting compassionate release, and Ms. Ordaz meets their criteria due to her age, medical conditions, and the inconsistent care she has received for them. Third, her unit team and Warden at FCI Tallahassee have recommended a reduction in sentence.

In its previous order, this Court outlined in detail Ms. Ordaz's serious drug crimes, committed in the 1990s. She cannot change what she did; nothing can. But the standard is not what she did over 20 years ago but who she is today. *Pepper v. United States*, 562 U.S. 476, 491 (2011) (stating rehabilitation is "clearly relevant to the selection of an appropriate sentence . . . ."). The nature of Ms. Ordaz's offense "is just one factor in the section 3553(a) analysis." *United States v. Greene*, 516 F. Supp. 3d 1, 26–27 (D.D.C. 2021) (Kentaji Jackson-Brown, J.) (rejecting the argument that some crimes are "just too egregious to warrant granting . . . compassionate release").

As then-judge, now Justice, Jackson-Brown explained, focusing on the nature of the transgression, obscures the "nuanced analytical framework that Congress has provided in section 3582(c), which plainly differentiates a sentence modification from other sentencing procedures." *Id.* at 26. Once the extraordinary and compelling element is met, "the presumption then effectively shifts in favor of . . .release, and the court must determine whether any of the purposes of punishment set forth in section 3553(a) require keeping the defendant incarcerated nevertheless[.]" *Id.* at 27.

What was an appropriate punishment 25 years ago is no longer fits the person Ms. Ordaz has become. *Id.* at 488. As of filing, at least 3,320 people have signed a petition to give her clemency.[15] Rehabilitation is superfluous if people are always only judged by what they did when they were "young and stupid," as Ms. Ordaz describes her previous self. Accordingly, the fact that she continued to run a drug operation from jail in the 1990s has no bearing on what she will do if released today. *Compare Ordaz*, 2020 WL 5993289 at *1 (finding Ms. Ordaz has "shown a tendency to continue criminal activity" based on actions taken in 1996) *with United States v. Tidwell*, 476 F. Supp. 3d 66, 77 (E.D. Pa. 2021) (stating that the evaluation of a defendant's "history and characteristics is not frozen in time").

Similarly, 25 years of incarceration is commensurate with the seriousness of the crime and supports respect for the law. *United States v. Mumford*, 544 F. Supp. 3d 615, 619-20 (E.D. Va. 2021) (finding that reducing the defendant's sentence "in no way diminishes the seriousness of the offenses" given that the defendant had already been incarcerated for more than 25 consecutive years). The delay will, however, jeopardize Ms. Ordaz's eyesight as cataract surgery is delayed,

---

[15] "Help Bring My Mom Home, Lazara Ordaz," Change.org, last accessed July 5, 2024. https://www.change.org/p/petition-to-president-of-the-unites-states-joe-biden-vice-president-of-the-united-states-kamala-harris-help-bring-my-mom-home-lazara-ordaz

decrease her mobility as her shoulder pain and sciatica are not treated, and increase the chances of a catastrophic medical event because her shortness of breath remains unexplained.

Ms. Ordaz will be going home, but the longer she is forced to wait, the harder that transition will be. Her current release date is July 31, 2028, and she will be eligible to live in a halfway house as early as July 2027. Ex. E at 1. Holding Ms. Ordaz in prison for an additional three years will not increase public safety, strengthen deterrence, or promote respect for the law. 25 years of incarceration sends that message as effectively as 28 because "the marginal deterrent effect of increasing already lengthy prison sentences is modest at best."[16] Ms. Ordaz has spent a third of her life in prison, a very high price to pay even for serious crimes. She is now a 65-year-old woman. The Justice Department recognizes that keeping the elderly behind bars is "a costly way to deter future crimes by aging individuals who already are less likely to commit crimes by virtue of age."[17]

Ms. Ordaz has accepted responsibility for her actions, lamenting in her PSR that "I have wasted part of my life hurting others when I could have done something to help society." PSR ¶ 108. Her experience in prison has taught her a great deal, including how to break unhealthy patterns of behavior. Learning this vital lesson has not been easy. Her time behind bars has been unduly harsh because of her medical conditions and the spread of COVID-19. *United States v. Edwards*, 451 F. Supp. 3d 562, 569 (W.D. Va. 2020) (stating that the Court would not have sentenced the defendant to incarceration during the pandemic had COVID-19 been foreseeable). She spent much of the pandemic on lockdown, which affected her ability to get medical care. Pre-pandemic sentences can be shortened if the defendant's incarceration during COVID-19 has "sufficiently increased the severity of the sentence beyond what was originally anticipated such that the

---

[16] Steven N. Durlauf & Daniel S. Nagin, Imprisonment and Crime, 10 Criminology & Pub. Pol'y 13, 14 (2011).

