IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| v. | : | CRIMINAL NO. 98-587-01 |
| LAZARA ORDAZ | : | |

### GOVERNMENT'S RESPONSE IN OPPOSITION TO DEFENDANT'S SECOND MOTION TO REDUCE SENTENCE PURSUANT TO 18 U.S.C. § 3582(c)(1)(A)(i)

Defendant Lazara Ordaz seeks compassionate release under 18 U.S.C. § 3582(c)(1)(A)(i). This motion should be denied, as she does not present an "extraordinary and compelling reason" allowing consideration under the statute.

**I.  Background.**

**A.  Criminal Conduct.**

Lazara Ordaz was given an incredible opportunity. In 1980, she was 21 years old, and living in her native Cuba, when she and her three brothers saw a chance for a better life. Amidst political tumult, President Fidel Castro announced that anyone who wanted to leave Cuba could do so, setting off the six-month "Mariel boatlift," when tens of thousands fled the island in search of political freedom and economic opportunity in the United States. Ordaz and her brothers joined them. When she arrived in Florida, she was

sponsored by a Catholic organization and relocated to San Jose, California, but she soon moved to Miami, where her family members settled. PSR ¶ 142.

She then rewarded the United States for its welcome by setting off on a nearly two-decade spree of criminal activity that only escalated in severity as the years passed. Beginning in 1981, she repeatedly committed crimes in Florida – carrying a concealed firearm (1981), possession of marijuana (1983), petit theft (1984), possession with intent to sell controlled substance (1988), sale of cocaine (1988), possession of cocaine (1990). PSR ¶¶ 125-130. She incurred only modest penalties, which did not deter her at all.

By 1993, she was living in Philadelphia, and took her criminal activity to a new level. She put together and led an organization that sold millions of dollars' worth of cocaine, between September 1993 and October 1998, in North Philadelphia. The government labeled it the Ordaz Cocaine Organization.

Ordaz was established in the Philadelphia drug trafficking trade by her brother, Cosme Ordaz. In about 1990, Lazara Ordaz came to Philadelphia, where her brother Cosme was living and was selling drugs. In 1992, Cosme Ordaz pled guilty to federal charges and began serving a prison term. Lazara Ordaz had been selling cocaine that she obtained from her brother in the area of 7th and Tioga Streets, and upon her brother's incarceration she continued as the leader of the organization he founded. This cocaine distribution organization was substantial. Under Lazara Ordaz's leadership, it distributed in excess of 150 kilograms of cocaine, worth $3 million, in North Philadelphia. Ordaz hired several subordinates to work as lookouts, street sellers, "caseworkers" or mid-level managers, and an upper-level manager. In addition, the organization utilized an

"enforcer," Miguel Morales, to protect the organization from rival drug dealers. Morales was involved in several incidents in which guns were drawn, including one on September 21, 1997, when another co-defendant, William Colon, shot Valentine Rodriguez, who had repeatedly "ripped off" bundles of cocaine.

The defendant and her subordinates obtained cocaine both from a local source and from Miami, Florida, where the defendant and/or her co-conspirators would travel by car on a weekly basis to obtain at least one kilogram at a time. The defendant utilized stash houses throughout Philadelphia. She marked her drug distribution territory first at the corner of 7th and Tioga streets in Philadelphia, and later down the street at 8th and Tioga Streets. When the defendant became incarcerated as a result of a firearms offense in Philadelphia County (CP9610-0287), she continued to direct her drug trafficking operation from jail, as well as during the time that she was participating in a work release program after her incarceration. Once released from jail, the defendant did not hesitate—again—to keep and carry firearms despite her status as a convicted felon.[1]

