**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF PENNSYLVANIA**

**UNITED STATES OF AMERICA**          **CASE NO.: 2:98-cr-00587-JHS-1**

**v.**

**LAZARA ORDAZ**

**REPLY TO THE GOVERNMENT'S OPPOSITION TO A REDUCTION IN
SENTENCE FOR LAZARA ORDAZ**

## INTRODUCTION

All the parties — BOP, US Attorney, and Ms. Ordaz — agree that she is ready to return to society. Her unit team supported her request for a reduction in sentence, and the Warden approved it. The U.S. Attorney acknowledges her "admirable" prison record, listing her outstanding work ethic, extensive programming, near-perfect disciplinary record, and family support. Gov't Opp. at 15-16. The government does not argue she failed to exhaust her remedies, dispute she is over 65 or that she has completed significantly more than 10 years of her sentence. Gov't Opp. at 11. The only point of contention is whether she is sick enough to meet the "extraordinary and compelling" legal standard. If this Court agrees that she has experienced a "serious deterioration in physical or mental health because of the aging process," then no obstacle remains to granting her compassionate release. U.S. Sentencing Guidelines Section 1B1.13(b)(2).

## ARGUMENT

**A. Ms. Ordaz has Suffered a Serious Deterioration in Health due to Aging and Is Eligible for Compassionate Release Under the Sentencing Guidelines**

Ms. Ordaz no longer has the stamina to make her bed or work for more than 30 minutes a day. Doc 973-1 (Ex. A) at 29; Ex. C at 157.[1] She reports struggling to walk fast enough to make it from one building to another at FCI Tallahassee during the 10-minute movement windows. Doc 973-1 (Ex. A) at 6. The government concedes that she "presents: hypothyroidism; hypertension; prediabetes; shoulder and back pain; Vitamin D deficiency; hyperlipidemia; sleep apnea; cataracts; and asthma." Gov't Opp. at 10. Her latest medical records add to that list sciatica, lumbago, Helicobacter pylori [H. pylori], dental caries (since 2018), and fractured dental restorative material with loss of material (since 2017). The government acknowledges that Ms. Ordaz suffers from gender dysphoria; she also has an unspecified affective mood disorder and cannabis use disorder. Doc 973-1 (Ex. A) at 47-48. In spite of all this, the government argues that Ms. Ordaz is not sick enough to warrant compassionate release.

The Sentencing Guidelines provide two separate grounds for release based on medical conditions that the Government seems to conflate. U.S. Sentencing Guideline 1B1.13(b)(1)(B) requires the movant to have a physical or mental health condition which "diminishes the ability of the defendant to provide self-care within the

---

[1] Both parties used letters to refer to their exhibits. For clarity, Ms. Ordaz will refer the government's Exhibit A as Doc 973-1 (Ex. A). Other exhibit references are to Ms. Ordaz's motion (Doc 972).

environment of a correctional facility and from which he or she is not expected to recover." Section 1B1.13(b)(2) covers senior citizens who are suffering from "serious" effects from the aging process and who have served 10 years or 75% of their time, whichever is less. The two sections are distinct. *United States v. Ebbers*, 432 F. Supp. 3d 421, 429 (S.D.N.Y. 2020). Section (b)(1)(B), which the *Ebbers* Court calls the Medical Condition Note, applies to people below the age of 65 who have not yet served a substantive part of their sentences but who have debilitating or even terminal medical conditions. *Id.* at 428 (calling Section (b)(1)(B) the Medical Condition Note). Section 2, the Age of Defendant Note, is for senior citizens and long-timers with "serious" chronic conditions. *Id.* (calling Section 2 the Age of Defendant Note).[2]

