IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA,

v.

LAZARA ORDAZ,

              Defendant.

CRIMINAL ACTION
NO. 98-587

## OPINION

**Slomsky, J.**                                                   **November 25, 2024**

I.      **INTRODUCTION** ................................................................................... 2

II.     **BACKGROUND** ..................................................................................... 2

   A.   Defendant's Criminal History ............................................................... 2

   B.   Defendant's First Motion for Compassionate Release .......................... 5

   C.   Defendant's Second Motion for Compassionate Release ...................... 6

   D.   Government's Response in Opposition to Defendant's
       Compassionate Release Motion ........................................................... 9

   E.   Defendant's Reply to the Government's Opposition ............................ 11

III.    **STANDARD OF REVIEW** ................................................................... 13

IV.     **ANALYSIS** ............................................................................................ 18

   A.   Defendant's Medical Conditions Do Not Present Extraordinary and
       Compelling Reasons to Grant Compassionate Release ....................... 18

   B.   Defendant Has Not Demonstrated that the Federal Correctional Institution
       Has Failed to Provide Her with Adequate Medical Care ..................... 23

   C.   The § 3553(a) Sentencing Factors Do Not Weigh in Favor
       of Defendant's Release ....................................................................... 27

V.      **CONCLUSION** .................................................................................... 29

## I.    INTRODUCTION

Defendant Lazara Ordaz ("Defendant"), who is serving a 420-month sentence, moves for compassionate release pursuant to 18 U.S.C. § 3582(c)(1)(A).  (Doc. No. 972.)  Defendant asserts that her age, medical condition, and the Bureau of Prison's ("BOP") failure to provide her with adequate care amount to extraordinary and compelling reasons justifying her release.  Further, Defendant argues that her release is warranted because she poses no danger to the public, has been sufficiently punished, and is rehabilitated.  The Government opposes the Motion, averring that Defendant's medical conditions are ordinary for her age and can be treated while she is in custody, without discussing whether the sentencing factors under 18 U.S.C Section 3553(a) warrant her release.  For the reasons that follow, Defendant's Motion (Doc. No. 972) will be denied.

## II.    BACKGROUND

### A.  Defendant's Criminal History

In 1980, Defendant emigrated to the United States from Cuba and settled in Florida.  (Doc. No. 973 at 1).[1]  In 1981, she began a crime spree that led to convictions for carrying a concealed firearm in 1981, possession of marijuana in 1983, petit theft in 1984, possession with intent to sell a controlled substance in 1988, sale of cocaine in 1988, and possession of cocaine in 1990.  (Id. at 2.)

In the early 1990s, Defendant moved to Philadelphia, Pennsylvania, and sold drugs with her brother, Cosme Ordaz.  (Doc. No. 973 at 2; see Doc. No. 972 at 3)  In 1992, Cosme was incarcerated, and Defendant began leading the drug organization he founded, known as the Ordaz

---

[1]    The facts are taken from Defendant's Motion for Compassionate Release (Doc. No. 972) and the Government's Response in Opposition to the Motion (Doc. No. 973).  Both briefs cite to the Presentence Report.

Cocaine Organization ("OCO").  (Doc. No. 973 at 2.)  Between 1993 and 1998, the OCO, under Defendant's leadership, distributed over 150 kilograms of cocaine worth in excess of $3 million. (Id.)

As the OCO's leader, Defendant hired lookouts, street sellers, managers, and "enforcers" to protect the organization from rival drug dealers.  (Id. at 2-3.)  Defendant and her subordinates obtained cocaine both from local sources and those in Miami, Florida.  (Id. at 3.)  Additionally, the OCO had stash houses throughout Philadelphia.  (Id. at 3.)

In 1996, Defendant was involved in a shootout, and subsequently incarcerated in Philadelphia for a related firearms offense.[2]  (See Doc. No. 972 at 3; Doc. No. 973 at n.1.)  While incarcerated and participating in work release, however, Defendant continued to direct her drug-trafficking operation.  (Doc. No. 973 at 3.)  Following her incarceration, she continued to keep and carry a firearm as a convicted felon.  (Id.)

On December 16, 1998, Defendant and 17 others were indicted by a grand jury in the Eastern District Pennsylvania.  (Id. at 4.)  The 22-count Indictment charged Defendant with the following offenses:

- Conspiracy to distribute more than 150 kilograms of cocaine, in violation of 21 U.S.C. § 846 (Count One);

---

[2]    In August 1996, Defendant was involved in a shootout, during which two innocent bystanders were injured.  (Doc. No. 973 at n. 1.)  According to Defendant, she was standing on the corner playing with neighborhood children when rival drug dealers drove by and opened fire on her. (Doc. No. 972 at 3.)  She claims that she returned fire in an attempt to protect the children. (Doc. No. 973 at n. 1; Doc. No. 972 at 3.)  She was charged with both reckless endangerment and carrying a firearm without a license.  (Doc. No. 972 at 3.)  Regarding this episode, the Court has considered the letter submitted by Maritza DeFabian, mother of the 6-year-old shootout victim, in which DeFabian asserts that her daughter's injuries were not Defendant's fault.  (See Doc. No. 972-1 at 1.)  Nevertheless, as the Court has previously observed, a gun fight is foreseeable among drug dealers.  (Doc. No. 963 at n. 1.)

- Use of a communication facility or telephone facility to facilitate a drug felony, in violation of 21 U.S.C. § 843(b) (Counts 33, 27, 40, 41, 44, 47, 49, 50, 54-62, and 64-66); and

- Possession of a firearm by a convicted felon, in violation of 21 U.S.C § 922(g)(1) (Count 74).

(Id. at 4.)

On December 2, 1999, Defendant plead guilty to all 22 counts. (Doc. No. 265.) On November 1, 2000, she was sentenced to 420 months' imprisonment, followed by five years of supervised release.[3] (See Doc. No. 451.)

Defendant is currently incarcerated at the Federal Correctional Institution in Tallahassee, Florida ("FCI Tallahassee") and has served over 25 years of her sentence. (Doc. No. 972-6 at 6-7.) She is 65 years old. (Doc. No. 974.) In the past 18 years, Defendant has only committed one infraction while incarcerated for possession of alcohol. (Doc. No. 973 at 15; see Doc. No. 972-6 at 10.) As of October 31, 2023, Defendant had earned approximately 40 months of good time credit and was projected to earn approximately 60 months of good time credit in total. (Doc. No. 972-6 at 9.) Defendant has also earned one year of First Step Act credit. (Id.) Defendant's projected release date is July 31, 2028. (Doc. No. 972-6 at 7.) She is eligible for home detention on February 1, 2028. (Id.)

According to the BOP's assessment, Defendant presents a low risk of recidivism. (See Doc. No. 972 at 11.) Further, BOP staff members who interact closely with Defendant, specifically a counselor and her case manager, have indicated that she is a good candidate for compassionate release. (Doc. No. 973 at 16.) Her counselor provided the following reasons to support his

---

[3] The other Defendants in this case, including Cosme Ordaz, received lower sentences than Defendant. (Doc. No. 973 at n. 1.) Cosme Ordaz was released from prison in 2019. (Id.)

position:  (1) Defendant's long incarceration, (2) her support group in the community, and (3) her respectful behavior as an inmate.  (Id.)