[17] U.S. Dep't of Justice. Office of Justice. Programs, Five Things About Deterrence, (June 5, 2016) https://nij.ojp.gov/topics/articles/five-things-about-deterrence.

purposes of sentencing are fully met even with the proposed reduction." *United States v. Fleming*, No. CR ELH-08-086, 2022 WL 743955, at *27 (D. Md. Mar. 11, 2022); *see also United States v. Park*, 456 F.Supp.3d 557, 563 (S.D.N.Y. 2020) (noting that a sentence "that was sufficient but no greater than necessary" may now, in light of COVID-19, become "one immeasurably greater than necessary"). For the last several years Ms. Ordaz has lived in a COVID hotspot, experienced the disease itself, and suffered through painful medical conditions without proper care. Ex. C at 147-8. Her transgression was serious, but so is the price she has paid for it.

### C. Ms. Ordaz Is Rehabilitated

Ms. Ordaz's rehabilitation began with getting her GED; since accomplishing that, she has taken over 80 courses in topics as varied as nutrition, English, life management, self-esteem, painting. Ex. E at 1-2. She has also worked to improve the lives of staff and other incarcerated people. She has earned a Grade One (highest level) status as an employee in UNICOR  and volunteered in the kitchen to assist in feeding staff and inmates during the pandemic. Doc. 955 at 22.

Ms. Ordaz has received accolades from other incarcerated women, those who know her best. She has been described as "the perfect roommate," someone who is constantly reading, taking lessons, "willing to share or outright give away anything she ha[s] to help someone else." Doc. 955 at 77. One incarcerated woman noted that before meeting Ms. Ordaz, she was "constantly fighting, using drugs, and feeling like [she] had nothing to live for," but that Ms. Ordaz counseled her, injecting new meaning into her life. Ex. B at 15. She also helps other addicts "get clean and invest their time doing positive things." *Id*. Four BOP staff members have written support letters on behalf of Ms. Ordaz's release, despite generally preferring to stay out of such matters. Doc. 955 at 72-5. UNICOR foreman Glendale Walker noted that Ms. Ordaz "has a heart for people and

showed great remorse for her actions." *Id*. at 75. Another foreman, Amaury Flete, expressed that "Ms. Ordaz would make the most out of any second chance she may be given." *Id*. at 74.

These community bonds extend well beyond the walls of FCI Tallahassee. Although incarceration tests every relationship, Ms. Ordaz has maintained strong family ties during her sentence, and thus, she will have a supportive environment upon reentry. Family support favors a sentence reduction. *United States v. Parker*, 461 F. Supp. 3d 966, 983 (C.D. Cal. 2020). Ms. Ordaz's daughter, Lazara Serrano, has confirmed that Ms. Ordaz can live with her in North Philadelphia following her release. Ex. F. Ms. Serrano runs a floral arrangement business and is a homeowner. She plans to convert her basement into a suite for her mother, take her to doctor appointments, and provide other critical support. *Id*. She notes that Ms. Ordaz has a "large team of supporters" who will "support her physical and emotional well-being" and that she is ready for her mother to come home so that they can enjoy the time they have left together. *Id*.

Ms. Ordaz entered prison as a refugee from a troubled country, knowing little about America's language or legal system and foolishly squandered the freedom offered her to sell drugs. Over the last two decades, however, she has gone from a street corner drug dealer to a wise mother, mentor, and friend. The prison staff who interact with her daily believe that she has taken full accountability for her past actions and deserves to go home. She will not repeat her mistakes of 24 years ago because she is no longer that person. Now she "is a real friend, which are hard to come by in a place like this. There is only one word that can sum up Lazara Ordaz [--] that is 'love.' She is the true meaning of the word." Ex. B at 22.

## CONCLUSION

Accordingly, Ms. Ordaz respectfully requests that this Court grant her compassionate release under whatever conditions this Court deems necessary. If this Court has any concerns about granting this motion, Ms. Ordaz requests a hearing so that they can be addressed.

Respectfully submitted,

/s/Catherine Sevcenko

Catherine Sevcenko, DC Bar 484218
*Admitted Pro Hac Vice*
The National Council for Incarcerated and
Formerly Incarcerated Women and Girls
300 New Jersey Ave, NW #900
Washington DC 20001
csevcenko@thecouncil.us
617 299 2604

## CERTIFICATE OF SERVICE

I hereby certify that a copy of this motion was served via ECF to all counsel of record, this 23[nd] day of July, 2024.

/s/Catherine Sevcenko

Catherine Sevcenko, DC Bar 484218
*Admitted Pro Hac Vice*