---

[1] Ordaz expresses concern that she is deemed violent as a result of an incident that occurred on August 1, 1996. The PSR recounts: "[W]hile the defendant was standing in the corner of North 7th and W. Tioga Streets, Philadelphia, two individuals went by in a beige automobile and fired shots at her. The defendant returned fire numerous times with her own gun. During the shoot-out, 6-year-old Christina Reyes, who was sitting on the porch of 704 W. Tioga with her mother, received wounds to her head and back and was taken to St. Christopher's Hospital. Another victim in the shootout was 38-year-old Jesus Magobet who was standing at the corner of W. Tioga and Marshall Streets. He suffered a gunshot wound to his left hand and was taken to Temple University Hospital." PSR ¶ 131. Ordaz objects that she did not initiate this gun battle, and was only seeking to protect children in the area. Christina's mother confirms that account, and in a recent letter continues to support Lazara Ordaz and her request for release. But that does not mitigate what happened. The fact is that Ordaz persisted for years in a residential area in plying a deadly trade, arming herself and others while they trafficked large quantities of

On December 16, 1998, a grand jury sitting in the Eastern District of Pennsylvania returned a 76-count indictment, charging the defendant and 17 others with various offenses relating to drug trafficking and firearms. Specifically, the defendant was charged in 22 counts with the following offenses: conspiracy to distribute more than 150 kilograms of cocaine, in violation 21 U.S.C. § 846 (Count One); use of a communication facility or telephone to facilitate a drug felony, in violation of 21 U.S.C. §843(b) (Counts 33, 37, 40, 41, 44, 47, 49, 50, 54-62, and 64-66); and possession of a firearm by a convicted felon, in violation of 21 U.S.C. § 922(g)(1) (Count 74). The charges were based on the defendant's conduct during a six-year period in which she organized and led the drug trafficking organization.

She pled guilty to all 22 counts. The guideline range was 360 months to life. Judge Brody elected to impose a sentence within but not at the bottom of the range, and imposed a term of imprisonment of 420 months.

The defendant is serving her sentence at FCI Tallahassee. She has served 25 years and 1 month, and has credit for good conduct time of approximately 40 months, and therefore has served approximately 341 months of her sentence of 420 months. She has also received a full one-year time credit under the First Step Act for participation in recidivism reduction programs. Her current minimum release date is July 31, 2028, with eligibility for home confinement on February 1, 2028. Also, Ordaz has recently qualified

---

illegal drugs. What happened on August 1, 1996, was a natural result of that. When denying Ordaz's first motion for compassionate release, this Court agreed, stating: "Although Ordaz contends that she was only seeking to protect children in the area, such a gunfight was foreseeable among drug traffickers." ECF 963 at 2 n.1.

for the RDAP program due to her history of drug use from age 17 to 40. If she successfully completes the RDAP program, which takes approximately a year, she would likely get another year of credit. This would make her minimum release date July 31, 2027.[2]

**B.    Requests for Compassionate Release.**

Ordaz sought compassionate release in 2020, when she was 61 years old, primarily based on her risk from Covid given her medical conditions. The government acknowledged that Ordaz had an excellent record in prison but opposed the request given the seriousness of the crimes, and the fact that her medical conditions were being well managed by BOP. On October 9, 2020, this Court denied the motion because her conditions were all well managed by BOP, and also because the 3553 factors weighed against her given the seriousness of her crimes and the fact that she had served only 58% of her sentence at that time.

Ordaz's new motion was filed on July 23, 2024 (ECF 972). It principally asserts that Ordaz is rehabilitated, and is deserving of relief due to her age and purported deterioration in health.

---

[2] There were 18 defendants in this case. All received lower sentences than Ordaz, and all have been released. Ordaz's brother, Cosme Ordaz, who initiated the criminal organization, was sentenced to 298 months, and was released in 2019.