As people age out of crime, it is sound policy to have a lower bar for long-timers with serious medical conditions. The government argues that granting compassionate release is an "exceptional remedy," but it only cites cases involving people under 65 seeking release under the more stringent Medical Condition Note for this proposition. Gov't. Opp. at 14. The movant in *Teman,* for instance, was attempting to get compassionate release under the Medical Condition Note one week after reporting to FCI Miami based on "fever, gastro-intestinal issues, nausea, dizziness, headaches, tremors, congestion and mucus, and nasal drip" and a claim that the COVID vaccine was contraindicated for him. *United States v. Teman*, No. 19 CR. 696 (PAE), 2024 WL 262781, at *2 (S.D.N.Y. Jan. 24, 2024), *reconsideration denied,* No. 19 CR. 696 (PAE), 2024 WL 1235616 (S.D.N.Y. Mar. 22, 2024). The requirements for compassionate

---

[2] Ms. Ordaz is not conceding her eligibility for release under (1)(B), but this Court need not decide that question as she meets the criteria under section 2.

release under the Medical Condition note are "demanding" because they allow release for young people who may have not served much time. The other cases the government relies upon share the same weakness. *See, e.g.*, *United States v. Gomez-Moreira*, No. 1:20-CR-00151-JLT, 2024 WL 245640, at *3 (E.D. Cal. Jan. 23, 2024) (denying compassionate release under the Medical Condition Note for middle-aged movant who suffers from chronic pain, trigger fingers, type II diabetes, hyperlipidemia, and hypertension); *United States v. Daniels*, No. CR 15-127, 2024 WL 3069814, at *6 (E.D. Pa. June 18, 2024) (denying compassionate release under the Medical Condition Note for a stable liver cyst, stomach pain, and urine ailments).

Ms. Ordaz's situation is distinguishable when considered in light of *Ebbers*. She has served 25 years and is a senior citizen. She has a series of medical conditions which, taken together, constitute a serious deterioration in her health. Ms. Ordaz must show by the preponderance of the evidence that she is entitled to compassionate release. *United States v. Williams*, No. CR 17-128, 2023 WL 3025388, at *3 (W.D. Pa. Apr. 20, 2023) (citing cases). The government concedes that she "presents: hypothyroidism; hypertension; prediabetes; shoulder and back pain; Vitamin D deficiency; hyperlipidemia; sleep apnea; cataracts; and asthma." Gov't Opp. at 10. Although each of these comorbidities might not be debilitating in isolation, the combination amounts to "serious deterioration in physical or mental health because of the aging process." *United States v. Swint*, No. CR 94-276, 2021 WL 1210111, at *5 (E.D. Pa. Mar. 31, 2021) (finding a litany of age-related medical conditions, including

several that affect eyesight and mobility" sufficient to meet the Defendant Age Note requirements).

The combination of Ms. Ordaz's medical conditions amount to a serious deterioration in her health. A movant who suffered from worn-down cartilage around his joints, lower back pain due to moderate to severe deterioration of his lumbar spinal discs, arthritis in his wrists and hands, high blood pressure, a swollen prostate, age related eyesight and hearing loss, and post herpetic neuralgia met the "serious deterioration standard." *United States v. Plunk*, No. 94-036, 2020 WL 3582902, at *2 (D. Alaska Apr. 9, 2020). Ms. Ordaz has a similar profile which features pain due to aging (sciatica and shoulder pain), high blood pressure, and eyesight deterioration. Although she does not have pain as a result of having shingles or hearing loss, she does have hypothyroidism, high cholesterol, sleep apnea, and asthma, which Mr. Plunk did not.

No two movants are going to have the exact same comorbidities but a combination of diseases related to age can amount to the requisite serious deterioration of health due to age. *United States v. Brunetti*, No. CR 94-127-13, 2020 WL 4516541, at *7 (E.D. Pa. July 31, 2020). If "a movant suffering from diabetes, high cholesterol, high blood pressure, chronic kidney disease, and cataracts 'undoubtedly' met the 'serious' medical condition element," then Ms. Ordaz, who has most of these ailments and some others, must also meet that requirement. *Id.* (paraphrasing and citing *United States v. Young*, No. 00-2-1, 2020 WL 1047815, at *8 (M.D. Tenn. Mar. 4, 2020)). Ms. Ordaz has submitted letters from the people who see her every day

stating she cannot care for herself in the prison environment.  In determining whether she meets the "extraordinary and compelling" standard, Ms. Ordaz asks this Court to consider all of the evidence she has presented. The medical records themselves paint a concerning picture of Ms. Ordaz's health; in combination with the rest of the evidence, they support Ms. Ordaz's claim that she has suffered serious deterioration in health due to the aging process.