### B.  Defendant's First Motion for Compassionate Release

On June 15, 2020, Defendant filed her first Motion for Compassionate Release (Doc. No. 955).  In that Motion, Defendant first argued that the COVID-19 pandemic, her age, and her medical condition placed her at increased risk of contracting COVID-19.  (Doc. No. 963 at 1.) Second, she averred that compassionate release was appropriate in light of the 18 U.S.C. § 3553(a) sentencing factors (the "§ 3553(a) factors" or the "Section 3553(a) factors") because she had rehabilitated in prison and would pose no danger to the community if released.[4]  (Doc. No. 963 at 6.)  In support of her position, Defendant referenced her steady employment with Federal Prison Industries ("UNICOR"), recommendation letters from her UNICOR supervisors, and her classwork.  (Id. at 6-7.)  Further, Defendant noted that she had both housing and a job waiting for her upon release.  (Id. at 7.)

---

[4]   When modifying a sentence under 18 U.S.C. § 3582(c)(1)(A), a court must consider the relevant sentencing factors set forth in 18 U.S.C. § 3553(a), which include:

   (1) the nature and circumstances of the offense and the history and characteristics
       of the defendant;

   (2) the need for the sentence imposed—
       a. to reflect the seriousness of the offense, to promote respect for the law, and
          to provide just punishment for the offense;
       b. to afford adequate deterrence to criminal conduct;
       c. to protect the public from further crimes of the defendant; and
       d. to provide the defendant with needed educational or vocational training,
          medical care, or other correctional treatment in the most effective manner[.]
          … [and]

   (6) the need to avoid unwarranted sentence disparities among defendants with
       similar records who have been found guilty of similar conduct.

On October 9, 2020, this Court denied Defendant's Motion.  (Doc. No. 963.)  First, the Court held that "Defendant's medical condition . . . [was] not severe enough to warrant release because her condition . . . [did] not place her at an especially high risk of serious illness or death if she were to contract COVID-19."  (Id. at 15.)  Second, the Court observed that "her reported medical condition . . . [did] not rise to the level of warranting compassionate release."  (Id. at 16.)  Finally, the Court ruled that "the relevant Section 3553(a) factors . . . [did] not support Defendant's release to home confinement or sentencing reduction."  (Id. at 16.)

### C. Defendant's Second Motion for Compassionate Release

On July 23, 2024, Defendant filed the instant Motion for Compassionate Release (Doc. No. 972) under 18 U.S.C. § 3582(c)(1)(A).[5]  Defendant argues that her medical condition, age, and rehabilitation warrant her release from custody.  (See Doc. No. 972.)

First, Defendant argues that the deterioration of her physical health due to aging constitutes an extraordinary and compelling circumstance, warranting her release.  (Id. at 9).  Specifically, Defendant alleges that she "struggles with the activities of daily living because [of] chronic

---

[5]   The Court notes that in Defendant's counseled Motion, it highlights that on June 5, 2024, Defendant's unit team approved Defendant's request for compassionate release and forwarded it to the Warden of FCI Tallahassee.  (Doc. No. 972 at 7; see Doc. No. 972-5.)  The same day, the Warden petitioned the BOP Office of the General Counsel to consider Defendant for compassionate release pursuant to 18 U.S.C. 3582(c)(1)(A).  (Doc. No. 972-5 at 4-5.)  In this petition, the Warden stated:

> Inmate Ordaz meets the guidelines stipulated in Program Statement 5050.50, elderly inmates who are 65 years or older and have completed the greater of 10 years or 75% of their term of imprisonment to which they were sentenced.  She is currently 65 years old and has completed 24 years and 11 months of imprisonment.  If approved for release from federal custody, inmate Ordaz has been approved to release to the Eastern District of Pennsylvania.

(Id. at 4.)  As of September 1, 2024, when the Government submitted its Response to Defendant's Second Motion (Doc. No. 973), the BOP was still reviewing the Warden's petition.  (Doc. No. 973 at 11.)  As of today, she is still incarcerated.

shoulder pain, hypertension, shortness of breath, cataracts, falling spells, and sciatica." (Id.) In addition, she has dental damage, hypothyroidism, vertigo, sleep apnea, and an eGFR rate indicative of stage 3a kidney disease. (Id. at 4.) Further, she reports that, due to her shortness of breath, she struggles while mopping the floor and can no longer go up the stairs or make her bed, even though she uses her inhaler one to three times per day. (Id. at 9.) Additionally, Defendant asserts that her left shoulder pain prevents her from carrying and reaching for things, sleeping on her left side, and dressing without pain. (Id. at 11, 13.) Defendant also avers that "[s]he has moderate sleep apnea and her CPAP machine is unreliable." (Id. at 9.)

As evidence of her daily struggles, Defendant references her medical records, attached to her present Motion as Exhibits C-1 (Doc. No. 972-3) and C-2 (Doc. No. 972-4), and also letters from her fellow inmates, attached to her present Motion as Exhibit B (Doc. No. 972-2). In these letters, Defendant's peers assert that she requires help "showering[,]" "dress[ing], making her bed, making sure the room is ready for inspection, cleaning the floors, . . . [travelling] around the compound when she has to go to different departments[,]" climbing the stairs, "carrying her commissary[,]" "reading the computer[,] and filling out forms." (Id. at 10 (quoting Doc. No. 972-2 at 23, 25, 27).)

Second, Defendant argues that FCI Tallahassee "cannot provide the level of care and attention that . . . [her] medical conditions require." (Id. at 12.) She claims that FCI Tallahassee is understaffed, has an "incomplete medical screening process[,]" and has a hard time "promptly addressing medical emergencies." (Id. at 6.) In support of this proposition, she cites a 2023 inspection report published by the United States Department of Justice, Office of the Inspector General. (Id. (citing U.S. Dep't of Just., Inspection of the Federal Bureau of Prisons' Federal

Correctional Institution Tallahassee, No. 24-005 (Nov. 8, 2023), https://oig.justice.gov/ sites/ default/ files/ reports/ 24-005.pdf).)

Defendant also claims that FCI Tallahassee has "consistently delayed and denied [her] treatment, jeopardizing her health and leaving her in chronic pain." (Id. at 12.) Defendant explains that she underwent shoulder surgery in 2009, has been suffering from chronic pain ever since, and will likely require another surgery. (Id. at 10-11.) She states that her surgery "was scheduled for [the] fall of 2021 and has not happened." (Id. at 13.) She also asserts that if she does eventually undergo shoulder surgery, the BOP is too short-staffed to provide her with physical therapy and follow-up treatments. (Id. at 11.) Defendant also argues that the BOP cannot manage her left shoulder pain and sciatica because her medication is no longer listed on the BOP's formulary.[6] (Id. at 13.)