## II. Discussion.

### A. Governing Law.

The compassionate release statute, 18 U.S.C. § 3582(c)(1)(A), as amended by the First Step Act on December 21, 2018, provides in pertinent part:

> (c) Modification of an Imposed Term of Imprisonment.—The court may not modify a term of imprisonment once it has been imposed except that—
>
> (1) in any case—
>
> (A) the court, upon motion of the Director of the Bureau of Prisons, or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier, may reduce the term of imprisonment (and may impose a term of probation or supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment), after considering the factors set forth in section 3553(a) to the extent that they are applicable, if it finds that—
>
> (i) extraordinary and compelling reasons warrant such a reduction . . .
>
> and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission . . . .

Further, 28 U.S.C. § 994(t) provides: "The Commission, in promulgating general policy statements regarding the sentencing modification provisions in section 3582(c)(1)(A) of title 18, shall describe what should be considered extraordinary and compelling reasons for sentence reduction, including the criteria to be applied and a list of specific examples. Rehabilitation of the defendant alone shall not be considered an extraordinary and compelling reason."[3] "[T]he "extraordinary and compelling" standard remains

---

[3] The inmate does not have a right to a hearing. Rule 43(b)(4) of the Federal Rules of Criminal Procedure states that a defendant need not be present where "[t]he

"inherently narrow" and "stringent." *United States v. Rodriguez-Pena*, 108 F.4th 12, 17 (1st Cir. 2024) (citations omitted).

The Sentencing Guidelines policy statement appears at § 1B1.13, and provides that the Court may grant release if "extraordinary and compelling circumstances" exist, "after considering the factors set forth in 18 U.S.C. § 3553(a), to the extent that they are applicable," and the Court determines that "the defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g)."

This policy statement is binding. The governing compassionate release statute, § 3582(c)(1)(A)(i), states that a reduction in sentence must be "consistent with applicable policy statements issued by the Sentencing Commission . . . ." *See Dillon v. United States*, 560 U.S. 817, 821 (2010) (holding that under the materially identical provision in 18 U.S.C. § 3582(c)(2) regarding application of retroactive guideline amendments that the criteria stated by the Sentencing Commission are binding).[4]

---

proceeding involves the correction or reduction of sentence under Rule 35 or 18 U.S.C. § 3582(c)." *See Dillon v. United States,* 560 U.S. 817, 827-28 (2010) (observing that, under Rule 43(b)(4), a defendant need not be present at a proceeding under 18 U.S.C. § 3582(c)(2)).

Further, this Court does not have authority to grant a transfer to home confinement, or review BOP's administrative decision regarding that issue. *See* 18 U.S.C. § 3621(b) (BOP's designation decision is not subject to judicial review); *see also, e.g.*, *United States v. Aguibi*, 858 F. App'x 485, 486 n.2 (3d Cir. 2021) (not precedential; per curiam) ("To the extent that Aguibi requested a transition to home confinement, the Bureau of Prisons has the sole authority to place a prisoner in home confinement."); *United States v. Saunders*, 986 F.3d 1076, 1078 (7th Cir. 2021); *United States v. Houck*, 2 F.4th 1082, 1085 (8th Cir. 2021); *United States v. Gray*, 2020 WL 6822949, at *2 (E.D. Pa. Nov. 20, 2020) (Sanchez, C.J.).

[4] Prior to November 1, 2023, the Sentencing Commission had not updated its

In this matter, the defendant's request is premised on her age and health. With respect to these subjects, the guideline policy statement provides in Section 1B1.13(b) that "extraordinary and compelling reasons" exist where:

(1) Medical Circumstances of the Defendant.—

    (A) The defendant is suffering from a terminal illness (i.e., a serious and advanced illness with an end-of-life trajectory). A specific prognosis of life expectancy (i.e., a probability of death within a specific time period) is not required. Examples include metastatic solid-tumor cancer, amyotrophic lateral sclerosis (ALS), end-stage organ disease, and advanced dementia.

    (B) The defendant is—

        (i) suffering from a serious physical or medical condition,

        (ii) suffering from a serious functional or cognitive impairment, or

        (iii) experiencing deteriorating physical or mental health because of the aging process,

    that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover.