### B. BOP Medical Officer Du's Assessment of Ms. Ordaz's Health Is Not Credible

BOP Medical Officer Du's assessment of Ms. Ordaz's health on July 16, 2024, is puzzling because he doubts the legitimacy of of Ms. Ordaz's symptoms, yet he has been treating those same symptoms for the last two years without question. The government requested that the medical officer at FCI Tallahassee, Dr. Tri Du, examine Ms. Ordaz and report his findings. It relies on Dr. Du's summary of her conditions made on July 16, 2024, as evidence that she is not ill enough to meet the extraordinary and compelling standard. Gov't Opp. at 13. When considered in the context of Ms. Ordaz's full medical history, Dr. Du's report reverses his previous medical opinion.

Ms. Ordaz provided a contemporaneous description of the July 16 visit with Dr. Du before she knew the content of his report:

> I got called to the Medical Department this afternoon. Dr. Du . . . proceeded to use a stethoscope to listen to my lungs and check my breathing. That was the extent of his medical examination. He did not perform any other examinations nor did he ask any relevant questions regarding my ailments or medications. (But i Did told him about my breathing problems and the pain [and] suffer and how ppl have to help me with some of the day task) He did, however, increase all of my pain

medications . . . . He also added prednisone to help with my breathing and prescribed a higher dosage for my inhaler. . . . Dr. Du must have decided that I needed more treatment for my ailments that he put me on added medications and increased dosages. Also he send me to do some XRay for my shoulder . . . .

Dr. Du's initial report that was filed around 3 pm on July 16 tracks with this description. Although he noted that Ms. Ordaz seemed to be "purposefully wheezing," he diagnosed dyspnea on exertion (DOE) and increased her Advair prescription while continuing albuterol.[3] Doc 973-1 (Ex. A) at 5. He also admitted her pain needed "better control;" he prescribed Trileptal and ordered a shoulder x-ray, *Id.*

Six hours later, he marked the first report "incomplete" and made several changes to produce the report that the Government quotes in its brief at page 13. The final version contained the following additions and changes:

- A claim that he "witnessed her [Ms. Ordaz] running and climbing three flights of stairs without discomfort. She did stop, used her inhaler, and walked slowly when she saw me looking at her;"
- Elaboration on Ms. Ordaz's alleged fake wheezing by claiming she was using the "Valsalva Maneuver;"
- Speculation that Ms. Ordaz was faking: "'? worsening symptoms due to pending compassionate release petition;"
- Deletion of the prescription for Advair;
- Addition of a prescription for Trileptal*;* and
- An order for a consult for Ms. Ordaz's shoulder pain with a target date of late October instead of the x-ray

Doc 973-1 (Ex. A) at 1-3.

### 1. *Stair Climbing Observation*

Dr. Du's does not say when he saw Ms. Ordaz running and going up the stairs

---

[3] "Advair "works by relaxing muscles in the airways to improve breathing." Kaci Durban, M.D., Advair, drugs.com (Jan 23, 2024), https://www.drugs.com/advair.html

without difficulty. Doc 973-1 (Ex. A) at 1. Ms. Ordaz denies she can run. She offers that she sometimes has to walk fast if she is not at her destination by the end of the ten-minute movement window but she has to use her inhaler when that happens. *Id.* at 6. Ms. Ordaz further reports seeing Dr. Du outside the clinic when she arrived for the July 16 consultation. She told him to go ahead of her because she would have to go up the stairs slowly; she had no choice because the elevator was out of service.[4] Ms. Ordaz reports that she did not see Dr. Du when she used the inhaler at the top of the stairs because he was already in the examination room. She confirms that she needed the inhaler because she had just climbed stairs. Dr. Du does not explain why Ms. Ordaz would use her inhaler for his benefit, rather than out of necessity given the exertion they both agree she had just made.