Additionally, Defendant notes that her shortness of breath remains undiagnosed, her cataracts (diagnosed in 2021) have not been surgically removed, and as of July 22, 2024, her doctor "no longer worked at the prison and had not refilled her new prescription." (Id. at 13-15.) Finally, Defendant points out that she has struggled with adjustment disorder, anxiety, depression, and gender dysphoria. (Id. at 12.) Nevertheless, she asserts that the BOP has not provided her with hormone treatment or mental counseling for her gender dysphoria.[7] (Id. at 12, 14.)

---

[6]  Defendant asserts that the BOP will no longer provide her with Trileptal, which effectively managed her pain, because it was removed from the BOP's formulary. (Doc. 972 at 13; see Doc. No. 972-4 at 158.) Further, she claims that she has been denied Lidoderm patches and offered over-the-counter medications and muscle rubs in the alternative. (Id. at 13.) Defendant claims that these alternatives are less effective and more expensive. (Id.) Nevertheless, her medical records state that she was prescribed Trileptal on July 16, 2024. (Doc. No. 974 at 2-3.)

[7]  The BOP did issue Defendant chest binders on September 22, 2022 and October 19, 2023. (Doc. No. 972-4 at 66.)

Third, referencing the § 3553 factors, Defendant avers that she (1) poses no danger to the public, (2) has been sufficiently punished, and (3) is rehabilitated.  (Id. at 15-24.)  Specifically, Defendant submits that she poses no threat to the public because of her age (65) and numerous physical ailments.  (Id. at 16.)  Further, she states that her "almost perfect" prison record, work ethic, and educational pursuits while incarcerated demonstrate that she not only poses no danger to the public but will also be employable once released.[8]  (Id. at 18-19).  As evidence, Defendant references her prison record, attached to her instant Motion as Exhibit E (Doc. No. 972-6), and testimony from her UNICOR supervisors stating that Defendant is trustworthy, has a strong work ethic, leadership skills, and a positive attitude (Doc. No. 955).  And, as noted, she has provided character letters from her fellow inmates, attached to her instant Motion as Exhibit B (Doc. No. 972-2).  (See Doc. No. 972.)

Finally, in accordance with the § 3553(a) sentencing factors, Defendant argues she has been sufficiently punished in light of her rehabilitation.  (Doc. No. 972 at 20-21, 24-25.)  Specifically, she states that "[w]hat was an appropriate punishment 25 years ago . . . no longer fits the person . . . [she] has become."  (Id. at 21.)  Further, she asserts that her time served (approximately 25 years) sufficiently addresses the seriousness of her crimes and promotes respect for the law.  (Id. at 21.)  Defendant also claims that her early release will not undermine the deterrent effect of her sentence.  (Id. at 20.)

### D. Government's Response in Opposition to Defendant's Compassionate Release Motion

On September 1, 2024, the Government submitted a Response (Doc. No. 973).  The Government maintains that Defendant's Motion should be denied because she "does not present

---

[8]  Defendant has earned a General Education Development degree and has taken over 80 educational courses while incarcerated.  These courses include drug addiction, life and business management, and English.  (Doc. No. 972 at 18-19, 23; see Doc. No. 972-6 at 2-3.)

an 'extraordinary and compelling reason' allowing consideration for compassionate release." (Id. at 10 (quoting 18 U.S.C. § 3582(c)(1)(A)(i)).)[9]  In this regard, the Government makes three main arguments.  First, the Government observes that Defendant does not have a terminal illness.[10]  (Id. at 10.)   Second, the Government argues that Defendant "is [not] experiencing a serious deterioration in physical or mental health because of the aging process."[11]  (Id. at 11-12 (quoting U.S.S.G §1B1.13(b)(2).)  In support of this argument, the Government reports that on July 16, 2024, Dr. Du at FCI Tallahassee evaluated Defendant and "did not see a basis for compassionate release." (Id. at 14.)  Dr. Du claimed that he "witnessed . . . [Defendant] running and climbing three flights of stairs without discomfort[,]" but after she noticed him, she stopped, used her inhaler, and began walking slowly.  (Id. at 13 (quoting Doc. No. 974 at 1).)  In his report, Dr. Du also speculated that Defendant was exaggerating her symptoms due to her pending compassionate release motion.  (Doc. No. 974 at 2-3.)   Additionally, the Government avers that although

---

[9]    The Government discounts the Warden's recommendation that Petitioner be considered for compassionate release, asserting that "the standard that the warden applied, set forth in BOP Program Statement 5050.50, is broader than the definition of 'extraordinary and compelling reasons' set forth in USSG § 1B1.13, as amended November 1, 2023, which must govern . . . [the Government's] assessment at this time . . . ."  (Doc. No. 973 at 11.)  Specifically, the Government notes that Statement 5050.50 allows an elderly inmate to be considered for compassionate release regardless of whether he or she "is experiencing a serious deterioration in physical or mental health because of the aging process."  (Id. at 12 (quoting U.S.S.G. § 1B1.13(b)(2)).)  Because Defendant is not experiencing a serious deterioration in health, the Government opposes the Motion.  (Id. at 11.)

[10]   Under U.S.S.G § 1B1.13(b)(1)(A), terminal illness constitutes an extraordinary and compelling reason warranting the reduction of a defendant's sentence. U.S.S.G § 1B1.13(b)(1)(A).

[11]   Under U.S.S.G § 1B1.13(b)(2), a defendant's circumstances are "extraordinary and compelling" if he or she "(A) is at least 65 years old; (B) is experiencing a serious deterioration in physical or mental health because of the aging process; and (C) has served at least 10 years or 75 percent of his or her term of imprisonment, whichever is less." U.S.S.G § 1B1.13(b)(2). The government does not contest prongs (A) or (C), conceding that Defendant is 65 years old "and has served well over ten years of her sentence." It does contest prong (B). (See Doc. No. 973 at 11-12.)

Defendant's fellow inmates attest to her daily limitations, she has not made similar complaints to BOP staff or received any assistive devices.  (Doc. No. 973 at 12.)

Third, responding to Defendant's claim that the BOP has not provided her with adequate treatment, the Government argues that (1) her optometrist has not recommended cataract surgery, (2) her "medical records do not indicate any need for [orthopedic] follow-up[,]"[12] and (3) she is prescribed medication for her shoulder, lower back, and sciatica pain.  (Id. at 12-13.)

In summary, the Government argues that Defendant's conditions are "ordinary for her age, and . . . treated and maintained in BOP custody."  (Id. at 14.)  Moreover, because Defendant does not present "extraordinary and compelling reasons," the Government does not analyze the § 3552(a) factors.  (Id. at 15-17.)  And while the Government acknowledges the admirability of Defendant's conduct in prison, referencing her prison record, educational efforts, "favorable work performance[,]" reputation in the prison facility, and familial support system, her apparent rehabilitation does not constitute an extraordinary and compelling circumstance warranting compassionate release.  (Id. at 15-17 (citing 28 U.S.C. § 9949(t); United States v. Claudio, No. 17-546, 2022 WL 1623650, at *3 (E.D. Pa. May 23, 2022)).)  Therefore, the Government concludes that "there is no basis for consideration for compassionate release."  (Id. at 15.)