    (C) The defendant is suffering from a medical condition that requires long-term or specialized medical care that is not being provided and

---

pertinent policy statement, § 1B1.13, since Congress amended the compassionate release statute in 2018. Accordingly, courts held that the earlier policy statement was not binding during that period, but could be considered as advisory. *United States v. Andrews*, 12 F.4th 255, 260 (3d Cir. 2021). The Commission has now updated the policy statement, which is therefore now binding in defining the circumstances that qualify as "extraordinary and compelling." *See* § 3582(c)(1)(A)(i), 28 U.S.C. § 994(t) (directing the Commission to define qualifying circumstances); *see, e.g.*, *United States v. Chavez*, 2024 WL 24065, at *3 (S.D. Cal. Jan. 2, 2024) (Curiel, J.) (explaining that new policy statement is binding); *United States v. Diamond*, 2023 WL 8724142, at *2 (S.D. Iowa Dec. 19, 2023) (Rose, C.J.) (same).

        without which the defendant is at risk of serious deterioration in health or death.

    (D)    The defendant presents the following circumstances—

        (i)    the defendant is housed at a correctional facility affected or at imminent risk of being affected by (I) an ongoing outbreak of infectious disease, or (II) an ongoing public health emergency declared by the appropriate federal, state, or local authority;

        (ii)    due to personal health risk factors and custodial status, the defendant is at increased risk of suffering severe medical complications or death as a result of exposure to the ongoing outbreak of infectious disease or the ongoing public health emergency described in clause (i); and

        (iii)    such risk cannot be adequately mitigated in a timely manner.

(2)    Age of the Defendant.—The defendant (A) is at least 65 years old; (B) is experiencing a serious deterioration in physical or mental health because of the aging process; and (C) has served at least 10 years or 75 percent of his or her term of imprisonment, whichever is less.

In general, the defendant has the burden to show circumstances meeting the test for compassionate release. *See, e.g.*, *United States v. Hampton*, 985 F.3d 530, 533 (6th Cir. 2021); *United States v. Newton*, 996 F.3d 485, 488 (7th Cir. 2021); *United States v. Neal*, 2020 WL 5993290, at *4 (E.D. Pa. Oct. 9, 2020) (Gallagher, J.); *United States v. Adeyemi*, 2020 WL 3642478, at *16 (E.D. Pa. July 6, 2020) (Kearney, J.). As the terminology in the statute makes clear, compassionate release is "rare" and "extraordinary." *United States v. Willis*, 382 F. Supp. 3d 1185, 1188 (D.N.M. 2019) (Johnson, J.) (citations omitted).

**B.     The Defendant's Circumstances.**

Ordaz does not present an "extraordinary and compelling reason" allowing consideration for compassionate release.

Notably, she does not invoke Section 1B1.13(b)(1), related to extraordinary medical circumstances. That is appropriate. The recent BOP medical records (filed under seal as Exhibit A) show that she does not present a terminal illness, or that she is unable to provide self-care in the institution.

Ordaz is 65 years old, and transgender (transitioning female to male). (We use the female pronoun not out of disrespect but because that reflects her current status in BOP records.) Ordaz presents: hypothyroidism; hypertension; prediabetes; shoulder and back pain; Vitamin D deficiency; hyperlipidemia; sleep apnea; cataracts; and asthma. These are ordinary conditions for a person of her age (and indeed for younger inmates as well), and all appear to be managed in prison with medications provided by the institution.

It appears that the only condition that physicians have deemed appropriate for possible further intervention is her dyspnea (shortness of breath). This may have been caused and/or aggravated by her two episodes of infection with Covid several years ago. It appears that the condition is managed with her use of an Albuterol inhaler, a standard medication. In examining further, doctors directed chest x-rays in recent years, most recently on May 31, 2024, which have consistently shown "[n]o radiographic evidence for an acute cardiopulmonary process."