  2. *Fake Wheezing*

  In both versions of his medical notes of the July 16 meeting, Dr. Du noted that Ms. Ordaz was pretending to wheeze. In the final version, he added that she was simulating wheezing by using the Valsalva Maneuver. Doc 973-1 (Ex. A) at 2. According to the Cleveland Clinic, the Valsalva Maneuver is used to slow down the heart rhythm: "you push air out, but with your nose and mouth closed (like having a bowel movement). You should do the Valsalva maneuver after your provider gives

---

[4] "Finally, we found that the elevator servicing the Health Services Department at the female prison was nonoperational at the time of our inspection. . . A member of FCI Tallahassee's management staff told us that before the elevator can be repaired the FCI Tallahassee Health Services and Safety Departments must agree on safety protocols governing the appropriate use of the elevator." Dept of Justice OIG, *Inspection of the Federal Bureau of Prisons' Federal Correctional Institution Tallahassee*, 24-005 at 36 (Nov. 2023), https://oig.justice.gov/sites/default/files/reports/24-005.pdf.

you instructions."[5] Ms. Ordaz's medical records do not reveal any reason she would have been taught the maneuver. Dr. Du does not explain how engaging in the maneuver would induce wheezing, and medical internet sites such the National Institutes of Health that explain the maneuver do not mention wheezing as a side effect.[6]

### 3. Malingering

Dr. Du's accusation that Ms. Ordaz's was exaggerating her symptoms to get compassionate release is a sudden and unexplained shift in his views. Dr. Du has been a Medical Officer at Tallahassee since 2022. His first substantive encounter with Ms. Ordaz took place on March 20, 2023, when she had her annual physical. His notes contain the following:

> Chronic Care Clinic
>
> Subjective: c/o SOB when she works. Inmate is 64. Inmate never smoked in past. Inmate denies any foot swelling. She only works about 30 minutes a day and wants to keep her job.
>
> Inmate c/o vertigo. Used to take meclizine.
>
> Pain: Inmate is compliant with her medications. She no longer wants to go to AM pill line for her trileptal.

Ex. C at 157.

Dr. Du treated Ms. Ordaz's shortness of breath by prescribing albuterol (2 puffs every 4 hours), and ordering an in house 2D-ECHO. Ex. C. at 208; Doc 973-1 (Ex. A)

---

[5] Cleveland Clinic, *Valsalva maneuver* (Jun 9, 2022),
https://my.clevelandclinic.org/health/treatments/23209-valsalva-maneuver
[6] See, e.g., https://www.ncbi.nlm.nih.gov/books/NBK537248/

at 24. In March 2023, Dr. Du did not question the veracity of her symptoms or her limited ability to work. In fact, Ms. Ordaz reports that Dr. Du offered to take her off work duty completely but she refused because she wanted a purpose. Because he believed her symptoms, he gave her prescription-strength medicine to address the problem.

On September 5, 2023, Ms. Ordaz met with a nurse practitioner and Dr. Du co-signed the medical record which notes "Shortness of Breath - inmate reports continued shortness of breath and reports using albuterol inhaler at least twice daily. She reports she gets out of breath while doing tasks such as making her bed." Doc 973-1 (Ex. A) at 29. The nurse practitioner increased Ms. Ordaz's pain meds and ordered routine chest x-rays because of her shortness of breath. *Id.* at 32. Dr. Du approved this treatment and did not express any concern about malingering. *Id.* at 34.