### E.  Defendant's Reply to the Government's Opposition

On September 10, 2024, Defendant submitted a Reply (Doc. No. 977), noting that the Government only contests "whether she is sick enough to meet the 'extraordinary and compelling' legal standard."  (Doc. No. 977 at 1 (quoting 18 U.S.C. § 3582(c)(1)(A)(i)).)

---

[12]  On July 16, 2024, Dr. Du recommended Defendant see an orthopedist.  (Doc. No. 974 at 3.)

First, Defendant argues that the Government conflates U.S.S.G § 1B1.13(b)(1)(B) (the "Medical Condition Provision") and § 1B1.13(b)(2) (the "Age of Defendant Provision"). (Id. at 2-3.) Defendant argues that the Age of Defendant Provision is "for senior citizens and long-timers[;]" therefore, it is less demanding than the Medical Condition Provision, which is for "young people who have not served as much time." (Id. at 3-4.) Thus, Defendant reasserts that her medical conditions collectively constitute "serious deterioration in physical or mental health."[13] (Id. at 4.)

Second, Defendant asserts that Dr. Du's assessment is not credible. (Id. at 6.) Dr. Du has been treating her since 2022, but never questioned the veracity of her shortness of breath until he learned that she was seeking compassionate release. (Id. at 11.) Further, after questioning her symptoms, Dr. Du increased her pain medication. (Id.; see Doc. No. 974 at 5.)

Third, Defendant asserts that contrary to the Government's averment, she has reported her daily struggles to BOP staff. (Doc. No. 977 at 12.) As evidence, Defendant cites her medical record, attached to Defendant's instant Motion as Exhibits C-1 (Doc. No. 972-3) and C-2 (Doc. No. 972-4), which detail her inability to make her bed or work more than 30 minutes per day. (Doc. No. 977 at 12.)

---

[13] In support of this claim, Defendant again asserts that she struggles with daily activities. (See Doc. No. 977 at 2.) Additionally, Defendant also argues that she suffers from the following conditions:

> hypothyroidism; hypertension; prediabetes; shoulder and back pain; Vitamin D deficiency; hyperlipidemia; sleep apnea; cataracts; . . . asthma[;] . . . sciatica; lumbago; Helicobacter pylori [H. pylori]; dental caries (since 2018); . . . fractured dental restorative material with loss of material (since 2017)[;] . . . gender dysphoria; . . . unspecified mood disorder and cannabis use disorder.

(Doc. No. 977 at 2 (second alteration in original).)

Finally, Defendant claims that (1) her "lengthy incarceration" has fulfilled the purposes of sentencing and will deter others, and (2) she poses no danger to society.  (Id. at 14.)

## III.    STANDARD OF REVIEW

Generally, a district court "may not modify a term of imprisonment once it has been imposed . . . ."  18 U.S.C. § 3582(c).  There are, however, "a few narrow exceptions" to this general "rule of finality[,]"  Freeman v. United States, 564 U.S. 522, 526 (2011), including the compassionate release statute, § 3582(c)(1)(A).  As amended by the First Step Act (enacted 2018), § 3582(c)(1)(A) empowers a district court to modify a term of imprisonment on a defendant's motion after the defendant has exhausted her administrative remedies.[14]  See § 3582(c)(1)(A)(i).  The statute provides, in part, that:

> the Court, upon Motion of the Director of the Bureau of Prisons, or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier, may reduce the terms of imprisonment (and may impose a term of probation or supervised release with or without

---

[14]  A defendant may file a motion for compassionate release directly with a district court after he or she "has fully exhausted all administrative rights to appeal a failure of the [BOP] to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier . . . ."  18 U.S.C. § 3582(c)(1)(A).  In other words, before a defendant can make such a request to the court, he or she "must at least ask the Bureau of Prisons (BOP) to do so on [his or her] behalf and give [the] BOP thirty days to respond[,]" United States v. Raia, 954 F.3d 594, 595 (3d Cir. 2020), and if the BOP does respond adversely within the 30 days, to then exhaust any available administrative appeals during that period.  See 18 U.S.C. § 3582(c)(1)(A).

Here, Defendant's Unit Manager sent a memorandum to the Warden at FCI Tallahassee on June 5, 2024, recommending she be considered for compassionate release under 18 U.S.C. 3582(c)(1)(A).  (Doc. No. 972-5 at 2).  On the same day, the Warden forwarded the request to the BOP Office of General Counsel.  (Id. at 5).  On July 23, 2024, while the BOP was reviewing the Warden's recommendation, Defendant filed her Motion for Compassionate Release (Doc. No. 972).  (See Doc. No. 973 at 11.)  Because at least 30 days lapsed from June 5, 2024, the date Defendant's request was sent to the BOP Office of General Counsel, she has met the exhaustion requirement.

conditions that does not exceed the unserved portion of the original term of imprisonment), after considering the factors set forth in [§ 3553(a)] to the extent that they are applicable, if it finds that—

(i) extraordinary and compelling reasons warrant such a reduction;
. . .

and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission[.]

§ 3582(c)(1)(A).  Congress, however, has not defined the phrase "extraordinary and compelling reasons," except to the extent that "[r]ehabilitation of the defendant alone" is insufficient to constitute an extraordinary and compelling reason.  28 U.S.C. § 994(t).  Instead, Congress delegated the authority to define "extraordinary and compelling reasons" to the United States Sentencing Commission.  In this regard, the Commission amended Section 1B1.13 of the Sentencing Guidelines.  Section 1B1.13 provides that a sentence reduction under § 3582(c)(1)(A) may be ordered where a court determines:

[A]fter considering the factors set forth in 18 U.S.C. § 3553(a), . . . —

(1) (A) Extraordinary and compelling reasons warrant the reduction; . . .
. . .

(2) The defendant is not a danger to the safety or any other person or to the community, as provided in 18 U.S.C. § 3142(g); and

(3) The reduction is consistent with this policy statement.

U.S.S.G. § 1B1.13 (a)(1)-(3).

Section 1B1.13(b) defines "extraordinary and compelling reasons," listing five specific qualifying circumstances:  a defendant's (1) medical condition, (2) age, (3) family circumstances, (4) history of abuse, or (5) unusually long sentence.  U.S.S.G. § 1B1.13(b)(1)-(4), (6).  Section 1B1.13(b) also provides a catch-all provision.  U.S.S.G. § 1B1.13(b)(5).  In part, Section 1B1.13(b) states:

Extraordinary and compelling reasons exist under any of the following circumstances or a combination thereof:

(1) MEDICAL CIRCUMSTANCES OF THE DEFENDANT. —

(A) The defendant is suffering from a terminal illness (i.e., a serious and advanced illness with an end-of-life trajectory). A specific prognosis of life expectancy (i.e., a probability of death within a specific time period) is not required. Examples include metastatic solid-tumor cancer, amyotrophic lateral sclerosis (ALS), end-stage organ disease, and advanced dementia.