Ordaz was examined by a cardiologist outside the institution on May 15, 2024, who did not observe signs of any cardiology issue on physical examination, but due to the

persistent dyspnea reported by Ordaz recommended further testing, specifically, a CT scan without contrast. The cardiologist noted that if that test is negative, then referral to a pulmonologist should be considered for further assessment. That test should be scheduled shortly, if it has not occurred already.

In the absence of a serious medical condition falling within Section 1B1.13(b)(1), Ordaz's motion instead relies on the age provision in Section 1B1.13(b)(2).

Notably, in a statement with minimal explication (*see* ECF 972, Exh. D), the warden of FCI Tallahassee has recommended that BOP support compassionate release, and that recommendation is currently being reviewed at higher levels within BOP. (If the warden's recommendation is approved, then the U.S. Attorney's Office would be consulted and asked to file a motion. The final determination, of course, always lies with the Court.) However, the standard that the warden applied, set forth in BOP Program Statement 5050.50, is broader than the definition of "extraordinary and compelling reasons" set forth in USSG § 1B1.13, as amended November 1, 2023, which must govern my assessment at this time and any determination by the Court.

Notably, the BOP program statement allows consideration for: "Inmates age 65 or older who have served the greater of 10 years or 75% of the term of imprisonment to which the inmate was sentenced." The warden's recommendation is based on that provision. Ordaz turned 65 last December, and has served well over 10 years of her sentence. But the binding guideline adds a critical additional requirement, besides age and length of time served: that the defendant "is experiencing a serious deterioration in

physical or mental health because of the aging process." USSG § 1B1.13(b)(2). That requirement is not met here at this time.

Ordaz demurs, insisting that her health has "deteriorated." She states that since the denial of her last compassionate release motion in 2020, "she has developed additional medical conditions, including shortness of breath, degenerative disc disease, and limited use of her left arm. These conditions have made performing routine activities, such as making her bed, difficult and painful for Ms. Ordaz." Mtn. 1. She states that she "can now no longer walk across the compound or carry commissary items back to her room," and that other inmates assist her with chores, dressing, and other tasks. *Id.* at 4.

But the medical records do not corroborate this account. While Ordaz and her friends state that she cannot walk across the compound or navigate stairs, and that she receives assistance from inmates in tasks such as dressing, making her bed, and cleaning her room, she has not made these complaints to BOP staff, and in fact Ordaz takes stairs on a regular basis to "pill line" to obtain her medication. Further, she has not requested or received any assistive devices.

Ordaz further represents that her eyesight is failing, partly due to cataracts, and she asks others for assistance in reading and filling out forms. But she was evaluated by an optometrist on February 7, 2024, who determined there was no change in her prescription (since 2021) warranting new glasses, and that while she has cataracts, surgery is not recommended at this time. The optometrist recommended an ordinary check-up in one year. Exh. A at 25-26.

Ordaz states that she has been waiting since 2021 for follow-up from orthopedic surgery. But the medical records do not indicate any need for follow-up.

She further asserts that necessary pain medication has been replaced by over-the-counter pills and rubs. That does not appear to be the case. She is prescribed amitriptyline, duloxetine, and meloxicam for her lower back pain, lumbago, sciatica, and shoulder pain. Those are all prescription medications provided by the institution.

Most recently, on July 16, 2024, at the request of the undersigned, Ordaz was examined by a doctor at FCI Tallahassee to assess whether the government should support compassionate release. He wrote:

> She is c/o [complaining of] dyspnea. 2D ECHO was essentially normal for her age with mild diastolic regurgitation of the pulmonary, tricuspid, and mitral valves. EKG was normal. CXR [chest x-ray] was clear. Despite her complaint, I witnessed her running and climbing three flights of stairs without discomfort. She did stop, used her inhaler, and walked slowly when she saw me looking at her. She saw a cardiologist who recommended a nuclear stress test and CT chest.
>
> Inmate does have chronic pain. Her l-spine x-ray shows mild to moderate degeneration.
>
> EMG showed moderate left ulnar neuropathy. All the other extremities were normal. She is on mobic, duloxetine, and amitriptyline for pain. She is amenable to restarting trileptal.
>
> She had an old left clavicle injury prior to incarceration. She had a distal left clavicle resection in 11/2009 while in BOP custody. She had improved symptoms after the surgery but continued to c/o pain afterwards. She refused a second surgery to treat her L shoulder problem (Weaver Dunn procedure) in 2012. She opted for years of cortisone injections instead. A couple of repeat MRI's revealed mild tendinopathy of her shoulder but nothing wrong with the prior surgery. There is no screw in her bone as she claims. She has numerous orthopedic f/u [follow-up] despite her contrary claims.
>
> She has moderate obstructive sleep apnea proven by sleep study done in 2022.

Exh. A at 1. This doctor stated that he did not see a basis for compassionate release.

The current record therefore does not support the requirement of Section 1B1.13(b)(2) that the inmate is "experiencing a serious deterioration in physical or mental health because of the aging process."[5]

Rather, Ordaz presents a number of conditions that are ordinary for her age, and that are treated and maintained in BOP custody. This is not a basis for the exceptional remedy of early release from a valid sentence.[6] *See United States v. Teman*, 2024 WL 262781, at *6 (S.D.N.Y. Jan. 24, 2024) (Engelmayer, J.) ("In the end, however, the decisive question is not whether [the defendant] would fare better and receive better care

---

[5] Ordaz vaguely states that there have been "delays" in medical treatment, Mtn. 12, but none are apparent in the comprehensive BOP records. She also asserts that prison conditions at FCI Tallahassee are poor, Mtn. 5, but that complaint would apply to any inmate, and is more appropriately the subject of an administrative complaint, and civil litigation if necessary.

[6] Ordaz does not seek relief under Section 1B1.13(b)(6), which applies to a person who has served more than 10 years of an "unusually long sentence" that would be grossly different under current law. It is the government's position that this provision is invalid, as exceeding the Sentencing Commission's authority. This issue is pending before the Third Circuit, which heard oral argument on the matter on June 27, 2024, in *United States v. Rutherford*, No. 23-1904. Further, even if the provision is deemed valid, this case does not qualify, as the defense apparently recognizes. Since Ordaz was sentenced, the only change in law of note was the 2005 decision in *Booker* that made the Guidelines advisory. But the guideline range in this case remains the same (360 months to life). Further, even under the law in effect at the time of sentencing, Judge Brody had the authority to impose a sentence as low as 360 months, but deemed the 420-month term warranted given the defendant's conduct. Accordingly, it cannot be said that the sentence would be grossly different under current law. *See, e.g., United States v. Steidell*, 2024 WL 1414195, at *5 (D. Haw. Apr. 2, 2024) (Watson, C.J.) ("a mid-guidelines sentence, by its very nature, cannot be considered unusually long" under § 1B1.13(b)(6)); *United States v. Fermin*, 2024 WL 1479155, at *6 (D.N.J. Apr. 5, 2024) (Kugler, J.) (pre-*Booker* life sentence for drug offenses remains warranted where the guideline range has not changed, and the court likely would not have imposed a different sentence).

if living at home. It is how [the defendant's] medical conditions measure against the demanding standards set by the Sentencing Commission for when such condition(s) are *extraordinary and compelling* so as to qualify for compassionate release.") (emphasis in original); *United States v. Gomez-Moreira*, 2024 WL 245640, at *3 (E.D. Cal. Jan. 23, 2024) (Thurston, J.) ("Diagnoses for chronic conditions, which are treatable by the BOP, such as diabetes, hyperlipidemia, and hypertension, do not establish extraordinary and compelling reasons that merit compassionate release."); *United States v. Daniels*, 2024 WL 3069814, at *5 (E.D. Pa. June 18, 2024) (Kearney, J.) (request fails where the defendant has not shown "he would receive superior care outside of the Bureau of Prisons").