In March 2024, Dr. Du again conducted Ms. Ordaz's annual physical. He noted she complained of "DOE," which means dyspnea on exertion, and that "She uses albuterol 5-6x/day" Doc 973-1 (Ex. A) at 21. He further noted "2DECHO normal. EKG normal. Labs equivocal. May need stress testing. … … Provisional diagnosis: DOE." *Id.* at 24. Although he noted that Ms. Ordaz's shortness of breath was "resolved," he then wrote check "EKG, BNP, labs." He also increased her albuterol and gave her a second inhaler with Fluticasone/salmeterol, which is indicated for shortness of breath. *Id.* Again, he did not question her account of her symptoms and proceeded to change and increase her medications. Finally, on June 1, 2024, Dr. Du ordered a

general radiology chest scan that he cancelled a week later in favor of the offsite CT scan "to evaluate progressive dyspnea on exertion." He also ordered a nuclear stress test for dyspnea. *Id.* at 11, 13. He still did not record any concern that Ms. Ordaz was not accurately reporting her symptoms.

Dr. Du has treated Ms. Ordaz since 2022, prescribing medicine and ordering tests to respond to her debilitating shortness of breath and pain. During that time, he never questioned the validity of her symptoms. Only when he learned that Ms. Ordaz is seeking compassionate release did he do an about-face and state she is faking. In spite of this conclusion, he did not take away her medication for shortness of breath and even increased her pain medication. Had he been convinced that she was making up her symptoms, he should have stopped the numerous prescriptions for these allegedly phantom symptoms.

Two facts cast doubt on Dr. Du's credibility: 1) he never questioned the existence of Ms. Ordaz's shortness of breath before she sought compassionate release and 2) he continued to treat it even after accusing her of faking her symptoms.

Ms. Ordaz must prove that she has serious medical conditions brought on by the aging process by the preponderance of the evidence. She has achieved this by submitting medical records that show a combination of chronic medical conditions that have severely limited her ability to work or care for herself in a prison environment. She has buttressed the medical evidence with letters from the women who live with her that explain that she can no longer care for herself due to breathing, pain, and mobility issues. Ex. B 23-26. Aside from Dr. Du's claim he saw Ms. Ordaz

11

running and climbing stairs, the government has not challenged these accounts other than to note they were offered by "friends." Gov't Opp. at 12. If this Court has any doubt that Ms. Ordaz has met her burden of proof, she respectfully requests an evidentiary hearing be scheduled.

### C. The Government's Additional Arguments Are Not Convincing

The Government tries to cast doubt on Ms. Ordaz's claims that she has difficulty with simple activities such as making her bed by saying that she has not complained to BOP staff about them. Gov't Opp. at 12. This is not accurate. Ms. Ordaz's medical records indicate that on September 5, 2023, she told medical staff that she could not make her bed. Doc 973-1 (Ex. A) at 29. In March 2023, she stated she could only work 30 minutes a day. Ex. C at 157.

Ms. Ordaz is not a complainer. Gov't Opp. at 16 (statement by Counselor Matthew Nettles); Ex. B at 29. Her entire life story, which includes living under communism, the Mariel boat lift, dealing drugs, and incarceration, has necessitated projecting an image of independence and invincibility to survive. Two formerly incarcerated women who did time with Ms. Ordaz explain how difficult it is to seek medical care in a prison and to show weakness by asking for help. Ex. B at 28-30. All speak of her work ethic, but Ms. Ordaz should not be denied compassionate release because she tried to hide her physical limitations. One of her support letters explains this seeming paradox: "There are times where she is challenged by tasks that is painstakingly difficult but in those times I am inspired by how she pushes past her limits. . . ." Ex. B at 12. Ms. Ordaz works as one of several unit orderlies who keep

the unit clean by activities such as sweeping and mopping floors, cleaning showers, collecting trash and similar tasks. Nothing about these janitorial duties should be "painstakingly difficult," unless one has serious medical conditions that preclude light physical labor.

In the end, the BOP staff did notice that Ms. Ordaz had physical limitations. The Warden recommended compassionate release based on her deteriorating health, acting on the recommendation of her case manager, Ms. Kimberly Harvey. Ms. Harvey must have known about, and documented, Ms. Ordaz's infirmities or she would not have recommended compassionate release. Gov't Opp. at 16 (citing her counselor stating Ms. Ordaz can no longer "run around"). The Warden, who knows Ms. Ordaz, would not have approved the recommendation if he thought she was healthy enough to remain incarcerated.