(B) The defendant is—

(i) suffering from a serious physical or medical condition,

(ii) suffering from a serious functional or cognitive impairment, or

(iii) experiencing deteriorating physical or mental health because of the aging process,

that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover.

(C) The defendant is suffering from a medical condition that requires long-term or specialized medical care that is not being provided and without which the defendant is at risk of serious deterioration in health or death.

(D) The defendant presents the following circumstances—

(i) the defendant is housed at a correctional facility affected or at imminent risk of being affected by (I) an ongoing outbreak of infectious disease, or (II) an ongoing public health emergency declared by the appropriate federal, state, or local authority;

(ii) due to personal health risk factors and custodial status, the defendant is at increased risk of suffering severe medical complications or death as a result of exposure to the ongoing outbreak of infectious disease or the ongoing public health emergency described in clause (i); and

(iii) such risk cannot be adequately mitigated in a timely manner.

(2) AGE OF THE DEFENDANT. —The defendant (A) is at least 65 years old; (B) is experiencing a serious deterioration in physical or mental health because of the aging process; and (C) has served at least 10 years or 75 percent of his or her term of imprisonment, whichever is less."

(3) FAMILY CIRCUMSTANCES OF THE DEFENDANT. —

(A) The death or incapacitation of the caregiver of the defendant's minor child or the defendant's child who is 18 years of age or older and incapable of self-care because of a mental or physical disability or a medical condition.

(B) The incapacitation of the defendant's spouse or registered partner when the defendant would be the only available caregiver for the spouse or registered partner.

(C) The incapacitation of the defendant's parent when the defendant would be the only available caregiver for the parent.

(D) The defendant establishes that circumstances similar to those listed in paragraphs (3)(A) through (3)(C) exist involving any other immediate family member or an individual whose relationship with the defendant is similar in kind to that of an immediate family member, when the defendant would be the only available caregiver for such family member or individual. For purposes of this provision, 'immediate family member' refers to any of the individuals listed in paragraphs (3)(A) through (3)(C) as well as a grandchild, grandparent, or sibling of the defendant.

(4) VICTIM OF ABUSE. —The defendant, while in custody serving the term of imprisonment sought to be reduced, was a victim of:

(A) sexual abuse involving a "sexual act," as defined in 18 U.S.C. 2246(2) (including the conduct described in 18 U.S.C. 2246 (2)(D) regardless of the age of the victim); or

(B) physical abuse resulting in "serious bodily injury," as defined in the Commentary to § 1B1.1 (Application Instructions);

that was committed by, or at the direction of, a correctional officer, an employee or contractor of the Bureau of Prisons, or any other individual who had custody or control over the defendant.

For purposes of this provision, the misconduct must be established by a conviction in a criminal case, a finding or admission of liability in a civil case, or a finding in an administrative proceeding, unless such proceedings are unduly delayed or the defendant is in imminent danger.

(5) OTHER REASONS. —The defendant presents any other circumstance or combination of circumstances that, when considered by themselves or together with any of the reasons described in paragraphs (1) through (4), are similar in gravity to those described in paragraphs (1) through (4).

(6) UNUSUALLY LONG SENTENCE. —If a defendant received an unusually long sentence and has served at least 10 years of the term of imprisonment, a change in the law (other than an amendment to the Guidelines Manual that has not been made retroactive) may be considered in determining whether the defendant presents an extraordinary and compelling reason, but only where such change would produce a gross disparity between the sentence being served and the sentence likely to be imposed at the time the motion is filed, and after full consideration of the defendant's individualized circumstances.

§ 1B1.13 (b)(1)-(6).

If a district court determines that an extraordinary and compelling reason exists, it must then weigh that reason against the § 3553(a) factors to determine if a sentence reduction is warranted and, if so, the extent of such reduction. United States v. Somerville, 463 F. Supp. 3d 585, 588 (W.D. Pa. 2020) ("[T]he Court must weigh the[] extraordinary circumstances against the ordinary sentencing factors under 18 U.S.C. § 3553(a)."). Section 3553(a) establishes factors for a court to consider in initially imposing a sentence. Not every factor is applicable, however, when considering a motion for compassionate release. In the instant case, the applicable factors are:

(1) the nature and circumstances of the offense and the history of the characteristics of the defendant;

(2) the need for the sentence imposed—

(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

(B) to afford adequate deterrence to criminal conduct;

(C) to protect the public from further crimes of the defendant; and

(D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner[.]

. . . [and]

(6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct[.]

§ 3553(a)(1)-(2), (6).  Therefore, if a balance of a defendant's extraordinary and compelling reasons with the 3553(a) factors supports a reduced sentence, and that reduction is consistent with applicable policy statements of the Sentencing Commission, a court may reduce a defendant's prison term, modify the terms of supervised release, or both.

## IV. ANALYSIS

Defendant's Motion will be denied because she has not demonstrated an extraordinary and compelling reason for her release.  Furthermore, the relevant § 3553(a) factors weigh against a reduction of her sentence.  Each of these conclusions is discussed seriatim.

### A. Defendant's Medical Conditions Do Not Present Extraordinary and Compelling Reasons to Grant Compassionate Release

To start, Defendant's medical conditions do not present extraordinary and compelling reasons for her release.  Specifically, Defendant asserts that she suffers from untreated left shoulder pain, sciatica, undiagnosed shortness of breath, hypertension, hypothyroidism, vertigo, falling spells, cataracts, dental damage, sleep apnea, and an eGFR rate indicative of stage 3a kidney disease.  (Doc. No. 972 at 4, 9.)  She argues that these conditions, taken together, constitute a "serious deterioration in her physical health" and render her unable to function in a prison environment.  (See id. at 8-9; Doc. No. 977 at 4.)  The Government concedes that Defendant presents with "hypothyroidism; hypertension; prediabetes; shoulder and back pain; Vitamin D deficiency; hyperlipidemia; sleep apnea; cataracts; and asthma."  (Doc. No. 973 at 10.)

Nevertheless, the Government avers that these conditions are ordinary for a person of Defendant's age and can be managed in prison. (Id. at 10.)

As Defendant correctly observes, a defendant's burden of proof is different under the Age of Defendant Provision and the Medical Condition Provision. If a defendant's age and time served qualify him or her for consideration under the Age of Defendant Provision, he or she need not (1) demonstrate total inability to provide self-care in prison, or (2) have a terminal illness. United States v. Brunetti, No. 94-127-13, 2020 WL 4516541, at *7 (E.D. Pa. July 31, 2020) (quoting United States v. Ebbers, 432 F. Supp. 3d 421, 428 (S.D.N.Y. 2020)).[15] Nevertheless, the deterioration of his or her physical and mental health must be "serious," impairing basic human functions. Id. This standard requires a fact-specific analysis. Id.

In the present case, Defendant satisfies the first two requirements of the Age of Defendant Provision, but not the third. She is 65 years old and has served over 10 years of her sentence. However, Defendant has not proven she is "experiencing a serious deterioration in physical or mental health because of the aging process." U.S.S.G § 1B1.13(b)(2).