Given the absence of an "extraordinary and compelling reason," there is no basis for consideration for compassionate release. The government recognizes that Ordaz's conduct in prison has been admirable. She has committed only one infraction during the past 18 years, which was a March 11, 2022, infraction for possession of alcohol (as a result of which she lost 41 days of good conduct time and six months of communications privileges, and was held in disciplinary segregation for 30 days). BOP classifies her as presenting a low risk of recidivism. Ordaz has taken many dozens of classes on a wide range of academic, life skill, art, and vocational subjects. Her education information summary at BOP notes that she completed "courses that are beneficial for employment opportunities and advantageous to his/her reintegration in to the community." Ordaz has had very favorable work performance evaluations.

Further, staff in the U.S. Attorney's Office reached out directly to the BOP facility and spoke to the counselor (who has the most day-to-day contact with Ordaz), Matt Nettles, as well as the case manager coordinator, Kimberly Harvin, who prepared the compassionate release package for the warden. Both of them affirmed their support for Ordaz's release. Harvin said that she considers Ordaz a "great" candidate for compassionate release because of her long incarceration, her excellent support group of friends to help her in the community, and the fact that she has been a respectful inmate who has been a "blessing" to have at the facility. Nettles acknowledged that Ordaz can no longer "run around" but that despite any medical or physical issues she has, she gets around well enough to be an excellent orderly for his unit. He said she never complains, has an excellent work ethic, is very professional, conducts herself well, and is well respected by the other inmates. He had no concerns about her possible release. This assessment is consistent with the letters of support from fellow inmates submitted by Ordaz. Another person who served time with Ordaz and has long been a supporter of hers is Jan Schneiderman, who is now a reinstated attorney in New York who prepared Ordaz's first motion for compassionate release and has been stalwart in her support of Ordaz. And Ordaz enjoys the support of family, including her daughter, who attests that Ordaz will live with her in Philadelphia upon release. The Probation Office has in fact approved that home release plan.

But these circumstances, commendable as they are, do not allow consideration by themselves for early release from the sentence imposed for Ordaz's most serious criminal conduct. The statute provides that rehabilitation alone is not a basis for compassionate

release. 28 U.S.C. § 994(t). *See United States v. Claudio*, 2022 WL 1623650, at *3 (E.D. Pa. May 23, 2022) (Kearney, J.) ("[The defendant's rehabilitation does not constitute an extraordinary and compelling reason for release. We commend [him] for his efforts towards rehabilitation. But we are not a parole board reducing sentences simply for good behavior while incarcerated; we must also find extraordinary and compelling reasons for release."). *See also United States v. Logan*, 2021 WL 1221481, at *8 (D. Minn. Apr. 1, 2021) (Schlitz, J.) (rehabilitation, even in combination with other considerations, is usually not compelling: "Prisoners are *supposed* to follow the rules, take classes, work at a job, and otherwise attempt to improve themselves. That a prisoner does so means that he has met baseline expectations, not that he has done something extraordinary. . . . The Court recognizes that there could be truly extraordinary instances of rehabilitation, such as a defendant who risks his life to help his fellow inmates in a pandemic or to rescue a corrections officer who has come under attack. But there is nothing 'extraordinary and compelling' about a prisoner who simply does the things that prisoners are supposed to do.").

For these reasons, at this time, the motion for compassionate release should be denied.

Respectfully yours,

JACQUELINE C. ROMERO
United States Attorney


*/s Robert A. Zauzmer*
ROBERT A. ZAUZMER
Assistant United States Attorney
Chief of Appeals

## CERTIFICATE OF SERVICE

I hereby certify that this pleading has been served on the Filing User identified below through the Electronic Case Filing (ECF) system:

Catherine Sevcenko, Esq.

                                              */s Robert A. Zauzmer*
                                              ROBERT A. ZAUZMER
                                              Assistant United States Attorney

Dated:  September 1, 2024.