The government also questions Ms. Ordaz's claims about her deteriorating vision because she did not need a new prescription for her glasses in February 2024. Gov't Opp. at 12. The two issues — vision correction and cataracts — are not inextricably linked. While strengthening a prescription can improve vision when cataracts are just developing, that adjustment cannot stave off the need for surgery forever. According to the American Academy of Ophthalmology "as the cataract worsens, a point will be reached where new eyeglasses will not help. . . . [T]he optometrist would be correct in not prescribing new glasses if the cataracts are advanced enough to warrant surgery."[7] Ms. Ordaz was first diagnosed with cataracts

---

[7] David F. Chang, *Can stronger glasses suffice until I need cataract surgery?,* American Academy of Ophthalmology (Jan 17, 2024), https://www.aao.org/eye-

in both eyes in 2021. Doc 973-1 (Ex. A) at 49. Her 2024 records show changes and, presumably, degeneration. *Id.* at 56.

### D. Ms. Ordaz's Lengthy Incarceration Has Met the Purposes of Sentencing

Ms. Ordaz is not arguing that she deserves compassionate release just because she has been rehabilitated — although all agree she is. She is asking for a reduction in sentence because the purposes of sentencing have been fulfilled. 18 U.S.C. 3553(a). The BOP officials who interact with Ms. Ordaz every day believe that she is no danger to society and, presumably, that her lengthy incarceration is sufficient punishment and will deters others. *See* Gov't Opp. at 16. She has been severely punished for drug trafficking, including being incarcerated during a once-in-a-century pandemic. The government did not argue that keeping Ms. Ordaz locked up for an additional few years would contribute to public safety, deterrence, or fair punishment. It agrees her release date, currently July 2028, will almost certainly be moved up due to continued accumulation of FSA earned time credits or participation in RDAP. Gov't Opp. at 5. In fact, Ms. Ordaz reports that her unit team is recommending that she be transferred to a halfway house as early as winter 2025.[8] A difference of a two-or-three-year incarceration in a prison or RRM will not add to the deterrence power of long

---

health/ask-ophthalmologist-q/glasses-cataracts

[8] Counsel has requested confirmation from case manager Kimberly Harvey. Ms. Ordaz has mailed the documentation to Counsel who will provide it to the Court upon receipt. Even if Ms. Ordaz is transferred to a halfway house, however, she will still be in BOP custody, so her motion will not become moot. 18 U.S.C. §3621; *Goldings v. Winn*, 383 F.3d 17, 24-25 (1st Cir. 2004). This is simply further evidence that the BOP believes that she is ready to reenter society.

sentences for drug offenses, but it will feel like a lifetime to Ms. Ordaz's daughter, other family, and friends.

Ms. Ordaz's unquestioned exemplary record cannot be reconciled with the idea that she is gaming the system to obtain compassionate by exaggerating her symptoms. On the one side is the testimony of BOP officials and the women who care for her every day who uniformly praise her integrity, diligence, and kindness. On the other are unsubstantiated comments from a doctor who claims she is malingering and Ms. Ordaz's own stoicism. This Court should believe BOP staff, the medical records, and the women who know her best to find that her health has seriously deteriorated due to aging, which is what the Sentencing Guidelines require.

## CONCLUSION

Ms. Ordaz respectfully requests that this Court grant her motion for compassionate release for the reasons explained above. In the alternative, she requests an evidentiary hearing, should this Court have any lingering doubts about her health.

Respectfully submitted,

/s/Catherine Sevcenko

Catherine Sevcenko, DC Bar 484218
*Admitted Pro Hac Vice*
The National Council for Incarcerated and
Formerly Incarcerated Women and Girls
300 New Jersey Ave, NW #900
Washington DC 20001
csevcenko@thecouncil.us
617 299 2604

**CERTIFICATE OF SERVICE**

I hereby certify that a copy of this motion was served via ECF to all counsel of record, this 10th day of September, 2024.

<u>/s/Catherine Sevcenko</u>

Catherine Sevcenko, DC Bar 484218
*Admitted Pro Hac Vice*