In October 2021, the Court denied Defendant's first Motion for Compassionate Release, observing that, at 61 years of age, Defendant was "essentially in the age group covered by the Application Notes, but her reported medical conditions . . . [did] not rise to the level of warranting

---

[15]  Because Brunetti and Ebbers were decided in 2020, before Section 1B1.13 was amended in 2023, both decisions use the terms "Medical Condition Note" and "Age of Defendant Note" to reference the language of U.S.S.G. § 1B1.13 n.1(A)-(B) (2018). Presently, almost identical language is codified in Section 1B1.13(b)(1)(B) and Section 1B1.13(b)(2) respectively. Therefore, the Court refers to Section 1B1.13(b)(1)(B) and Section 1B1.13(b)(2) as the "Medical Condition Provision" and the "Age of Defendant Provision" respectively.

compassionate release."[16]  (Doc. No. 963 at 16.)  Defendant asserts that since this denial, her condition has worsened, warranting her release.  Specifically, Defendant notes that all of her medical conditions, including her development of "shortness of breath, degenerative disc disease, and [the] limited use of her left arm[,]" render her daily activities difficult.  (Doc. No. 972 at 1.) Nevertheless, her medical conditions and these developments do not satisfy the seriousness requirement of the Age of Defendant Provision.

　　　　To demonstrate that her medical conditions collectively constitute a "serious deterioration," Defendant relies on cases decided in this District.  However, these cases are not analogous to Defendant's situation.  First, Defendant cites United States v. Reaves, 668 F. Supp. 3d 360 (E.D. Pa. Apr. 5, 2023).  (Doc. No. 972 at 10.)  In Reaves, Judge Eduardo Robreno granted the compassionate release motion of a 56-year-old who experienced difficulty bathing and dressing. (Id.)  In the present case, Defendant similarly struggles with daily activities including bathing, dressing, and walking.  (See Doc. No. 972-2; Doc. No. 972-3; Doc. No. 972-4.)  However, in Reaves, the defendant also "require[d] numerous and continuing appointments outside of his BOP facility, including infusions every eight weeks because of his Chron's disease."  Reaves, 668 F. Supp. 3d at 364.  Additionally, he required a prosthetic eye replacement and thyroid mass removal surgery.  Id. at 364-65.  These requirements distinguish Reaves from the Defendant's case.

---

[16]  Here, "Application Notes" refers to U.S.S.G. § 1B1.13 n.1 (A)(ii)(III)-(B) (2018).  As noted, the language contained in these Application Notes is now codified in U.S.S.G. § 1B1.13(b)(1)(B)(iii)-(2).  In arriving at this decision on the First Motion for Compassionate Release, the Court acknowledged that Defendant has suffered from the following conditions: hypertension, hyperthyroidism, osteoporosis, "shoulder pain, orthopedic pain, anemia, glaucoma, allergic rhinitis, acute respiratory infections, sinusitis, esophageal reflux, lumbago, sciatica, bone and cartilage disorders, degenerative disc disease, anterolisthesis, dysphagia, vertigo, and dental issues."  (See Doc. No. 963 at 4, n. 5.)

Here, Defendant does not have a similar need for outside medical treatment.  Although Defendant reports that she was scheduled for left shoulder surgery in the fall of 2021 that never occurred, she was merely scheduled for a "non-surgical[,]" "routine" orthopedic follow-up in February 2021, and her medical records do not show that surgery was recommended.  (Doc. No. 973 at 13; Doc. No. 972-3 at 127; see Doc. No. 974 at 2-3.)  Additionally, Defendant insinuates that she requires cataract surgery.  (See Doc. No. 972 at 14.)  However, her medical records do not show that cataract surgery has been recommended.  (See Doc. 972-4 at 57.)  At Defendant's last reported optometrist appointment on February 7, 2024, her prescription remained unchanged and she was instructed to return for evaluation in one year.  (Doc. No. 972-4 at 54.)  These facts demonstrate that Defendant requires less medical attention than the defendant in Reaves, and that her medical condition is not as serious.

Next, to demonstrate that a combination of age-related conditions may constitute a serious deterioration in health, Defendant cites both United States v. Swint, No. 94-276, 2021 WL 1210111 (E.D. Pa. Mar. 31, 2021) and United States v. Brunetti, No. 94-127-13, 2020 WL 4516541 (E.D. Pa. July 31, 2020).  (Doc. No. 977 at 4-5.)  However, Defendant's medical condition is not as serious as those of the defendants in either case.

In Swint, Judge Jan DuBois observed that a 70-year-old defendant was "experiencing a serious deterioration in physical or mental health because of the aging process . . . ."  Swint, 2021 WL 1210111, at *5.  In arriving at this conclusion, Judge DuBois noted that the defendant was suffering from "hypertension, hypertensive retinopathy, hyperlipidemia, prediabetes, lower back pain, an enlarged prostate, arthritis, a history of knee replacement surgery, . . . kyphosis[,] . . . anemia, dermatitis/eczema, edema, esophageal reflux, shoulder pain, spinal stenosis, vitamin D deficiency, and neuralgia/neuritis."  Id. at *2.  Additionally, the BOP (1) issued the defendant a

cane, walker, and shower chair, (2) designated him a "fall-risk," and (3) assigned him to a lower bunk. Id. at *2, *5.

Although there are some parallels between Defendant's case and Swint, they are not analogous. Here, Defendant suffers from some of the same medical conditions as the defendant in Swint. (See Doc. No. 972-3; Doc. No. 927-4; Doc. No. 974.) Further, since March 2022, Defendant has similarly been designated to a lower bunk and a cell on the first floor. (Doc. No. 972-4 at 37; Doc. No. 972-6 at 4.) Nevertheless, Defendant's prison record indicates that she remains on regular work duty without medical restrictions. (See Doc. No. 972-6 at 4.)[17] Further, her medical records do not indicate that FCI Tallahassee has issued her any ambulatory devices. (See Doc. No. 972-4 at 66.) They merely show she was issued knee braces, alternative institutional shoes, chest binders, a CPAP machine, glasses, and a pillow. (Doc. No. 972-4 at 66.) Considering these facts, Defendant's physical limitations are less serious than those of the defendant in Swint.

In Brunetti, Judge Mark Kearney determined that the medical conditions of a 73-year-old defendant "may" have constituted extraordinary and compelling circumstances under the Age of Defendant Note but did not rule on the matter conclusively because the § 3553(a) factors weighed against the defendant. Brunetti, 2020 WL 4516541, at *1, *8. Judge Kearney described the defendant's medical conditions as follows:

> Mr. Brunetti has a history of thymoma in his chest. He received a 2018 surgery to remove thymoma nodules in his chest but has experienced persistent pain on the incision site for the past eighteen months and still feels frequent shortness of breath. Mr. Brunetti also suffers from serious eye conditions, including hypertensive retinopathy, branch retinal vein occlusion, epiretinal membrane, and cataracts. To treat these conditions, Mr. Brunetti uses prescription eye drops and Avastin

---

[17] On March 30, 2023, Defendant told Dr. Du that she was experiencing shortness of breath while working and could only work for 30 minutes per day. (Doc. No. 972-4 at 28.) Nevertheless, Defendant told Dr. Du she wanted to keep her job. (Id.) Although Defendant should not be punished for her work ethic, (See Doc. No. 977 at 12), her non-restricted work status indicates that her physical limitations are not serious enough to render her daily work and life unbearable.

injections. Mr. Brunetti also has coronary artery disease and a heightened risk for cardiovascular accident or stroke.  These issues to his physical health can each fairly be said to be caused by the aging process.

Id. at *7 (footnotes omitted).  Additionally, Judge Kearney likened the defendant's condition to that of the defendant in United States v. Plunk, 453 F. Supp. 3d. 1308 (D. Alaska 2020).  Id. at 7. In Plunk, the court found "extraordinary and compelling reasons" under the Age of Defendant Note, observing that a 70-year-old defendant suffered from "worn-down cartilage around his joints, lower back pain due to moderate to severe deterioration of his lumbar spinal discs, arthritis in his wrists and hands, high blood pressure, a swollen prostate, age related eyesight and hearing loss, and post herpetic neuralgia."  Brunetti, 2020 WL 4516541, at *7 (citing Plunk, 453 F. Supp. 3d. 1308 at 1312-13).  However, here, Defendant's medical conditions do not rise to the level of seriousness as those described in Brunetti or Plunk.  Thus, given the above discussion, Defendant's medical condition is not sufficiently serious to warrant compassionate release under the Age of Defendant Provision.

### B.  Defendant Has Not Demonstrated that the Federal Correctional Institution Has Failed to Provide Her with Adequate Medical Care

In addition to the reasons set forth above, Defendant does not qualify for compassionate release under the Medical Condition Note because she has not demonstrated that FCI Tallahassee has failed to and cannot provide her with adequate medical care.

When evaluating whether a defendant's circumstances are extraordinary and compelling under the Medical Condition Provision, a court considers whether the defendant presents evidence that he or she would receive superior care outside of the BOP.  United States v. Daniels, No. 15-127, 2024 WL 3069814, at *5 (E.D. Pa. June 18, 2024).  In this case, Defendant has not done so for several reasons.

First, Defendant's medical record indicates that she has routinely received treatment for her shoulder pain, lumbago, and sciatica.  In this regard, Defendant's medical records show that she has attended orthopedic visits, received injections, and been prescribed medication to treat her chronic pain.  (See Doc. No. 972-3 at 128; Doc. No. 972-4 at 33; Doc. No. 974 at 1-2.)  For example, on March 19, 2024, Dr. Du observed that Defendant's chronic pain needed better control, prescribing her amitriptyline, meloxicam, and duloxetine for her shoulder pain, lumbago, and sciatica pain.  (Doc. No. 974 at 22-23.)  Each of these prescriptions was marked to expire on September 17, 2024.  (Doc. No. 972-4 at 79-80.)  Then on July 16, 2024, Dr. Du prescribed Defendant oxcarbazepine for her pain and recommended she see an orthopedist in October 2024.  (Doc. No. 974 at 2.)  In his recommendation, Dr. Du asked that the orthopedist offer Defendant an injection and discuss surgery at his or her discretion.  (Id. at 2-3.)  As discussed above, surgery has not yet been recommended and denied.  (See Doc. No. 973-3 at 128; Doc. No. 974 at 2-3.)  For these reasons, Defendant has not proven that the BOP has failed to provide her with adequate medical care for her left shoulder pain, lumbago, and sciatica.  Further, the Court is not convinced that Defendant would receive superior treatment for her chronic pain outside of custody.

Second, Defendant's medical records also show that she has routinely received treatment for her shortness of breath.  For instance, on March 20, 2023, Dr. Du assessed Defendant with shortness of breath.  (Doc. No. 972-4 at 28.)  He noted that although Defendant reported both shortness of breath while working and her inability to work for more than 30 minutes per day, she wished to continue working.  (Id.)  To treat Defendant's shortness of breath, Dr. Du prescribed her albuterol and recommended she undergo an echocardiogram.  (Id. at 28, 40.)  On May 9, 2023, Defendant underwent an echocardiogram for her shortness of breath at Sound Diagnostics of Northwest Florida.  (Id. at 11.)  The results of this test were normal.  (Id. at 11-12.)

On September 5, 2023, Defendant was assessed by Nurse Practitioner Marissa Nelson.  (Id. at 35.)  Nelson noted that Defendant was still experiencing shortness of breath.  (Id.)  During this encounter, Defendant reported that she was using her albuterol inhaler at least twice per day and getting "out of breath while doing tasks such as making her bed."  (Id.)  Accordingly, Nelson renewed Defendant's albuterol prescription, instructing her to use it four times per day as needed to relieve and prevent asthma attacks.  (Id. at 33.)  Two days later, Defendant underwent a chest X-ray, the results of which were normal, revealing that her lungs were clear and her heart size was normal.  (See Doc. No. 974 at 124.)

On March 19, 2024, Defendant was again evaluated by Dr. Du.  (Id. at 21.)  During this encounter, Defendant reported that she was using her albuterol inhaler five to six times per day.  (Id.)  Among other conditions, Dr. Du assessed Defendant with asthma.  (Id. at 22.)  Accordingly, he prescribed her (1) an increased dosage of albuterol to inhale every four hours and (2) fluticasone and salmeterol to inhale two times per day.  (Id. at 22-24.)  Afterward, Defendant underwent an electrocardiogram ("EKG") on April 5, 2024.  (Doc. No. 974 at 55.)

On May 15, 2024, Defendant saw a cardiologist at HCA Florida Capital Cardiology Specialists for her shortness of breath.  (Doc No. 972-4 at 90.)  During this encounter, Defendant reported that she had been experiencing progressive shortness of breath since contracting COVID-19 two years prior and experienced occasional chest pain on exertion, rating this pain 6 out of 10.  (Id.)  Additionally, Defendant reported that her inhaler relieved her symptoms.  (Id.)  By way of treatment, the cardiologist (1) recommended nuclear stress testing, (2) considered referring Defendant to a pulmonologist after stress testing, and (3) recommended a computed tomography scan ("CT") of Defendant's chest.  (Id. at 91.)

On May 17 and 31, 2024, Defendant underwent chest X-rays for her shortness of breath. (Id. at 88; Doc. No. 974 at 112.)  Both were unremarkable.  (See id.)  Also on May 31, 2024, Dr. Du requested that Defendant undergo a nuclear stress test per the cardiologist's recommendation. (Doc. No. 974 at 12.)  Then, on June 1, 2024, Dr. Du requested a CT scan of Defendant's chest, also in accordance with the cardiologist's recommendation.  (Doc. No. 972-4 at 59).[18]

On July 16, 2024, Dr. Du evaluated Defendant at the Government's request.  (Doc. No. 973 at 13; see Doc. No. 974.)  Defendant reported that she had been experiencing "more short[ness] of breath when . . . walk[ing] long distances like to the laundry[,]" and asked Dr. Du to check her lungs because both of her parents died of lung cancer.  (Doc. No. 974 at 6.)  Dr. Du noted that Defendant's echocardiogram and EKG were normal, and that her X-ray was clear.  (Id. at 1.)  After this encounter, he increased Defendant's Advair prescription and continued her albuterol prescription.[19]  (Id. at 5.)

Considering this timeline of treatment, Defendant has not proven that the BOP has failed to adequately treat her shortness of breath.  Further, the Court is not convinced that Defendant would receive superior treatment for her shortness of breath outside of prison.

---

[18]  The medical records provided do not yet indicate that the nuclear stress test or a CT scan have been conducted.  The last date in the record showing a review of Defendant's conditions is July 16, 2024.  (See Doc No. 972-3; Doc. No. 972-4; Doc. No. 972-4; Doc. No. 974.) Presumably, the doctor's request will be followed.

[19]  The Court need not address the credibility of (1) Dr. Du's observations that he saw Defendant running and (2) Dr. Du's suspicion that she feigned wheezing and exaggerated her symptoms due to her compassionate release motion.  (See Doc. No. 974 at 1-3.)  These observations have not influenced the Court's decisions here because Defendant has not otherwise presented sufficient evidence to indicate that she is experiencing a "serious deterioration in physical or mental health because of the aging process[.]"  See U.S.S.G. § 1B1.13(b)(2).  Therefore, Defendant's contention that Dr. Du is not credible is moot.  (See Doc. No. 977 at 6-11.)

Third, Defendant's medical records do not indicate that she has received inadequate treatment for her cataracts. As discussed above, her medical records do not indicate that she requires cataract surgery. (See Doc. No. 972-4; Doc. No. 974.) Further, the record shows that she is under the regular care of an optometrist. (See id.)

Therefore, Defendant has not proven that the BOP has failed to provide her with adequate ophthalmological care. Additionally, the Court is not convinced that Defendant would receive superior care for her cataracts outside of custody.

Finally, the medical records show that over time, Defendant has received a medical evaluation for any other conditions she complains about and, at times, treatment is provided. Further, the Court has no reason to conclude that Defendant's lack of gender dysphoria treatment warrants her release. Because gender dysphoria could occur at any age, does not constitute "deteriorating physical or mental health because of the aging process[.]" See U.S.S.G. § 1B1.13(b)(1)(B)(iii). Therefore, although the Court is sympathetic to Defendant's situation, her gender dysphoria does not constitute an "extraordinary and compelling" circumstance under § 1B1.13(b)(1)(B)(iii).

Because Defendant has not proven that the BOP (1) has provided her with insufficient care in the past and (2) is unable to adequately care for her in the future, Defendant's circumstances are not "extraordinary and compelling" under Section 1B1.13(b)(1)(B)(iii).

### C. The § 3553(a) Sentencing Factors Do Not Weigh in Favor of Defendant's Release

The relevant § 3553(a) factors do not support Defendant's compassionate release. First, in Defendant's first Motion for Compassionate Release, the Court examined the nature and circumstances of the offense and Defendant's history and characteristics. See 18 U.S.C. § 3553(a)(1). In doing so, the Court observed:

From her arrival in Florida in 1988 until her arrest in 1998, Defendant committed a series of crimes growing in severity. Defendant's convictions include conspiracy to distribute more than 150 kilograms of a cocaine, using communications facilities or telephones to facilitate drug felonies, and possession of a firearm despite being a convicted felon, which resulted in an imposition of a 35-year sentence. (See Doc. No. 10.) As the head of the OCO, she employed enforcers, lookouts, street sellers, mid-level managers, and upper-level managers to help her distribute over 150 kilograms of cocaine worth over $3,000,000. (See id.) The enforcers were tasked with using violence to protect their illicit product. (Id.)

In 1996, Defendant was involved in a shootout that injured two innocent bystanders. While imprisoned and on parole for the related firearms offense, she continued to lead the OCO. As such, she has shown a tendency to continue criminal activity.

(Doc. No. 963 at 16-17.) These same observations apply to the present motion before the Court.

Additionally, the Court has considered the character letters submitted on Defendant's behalf by her fellow inmates, family, and friends, attached to Defendant's present Motion for Compassionate Release as Exhibits B (Doc. No. 972-2) and F (Doc. No. 972-7). The Court also acknowledges the support of BOP staff members in favor of Defendant's release. While her apparent rehabilitation is commendable, rehabilitation alone does not warrant compassionate release. See 28 U.S.C. § 944(t) ("Rehabilitation of the defendant alone shall not be considered an extraordinary and compelling reason."). Therefore, while Defendant's present characteristics are relevant, they are not determinative. Rather, they must be considered collectively with the nature and circumstances of the offense and the other relevant § 3553(a) factors. See 18 U.S.C. § 3553(a)(1). Therefore, given the gravity of Defendant's prior offenses and her past failure to be deterred from committing other offenses, these factors weigh against her release for compassionate reasons.

Second, the Court has also considered whether Defendant's release would reflect the seriousness of the offense, promote respect for the law, afford adequate deterrence, and protect the public from other crimes by her. See 18 U.S.C. § 3553(a)(2)(a)-(c). When the Court last considered these factors, Defendant had served less than two-thirds of her 35-year sentence. (See

Doc. No. 963 at 17.)  This is no longer the case, as Defendant has now served over 25 years of her sentence, which is more than two-thirds of her total sentence.  (See Doc. No. 972-6 at 9.)  Further, Defendant is eligible for home detention in February 2028.  (Doc. No. 972-6 at 7.)  Nevertheless, as the Court previously observed, "[t]he magnitude of her crimes warrants the sentence she received."  (Doc. No. 963 at 17.)  Therefore, releasing her from prison over three years prior to an apparent release date would be inappropriate, as it would not reflect the seriousness of her offenses, promote respect for the law, or assure adequate deterrence.

To the extent that Defendant's sentence must provide her with necessary "educational or vocational training, medical care, or other correctional treatment[,]" she has not been deprived of these opportunities.  See 18 U.S.C. § 3553(a)(2)(d).  Her prison record shows that she has taken over 80 educational courses while incarcerated.  (See Doc. No. 972-9 at 1-2).  Defendant asserts that this courseload has prepared her for employment outside of prison.  (Doc. No. 972 at 18.)

Lastly, the Court has considered the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct.  See 18 U.S.C. § 3553(a)(6).  In doing so, the Court adopts its prior observations:

> Defendant's co-conspirators received significantly lesser sentences because they were less culpable than her.  Defendant pled guilty to being the leader of the entire Ordaz Cocaine Organization.  She received a sentence within the range set by the Sentencing Guidelines, which Congress created to specifically address sentencing disparities.  To reduce Defendant's sentence would not reflect the Guideline's goal of avoiding unwarranted sentence disparities among similarly situated defendants and ensuring consistent punishment for similar offenses.

(Doc. No. 963 at 18.) Therefore, none of the applicable § 3553(a) factors favor Defendants release.

## V.   CONCLUSION

For the foregoing reasons, Defendants Motion for Compassionate Release will be denied.  An appropriate Order follows.